UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

CHRISTINE J. CASIANO, as Administrator of the Estate of RAYMOND
CASIANO, Deceased, and CHRISTINE J. CASIANO, Individually,

Plaintiff,

-*against*-

COUNTY OF NASSAU, NASSAU COUNTY CORRECTIONAL CENTER, MICHAEL
J. SPOSATO, Individually and as Sheriff of Nassau County, ARMOR
CORRECTIONAL HEALTH SERVICES, INC., ARMOR CORRECTIONAL HEALTH
SERVICES OF NEW YORK, INC., JOHN P. MAY, MARYLYN MARTIN-NAAR,
CARL-HENRI SANCHEZ, MICHAEL PARRINELLO, BIJU JOSE, LAURA HUNT,
AHSAN HABIB, "JOHN" FRANCIS (whose first name is fictitious but intended
to designate the Armor Correctional Physician's Assistant that examined
Decedent on multiple occasions in 2012 and 2013), DOROTHY MAZYCK,
ANDREA JANUSZ, "JANE" MUNOZ (whose first name is fictitious but
intended to designate the Armor Correctional LPN that treated Decedent
on multiple occasions throughout 2013), JOSEPHINE "DOE" (whose last
name is fictitious but intended to designate the Armor Correctional LPN
that treated Decedent through November, 2013), JELYN WILLIAMS, DENISE
BRADY, SUSAN JACOB, LISA FITZGERALD, SHAKIM RIVERA, "JANE DOES #1-
5" (whose names are fictitious but representing presently unidentified
NCCC and Armor Correctional employees processing Decedent's multiple
sick call requests and internal clinic referrals throughout 2013), NASSAU
UNIVERSITY MEDICAL CENTER, PRACHI ANAND, SABATINO IENOPOLI,
MICHAEL GRAZIANO, CHERIF MAKRAM, JORDAN LAGUIO, BRANDAN
SMITH, DOREEN MARY SMITH, and JON MILLER,

Defendants.

Docket No.: 16-cv-1194

**Complaint**
*and*
**Jury
Demand**

---

Plaintiff CHRISTINE J. CASIANO, as Administrator of the Estate of RAYMOND CASIANO,
Deceased, and CHRISTINE J. CASIANO, Individually, by and through her attorneys at
GIANFORTUNE & MIONIS, P.C., complaining of the Defendants respectfully alleges upon
information and belief, as follows:

PRELIMINARY STATEMENT

1.    This action seeks recovery for Defendants' violations of Decedent's
constitutionally protected rights including but not limited to his right to due process under law

1

while a pre-trial detainee and his right to be free from cruel and unusual punishment after his plea. While incarcerated at the NASSAU COUNTY CORRECTIONAL CENTER ("NCCC"), both prior and subsequent to his disposition, and subsequently "upstate" for the final four months of his life at the Ulster Correctional Facility and then the Greene Correctional Facility, Defendants unconstitutionally, recklessly, and with callous deliberate indifference, withheld and denied Decedent basic, necessary medical care and treatment for scleroderma, and then provided him with dangerous, contraindicated medications, all of which caused over one year of entirely preventable but perpetual pain, physical torture, extensive disability with an increasing loss of use of his arms and hands, constant and continual decline of his overall health with eventual yet preventable scleroderma renal crisis culminating in a lingering, painful, needless, and shameful death on April 23, 2014.

2.      This action further invokes this Court's supplemental jurisdiction and seeks recovery for the medical malpractice, carelessness, recklessness, and negligence, of the non-State Defendants which caused Decedent over one year of wholly preventable excruciating pain and suffering, extensive disability, constant and continual decline of his overall health with eventual yet preventable scleroderma renal crisis culminating in a lingering, painful, needless, wrongful and shameful death on April 23, 2014.

3.      At all relevant times herein, when Plaintiff's Decedent was detained at the NCCC it was the duty of Defendant ARMOR (as defined herein) to administer to the health needs of, medically tend to, and treat the inmates of the NCCC. Concomitantly, it was the duty and obligation of the Defendant COUNTY OF NASSAU to care for, protect, and ensure the welfare of said inmates.

4.      Defendant ARMOR had entered into a contract with the COUNTY OF NASSAU to provide health services and medical treatment for the inmates of the NCCC, and that contract was and remains in full force and effect.

5.      Following Decedent's transfer upstate on December 26, 2013, the employees of the State of New York, named and sued individually herein, assumed the duty to administer to the health needs of, medically tend to, and treat, Plaintiff's Decedent.

6.      Plaintiff's Decedent was denied competent, necessary, medically obvious, and timely care by all Defendants.  He was effectively ignored.  Decedent continuously documented multiple "sick-call requests" and made numerous complaints pertaining to his ever worsening scleroderma, a serious and ultimately fatal disease.  When left untreated or mistreated (both were the case here), it is incredibly painful, debilitating, results in scleroderma renal crisis, and death unnecessarily comes much sooner.

7.      The manifestations of scleroderma in Plaintiff's Decedent were patent and obvious; it started with painful hardening and discoloration of the skin on his hands and arms beginning in March of 2013, which slowly yet continuously progressed to the loss of use of his hands then his arms through his confinement.  Over time, the symptoms progressed to his legs and then his abdomen.

8.      Defendants failed to investigate enough to make an informed judgment; left the diagnosis and treatment to undertrained and unsupervised nurses and lower-level medical assistants who provided dangerous, contraindicated medications which resulted in an unnecessary progression of the disease and renal crisis; failed to provide a physician and/or a specialist despite requests by Decedent, the nursing staff, and even by supervisory personnel; delayed treatment; increased the dose of contraindicated medications making the condition more

3

dangerous; ignored the scleroderma diagnosis even after it was eventually made on November 27, 2013; ignored the recommendations of the specialist after the diagnosis was eventually made on November 27, 2013; and, interfered with access to treatment by failing to record, obtain, adequately maintain, and transfer Decedent's medical records.

9.      Plaintiff seeks redress against Defendants for their intentional, unconstitutional, reckless, and otherwise tortious conduct, and for the deliberate indifference exhibited by Defendants, including without limitation, with regard to policies, customs, practices, protocols, training of personnel, supervision of personnel, due process and the humane treatment of individuals that deprived Decedent of necessary medical attention, his constitutional entitlements, and of his life.

10.     The COUNTY Defendants had and have known about the deficient, incompetent, unprofessional, and negligent healthcare and medical treatment of inmates at the NCCC for years, and had and have failed to make reasonably effective efforts to remedy the situation.

11.     There is a long and pervasive history of deficient health and medical care at the NCCC, so as to establish a pattern of deficient health and medical care.

12.     That said pattern of deficient health and medical care demonstrates actual knowledge of the COUNTY and all COUNTY defendants.

13.     The said well-worn pattern of deficient health and medical care established, constituted and became policies, practices, and customs of the COUNTY defendants.

14.     Allowing such policies, practices, and customs to come into existence, to continue and to persevere constituted deliberate indifference on the part of the COUNTY Defendants.

15.     The significant patent of similar violations of health and medical care at the NCCC signified a need to train and to supervise.

4

16.     The Defendant COUNTY, NCCC, and Defendant SPOSATO failed to train and to supervise or to adequately train and to adequately supervise NCCC and ARMOR staff, amounting to deliberate indifference to the constitutional rights of NCCC inmates, including Plaintiff's Decedent.

17.     There was an obvious need for such training to avoid the violations of the constitutional rights of Decedent and other inmates, and that Defendants failed to correct the situation regarding this need for training.

18.     There was a pattern of similar constitutional violations by untrained or improperly trained employees and agents of the COUNTY Defendants.

19.     There was a direct causal link between that aforesaid inadequate training and the deprivation of Decedent's constitutional rights.

20.     That the COUNTY Defendants failed to establish a policy or practice that would protect Decedent and other NCCC inmates against deficient health and medical care.

21.     Defendant ARMOR failed to train and to supervise or to adequately train and to adequately supervise NCCC medical staff and correction officers, amounting to deliberate indifference to the constitutional rights of NCCC inmates, including Decedent.

22.     There was an obvious need for such training to avoid violation of the constitutional rights of Decedent and other inmates, and ARMOR failed to correct the situation regarding this need for training.

23.     There was a pattern of similar constitutional violations by untrained or improperly trained employees, agents, and subcontractors of Defendant ARMOR at the NCCC and at other correctional facilities for which Defendant ARMOR provided health and medical services, in New York State and elsewhere.

24.     Defendant ARMOR failed to establish a policy, custom, or practice that would protect Decedent and other NCCC inmates against deficient health and medical care.

25.     There was a direct causal link between the aforesaid inadequate training and the deprivation of Decedent's constitutional rights.

26.     There was an obvious need for supervision of NCCC staff, including corrections officers and medical staff, to avoid violation of Decedent's constitutional rights, and those of other inmates, and the COUNTY defendants and ARMOR failed to adequately supervise the aforesaid staff.

27.     Various supervisors employed by the Defendant COUNTY and the NCCC, including Defendant SPOSATO, directly participated in the constitutional violations alleged herein.

28.     Various supervisors employed by the Defendant COUNTY and the NCCC, including Defendant SPOSATO, promulgated, created, implemented and/or were responsible for or acquiesced in the continued operation of policies, practices, or customs that violated the Constitution of United States.

29.     Various supervisors of Defendant ARMOR directly participated in the constitutional violations alleged herein.

30.     Various supervisors of Defendant ARMOR promulgated, created, implemented, and/or were responsible for or acquiesced in the continued operation of policies, practices, or customs that violated the Constitution of United States.

31.     Municipal policies, customs, and/or practices were the moving force behind and/or the cause of the constitutional violations of Decedent's rights.

32.     Defendant ARMOR'S policies, customs, and/or practices were the moving force behind and/or cause of the constitutional violation of Decedent's rights.

33.     In contravention of their duty and obligation to provide proper health and medical care for inmates at the NCCC, and in violation of the constitutional rights of those inmates, the COUNTY Defendants ignored specific findings and recommendations relating to specific deficiencies and failures at the NCCC, at various points in time, of the New York State Commission of Corrections, a lawful and duly constituted agency of the State of New York tasked with the duty to investigate and oversee the care provided for and by correctional and holding facilities within the State.

34.     That the contraindicated, deficient, incompetent care of Decedent continued following his transfer upstate on December 26, 2013, as the individually named New York State employees denied care as a result of their individual deliberate indifference towards Decedent's constitutional rights by failing to investigate the cause of his ever worsening complaints, ignored even more obvious manifestations of the scleroderma, failed to obtain all records of the diagnosis, ignored the diagnosis of scleroderma, continued contraindicated medications, ignored Decedent's complaints of and unambiguous statement that he had scleroderma, and further interfered with, denied, and delayed any and all effective treatment.

35.     Defendants' deficiencies, deliberate indifference to Decedent's constitutional rights, incompetence, medical negligence, and actions and failures to act caused the wrongful, lingering death of Decedent on April 23, 2014.

36.     This action is brought seeking monetary relief, including compensatory, punitive, and pecuniary damages, costs, and legal fees.

<u>JURISDICTION AND VENUE</u>

37.    These causes of action arise under the Eighth and Fourteenth Amendments to the Constitution of the United States, Title II of the Americans with Disabilities Act (42 USC § 12132), and 29 USCS § 794, as made actionable by Chapter 42 U.S.C. §§ 1983, 1988, 1981, with subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3), and supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

38.    This Court has jurisdiction to issue declaratory relief pursuant to 28 USC §§ 2201 and 2202.  This Court may grant injunctive relief as authorized by 28 USC §§ 2283 and 2284 and Rule 65 of the Federal Rules of Civil Procedure.

39.    These causes of action further arise under violations of the Constitution of the State of New York.

40.    This is an action for damages in excess of Ten Million ($10,000,000.00) Dollars.

41.    Venue is proper in the Eastern District of New York under 28 USC § 1391(b)(2) because the majority of the events giving rise to this action occurred within Nassau County, State of New York.

<u>NOTICE OF CLAIM</u>

42.    That prior to the commencement of the instant action, Plaintiff, in accordance with the laws of the State of New York, served a duly verified Notice of Claim in writing upon Defendants COUNTY OF NASSAU, NASSAU COUNTY CORRECTIONAL CENTER, ARMOR CORRECTIONAL HEALTH SERVICES, INC., ARMOR CORRECTIONAL HEALTH SERVICES OF NEW YORK, INC., (named therein jointly as "Armor Correctional Health Services"), SHERIFF NASSAU COUNTY and NASSAU UNIVERSITY MEDICAL CENTER on or about the 12th day of March, 2015,

and that said Notice was served within ninety days of the Plaintiff's appointment as Administrator herein.

43.    That upon information and belief, prior to the commencement of the instant action, Plaintiff's Decedent, in accordance with the laws of the State of New York, served a duly verified Notice of Claim in writing upon Defendant COUNTY OF NASSAU, NASSAU COUNTY CORRECTIONAL CENTER, ARMOR CORRECTIONAL HEALTH SERVICES, INC., ARMOR CORRECTIONAL HEALTH SERVICES OF NEW YORK, INC., (named jointly therein as "Armor Correctional Health Services"), various un-named physicians and THE SHERIFF OF NASSAU COUNTY on or about the 20th day of November, 2013, and that said Notice was served during Decedent's incarceration within the NASSAU COUNTY CORRECTIONAL CENTER.  However, as a result of Defendants' acts and omissions, Decedent perished before he was able to prosecute his claims.

44.    That more than thirty days have elapsed since the presentation of said Notices of Claim and that said Claim remains unadjusted and Defendants have fully refused, failed and neglected to make any adjustments of same.

45.    That the Statutory Hearing required under New York State Municipal Law prior to the commencement of suit was completed on the 5th day of June, 2015.

46.    That this action is being commenced within one year and ninety days of the date of Plaintiff's appointment as Administrator of the Estate of RAYMOND CASIANO, Deceased, and within two years of Decedent's death on April 23, 2014.

<u>THE PLAINTIFF</u>

47.    That Plaintiff CHRISTINE J. CASIANO is an adult individual who resides at 362 Locust Avenue, Uniondale, County of Nassau, and State of New York.

9

48.     That Plaintiff CHRISTINE J. CASIANO is the natural daughter of RAYMOND CASIANO, the Decedent herein.

49.     That on or about the 15th day of December, 2014, Plaintiff CHRISTINE J. CASIANO was granted Letters of Limited Administration by the Surrogate's Court of Nassau County for the Estate of her father, RAYMOND CASIANO.  A copy of the Limited Letters is annexed hereto and made a part hereof as Exhibit "1."

<u>THE DEFENDANTS</u>

<u>A. NASSAU COUNTY DEFENDANTS</u>

50.     That Defendant COUNTY OF NASSAU ("COUNTY") was and still is a municipal corporation duly organized and existing by virtue of the laws of the State of New York.

51.     That Defendant NASSAU COUNTY CORRECTIONS CENTER ("NCCC") is the COUNTY'S primary correctional facility, located at 100 Carman Avenue, East Meadow, County of Nassau, and State of New York, in the Eastern District of New York.

52.     That at all times relevant hereto, Defendant MICHAEL J. SPOSATO was and still is the Sheriff of the Nassau County Sheriff's Department ("NCSD").

53.     That Defendant MICHAEL J. SPOSATO maintains an office located at the NCSD, 100 Carman Avenue, East Meadow, County of Nassau, and State of New York.

54.     That the NCSD is a department of the Defendant COUNTY.

55.     That the Defendant COUNTY owns the facility known as the NCCC.

56.     That the NCSD operates Defendant NCCC as a correctional facility pursuant to Article XX of the Nassau County Charter.

57.     That at all times pertinent hereto, the NCSD is headed by Defendant MICHAEL J. SPOSATO who is its chief supervisor and administrator.

58.     That at all times pertinent hereto, said Defendant MICHAEL J. SPOSATO, among other duties, oversees the operations of the NCSD, which includes the daily operation of the NCCC.

59.     That Defendant MICHAEL J. SPOSATO, as Sheriff, is responsible for supervising the deputy sheriffs, corrections officers, medical offices, and other staff, as he participates in formulating and establishing the practices, customs, and policies, of his department and the NCCC, as well as overseeing those practices, customs, and policies.

60.     That Defendant COUNTY is vicariously liable for and has ultimate responsibility for the acts and omissions of Defendants MICHAEL J. SPOSATO, and the NCCC which is operated by the NCSD.

61.     That Defendant COUNTY is vicariously liable for and has ultimate responsibility for the acts and omissions of Defendants ARMOR CORRECTIONAL HEALTH SERVICES, INC., ARMOR CORRECTIONAL HEALTH SERVICES OF NEW YORK, INC., and all employees of these entities working at or in connection with the NCCC, both named herein and those unnamed because said Defendant COUNTY contracted with and/or hired Defendants ARMOR CORRECTIONAL HEALTH SERVICES, INC., and/or ARMOR CORRECTIONAL HEALTH SERVICES OF NEW YORK, INC., to provide medical care and services to pre-trial detainees and inmates at the NCCC.

62.     That Defendant COUNTY had a nondelegable duty to Decedent to ensure that each and every one of his constitutionally guaranteed rights, including but not limited to his rights to due process under the law and to be free from cruel and unusual punishment were protected and enforced while said Decedent was both a pre-trial detainee and subsequently, when he was a prisoner at the NCCC, respectively.

63.     That Defendant COUNTY had a nondelegable duty to Decedent to ensure that he received all reasonable and necessary basic human needs inclusive of medical treatment and care while said Decedent was both a pre-trial detainee and prisoner at the NCCC under the Constitution of the United States of America, the Constitution of the State of New York, the statutes and laws of the State of New York, and under those cases made and provided.

64.     That at no time prior to Decedent's conviction was Defendant COUNTY empowered or authorized to punish him as the sole purpose of his detention was to ensure his presence at trial.

B. ARMOR CORRECTIONAL DEFENDANTS

65.     That Defendant ARMOR CORRECTIONAL HEALTH SERVICES, INC. is a Florida Corporation, duly existing and organized pursuant to the laws of the State of Florida, and registered with the Florida Department of State Division of Corporations since on or about July 19, 2004.

66.     That Defendant ARMOR CORRECTIONAL HEALTH SERVICES, INC. lists and maintains its registered agent's name and address for the service of process as Kenneth Palombo, 4960 SW 72nd Avenue, Suite 400, Miami, Florida 33155, with said Florida Department of State Division of Corporations.

67.     That Defendant ARMOR CORRECTIONAL HEALTH SERVICES OF NEW YORK, INC. is a Florida Corporation, duly existing and organized pursuant to the laws of the State of Florida, and registered with the Florida Department of State Division of Corporations since on or about March 3, 2011.

68.     That Defendant ARMOR CORRECTIONAL HEALTH SERVICES OF NEW YORK, INC. is a Florida corporation duly registered and authorized to conduct business within the State of New

12

York since May 5, 2011, under New York State Department of State identification number 4090357, with its principle county within the State of New York identified as the County of Nassau.

69.     That Defendant ARMOR CORRECTIONAL HEALTH SERVICES OF NEW YORK, INC. lists and maintains its registered agent's name and address for the service of process as Kenneth Palombo, 4960 SW 72nd Avenue, Suite 400, Miami, Florida 33155, with said Florida Department of State Division of Corporations.

70.     That Defendant ARMOR CORRECTIONAL HEALTH SERVICES, INC. and Defendant ARMOR CORRECTIONAL HEALTH SERVICES OF NEW YORK, INC. share the same officers and directors, and maintain and list the same address as their primary business location with the Florida Department of State Division of Corporations.

71.     That Defendant ARMOR CORRECTIONAL HEALTH SERVICES, INC. and Defendant ARMOR CORRECTIONAL HEALTH SERVICES OF NEW YORK, INC. both have, maintain, publish, represent, and list one José Armas as president.

72.     That Defendant ARMOR CORRECTIONAL HEALTH SERVICES, INC. and Defendant ARMOR CORRECTIONAL HEALTH SERVICES OF NEW YORK, INC. both have, maintain, publish, represent, and list one Kenneth Palombo as agent for service of process and both maintain Kenneth Palombo as Chief Operating Officer (COO).

73.     That Defendant ARMOR CORRECTIONAL HEALTH SERVICES, INC. and Defendant ARMOR CORRECTIONAL HEALTH SERVICES OF NEW YORK, INC. both have, maintain, publish, represent, and list one Marta Solodko as assistant corporate secretary.

74.    That Defendant ARMOR CORRECTIONAL HEALTH SERVICES, INC. and Defendant ARMOR CORRECTIONAL HEALTH SERVICES OF NEW YORK, INC. both have, maintain, publish, represent, and list one Eduardo Bertran as corporate secretary.

75.    That upon information and belief, Defendant ARMOR CORRECTIONAL HEALTH SERVICES, INC. and Defendant ARMOR CORRECTIONAL HEALTH SERVICES OF NEW YORK, INC. both have and maintain one Bruce Teal as Chief Executive Officer (CEO).

76.    That upon information and belief, at all times pertinent hereto Defendant ARMOR CORRECTIONAL HEALTH SERVICES OF NEW YORK, INC. was and remains a subsidiary, affiliate, alter-ego, and/or spin-off of Defendant ARMOR CORRECTIONAL HEALTH SERVICES, INC. and was formed specifically as a result of or in relation to these Defendants' contract with Defendant COUNTY to provide medical services to inmates at the Defendant NCCC.

77.    That Defendant Armor Correctional Health Services, Inc. and Defendant Armor Correctional Health Services of New York, Inc. are collectively referred to herein as "Defendant Armor."

78.    That Defendant ARMOR (as defined herein) contracted with Defendant COUNTY, Defendant NCCC, and/or the NCSD to provide health and medical services to the inmates of NCCC, assuming this function in place of Defendant NASSAU UNIVERSITY MEDICAL CENTER ("NUMC"), although Defendant ARMOR is to utilize Defendant NUMC's facilities and staff as needed.

79.    That Defendant ARMOR is responsible for creating, implementing, and enforcing policies, practices, customs, guidelines, and protocols applicable to its duty and obligation to provide health and medical services to inmates at NCCC.

14

80.     That Defendant ARMOR was, at all times relevant hereto, endowed by Defendant COUNTY, Defendant NCCC, and/or NCSD with powers and functions that are governmental in nature so that Defendant ARMOR became an agency or instrumentality of Defendant COUNTY, NCCC, and/or the NCSD, and, therefore operated under color of state law, and was subject to all obligations, constraints, and/or limitations, of the United States Constitution, New York State Constitution, and laws of the United States and State of New York.

81.     That Defendant COUNTY is vicariously liable for and has ultimate responsibility for Defendant ARMOR and ARMOR's employees as Defendant COUNTY employed and endowed Defendant ARMOR, and inherently ARMOR's employees, with the duty and obligation to provide health and medical services to the inmates at Defendant NCCC.

82.     That at all times hereinafter mentioned Defendant JOHN P. MAY was and remains a physician duly licensed to practice medicine in a jurisdiction other than the State of New York.

83.     That at all times hereinafter mentioned Defendant JOHN P. MAY was and remains employed as the Chief Medical Officer of Defendant ARMOR.

84.     That at all time hereinafter mentioned Defendant JOHN P. MAY was and remains employed by Defendant ARMOR.

85.     That Defendant JOHN P. MAY maintains a professional office located at Defendant ARMOR CORRECTIONAL HEALTH SERVICES, INC., 4960 S.W. 72nd Avenue, Suite 400, Miami, Florida 33155.

86.     That at all times pertinent hereto, Defendant JOHN P. MAY was charged with the responsibility to create, approve, implement, supervise, and effectuate all manners in which health care was provided to, or withheld from the inmates at Defendant NCCC, including but not limited to Plaintiff's Decedent.

15

87.    That on or about August 21, 2013, and other pertinent times, Defendant JOHN P. MAY personally became involved with the medical care of Decedent, reviewed medical records and charts of Decedent, and authorized certain medical care, including but not limited to a rheumatology consult.

88.    That at all time hereinafter mentioned Defendant MARYLYN MARTIN-NAAR was a physician duly licensed to practice medicine in New York but whose status is currently listed as "Not Registered," meaning her registration within this State lapsed without explanation.

89.    That at all time pertinent hereto Defendant MARYLYN MARTIN-NAAR was employed as the Medical Director of Defendant ARMOR.

90.    That at all time pertinent hereto Defendant MARYLYN MARTIN-NAAR was employed by Defendant ARMOR.

91.    That at all time pertinent hereto Defendant MARYLYN MARTIN-NAAR maintained a professional office located at Defendant NCCC, 100 Carman Avenue, East Meadow, County of Nassau, and State of New York.

92.    That Defendant MARYLYN MARTIN-NAAR currently maintains a professional office located at the Arizona State Prison Complex Central, 1305 E. Butte Avenue, Florence, State of Arizona, 85132.

93.    That at all times pertinent hereto, Defendant MARYLYN MARTIN-NAAR was charged with the responsibility to create, direct, approve, implement, supervise, effectuate, deliver and provide all manners in which health care was provided to, or withheld from the inmates at Defendant NCCC, including but not limited to Plaintiff's Decedent.

94.    That on or about September 24, 2013, and at other pertinent times, Defendant MARYLYN MARTIN-NAAR personally became involved with the medical care of Decedent,

reviewed medical records and charts of Decedent, increased a contraindicated medication without examining Decedent, and authorized certain medical care, including but not limited to consults with specialists.

95.    That at all time hereinafter mentioned Defendant CARL-HENRI SANCHEZ was a physician duly licensed to practice medicine in New York under license number 200355.

96.    That at all time pertinent hereto Defendant CARL-HENRI SANCHEZ was employed as a physician by Defendant ARMOR.

97.    That at all time pertinent hereto Defendant CARL-HENRI SANCHEZ was employed as a physician by Defendant COUNTY.

98.    That at all time pertinent hereto, Defendant CARL-HENRI SANCHEZ maintained a professional office located at Defendant NCCC.

99.    That Defendant CARL-HENRI SANCHEZ currently maintains a professional office for the practice of medicine located at 108 W. Suffolk Avenue, Suite B, Central Islip, County of Suffolk and State of New York.

100.    That at all times pertinent hereto, Defendant CARL-HENRI SANCHEZ was charged with the responsibility to create, direct, approve, implement, supervise, effectuate, deliver and provide all manners in which health care was provided to, or withheld from the inmates at Defendant NCCC, including but not limited to Plaintiff's Decedent.

101.    That on August 21, 2013, and other occasions during Decedent's incarceration, Defendant CARL-HENRI SANCHEZ personally provided and supervised medical care to Plaintiff's Decedent, including but not limited to prescribing a contraindicated steroid medication.

102.    That Defendant MICHAEL PARRINELLO is an adult individual who resides at 17 Timber Point Road, East Islip, County of Suffolk and State of New York.

103.    That at all times pertinent hereto, Defendant MICHAEL PARRINELLO was and remains a Registered Professional Nurse holding New York State license number 480359.

104.    That at all times pertinent hereto Defendant MICHAEL PARRINELLO was employed by Defendant ARMOR.

105.    That at all times pertinent hereto Defendant MICHAEL PARRINELLO was employed by Defendant COUNTY.

106.    That at all times pertinent hereto Defendant MICHAEL PARRINELLO was employed as a Registered Professional Nurse with the responsibility to supervise, implement, deliver, effectuate, and provide all matters in which health care was provided to or withheld from the inmates at Defendant NCCC, including but not limited to Plaintiff's Decedent.

107.    That on multiple occasions from February through December 2013 as detailed herein, during Decedent's pre-trial detention and subsequent incarceration, Defendant MICHAEL PARRINELLO personally provided and/or supervised medical care to Plaintiff's Decedent, despite the limitations and restrictions of his license as a Registered Professional Nurse.

108.    That Defendant BIJU JOSE is an adult individual who resides at 571 Rockland Street, Westbury, County of Nassau and State of New York.

109.    That at all times pertinent hereto, Defendant BIJU JOSE was and remains a Physician Assistant holding New York State license number 006795.

110.    That at all times pertinent hereto Defendant BIJU JOSE was employed by Defendant ARMOR.

111.    That at all times pertinent hereto Defendant BIJU JOSE was employed by Defendant COUNTY.

112.    That at all times pertinent hereto Defendant BIJU JOSE was employed as a Physician Assistant with the responsibility to supervise, implement, deliver, effectuate, and provide all matters in which health care was provided to or withheld from the inmates at Defendant NCCC, including but not limited to Plaintiff's Decedent.

113.    That in March and April of 2013 during Decedent's pre-trial detention, Defendant BIJU JOSE personally provided and/or supervised medical care to Plaintiff's Decedent despite the limitations and restrictions of his license as a Physician Assistant.

114.    That Defendant LAURA HUNT is an adult individual who resides at 38 N. Moore Street, Apartment 3, City, County, and State of New York.

115.    That at all times pertinent hereto, Defendant LAURA HUNT was and remains a Physician Assistant holding New York State license number 006011.

116.    That at all times pertinent hereto Defendant LAURA HUNT was employed by Defendant ARMOR.

117.    That at all times pertinent hereto Defendant LAURA HUNT was employed by Defendant COUNTY.

118.    That at all times pertinent hereto Defendant LAURA HUNT was employed as a Physician Assistant with the responsibility to supervise, implement, deliver, effectuate, and provide all matters in which health care was provided to or withheld from the inmates at Defendant NCCC, including but not limited to Plaintiff's Decedent.

119.    That in September of 2013 during Decedent's post-disposition detention, Defendant LAURA HUNT personally provided and/or supervised medical care to Plaintiff's Decedent despite the limitations and restrictions of her license as a Physician Assistant.

120.    That Defendant AHSAN HABIB is an adult individual who resides at 148-20 86th Avenue, Jamaica, County of Queens, and State of New York.

121.    That at all times pertinent hereto, Defendant AHSAN HABIB was and remains a Physician Assistant holding New York State license number 016052.

122.    That at all times pertinent hereto Defendant AHSAN HABIB was employed by Defendant ARMOR.

123.    That at all times pertinent hereto Defendant AHSAN HABIB was employed by Defendant COUNTY.

124.    That at all times pertinent hereto Defendant AHSAN HABIB was employed as a Physician Assistant with the responsibility to supervise, implement, deliver, effectuate, and provide all matters in which health care was provided to or withheld from the inmates at Defendant NCCC, including but not limited to Plaintiff's Decedent.

125.    That in December of 2013 during Decedent's post-disposition detention, Defendant AHSAN HABIB personally provided and/or supervised medical care to Plaintiff's Decedent despite the limitations and restrictions of his license as a Physician Assistant.

126.    That Defendant "JOHN" FRANCIS is an adult individual whose first name herein is fictitious but intended to designate the Physician Assistant who treated Plaintiff's Decedent at NCCC, on or about October 26 and 28, 2012, July 3, 17, and 19, 2013, August 21, 2013, November 5, 8, and 9, 2013, and, other dates not presently known to Plaintiff.

127.    That at all times pertinent hereto, Defendant "JOHN" FRANCIS was and remains a Physician Assistant holding a New York State license.

128.    That upon information and belief, at all times pertinent hereto, Defendant "JOHN" FRANCIS did not hold a valid New York State Physician Assistant license.

129.    That at all times pertinent hereto Defendant "JOHN" FRANCIS was employed by Defendant ARMOR.

130.    That at all times pertinent hereto Defendant "JOHN" FRANCIS was employed by Defendant COUNTY.

131.    That at all times pertinent hereto Defendant "JOHN" FRANCIS was employed as a Physician Assistant with the responsibility to supervise, implement, deliver, effectuate, and provide all matters in which health care was provided to or withheld from the inmates at Defendant NCCC, including but not limited to Plaintiff's Decedent.

132.    That Defendant "JOHN" FRANCIS personally provided and/or supervised medical care to Plaintiff's Decedent on or about October 26 and 28, 2012, July 3, 17, and 19, 2013, August 21, 2013, November 5, 8, and 9, 2013, and other dates not presently known to Plaintiff despite the limitations and restrictions of his license as a Physician Assistant.

133.    That Defendant DOROTHY MAZYCK is an adult individual who resides at 110 Mason Street, Hempstead, County of Nassau, and State of New York.

134.    That at all times pertinent hereto, Defendant DOROTHY MAZYCK was and remains a Licensed Practical Nurse holding New York State license number 097391.

135.    That at all times pertinent hereto Defendant DOROTHY MAZYCK was employed by Defendant ARMOR.

136.    That at all times pertinent hereto Defendant DOROTHY MAZYCK was employed by Defendant COUNTY.

137.    That at all times pertinent hereto Defendant DOROTHY MAZYCK was employed as a Licensed Practical Nurse with the responsibility to supervise, implement, deliver, effectuate,

and provide all matters in which health care was provided to or withheld from the inmates at Defendant NCCC, including but not limited to Plaintiff's Decedent.

138.    That Defendant DOROTHY MAZYCK personally provided and/or supervised medical care to Plaintiff's Decedent on multiple occasions throughout 2013.

139.    That Defendant DOROTHY MAZYCK personally responded to multiple "Sick Call Requests" made by Plaintiff's Decedent throughout 2013.

140.    That Defendant ANDREA JANUSZ is an adult individual who resides at 44 Armour Street, City of Long Beach, County of Nassau and State of New York.

141.    That at all times pertinent hereto, Defendant ANDREA JANUSZ was and remains a Licensed Practical Nurse holding New York State license number 288867.

142.    That at all times pertinent hereto Defendant ANDREA JANUSZ was employed by Defendant ARMOR.

143.    That at all times pertinent hereto Defendant ANDREA JANUSZ was employed by Defendant COUNTY.

144.    That at all times pertinent hereto Defendant ANDREA JANUSZ was employed as a Licensed Practical Nurse with the responsibility to supervise, implement, deliver, effectuate, and provide all matters in which health care was provided to or withheld from the inmates at Defendant NCCC, including but not limited to Plaintiff's Decedent.

145.    That Defendant ANDREA JANUSZ personally provided and/or supervised medical care to Plaintiff's Decedent on multiple occasions throughout 2013.

146.    That Defendant ANDREA JANUSZ personally responded to multiple "Sick Call Requests" made by Plaintiff's Decedent throughout 2013.

147.    That Defendant "JANE" MUNOZ is an adult individual whose first name herein is fictitious but intending to designate the medical provider, likely a nurse, who personally responded to several "Sick Call Requests" made by Plaintiff's Decedent and provided care to Decedent throughout 2013.

148.    That at all times pertinent hereto Defendant "JANE" MUNOZ was employed by Defendant ARMOR.

149.    That at all times pertinent hereto Defendant "JANE" MUNOZ was employed by Defendant COUNTY.

150.    That at all times pertinent hereto Defendant "JANE" MUNOZ was employed as a nurse with the responsibility to supervise, implement, deliver, effectuate, and provide all matters in which health care was provided to or withheld from the inmates at Defendant NCCC, including but not limited to Plaintiff's Decedent.

151.    That Defendant "JANE" MUNOZ personally provided and/or supervised medical care to Plaintiff's Decedent on several occasions throughout 2013.

152.    That Defendant "JANE" MUNOZ personally responded to several "Sick Call Requests" made by Plaintiff's Decedent throughout 2013.

153.    That Defendant JOSEPHINE "DOE" is an adult individual whose last name herein is fictitious but intending to designate the medical provider, likely a nurse, who personally responded to a "sick call" request made by Plaintiff's Decedent and provided care to Decedent in December of 2013 and other dates not presently known to Plaintiff.

154.    That at all time pertinent hereto Defendant JOSEPHINE "DOE" was employed by Defendant ARMOR.

155.    That at all time pertinent hereto Defendant JOSEPHINE "DOE" was employed by Defendant COUNTY.

156.    That at all times pertinent hereto Defendant JOSEPHINE "DOE" was employed as a nurse with the responsibility to supervise, implement, deliver, effectuate, and provide all matters in which health care was provided to or withheld from the inmates at Defendant NCCC, including but not limited to Plaintiff's Decedent.

157.    That Defendant JOSEPHINE "DOE" personally provided and/or supervised medical care to Plaintiff's Decedent on multiple occasions in December of 2013, and other dates not presently known to Plaintiff.

158.    That Defendant JOSEPHINE "DOE" personally responded to several "Sick Call Requests" made by Plaintiff's Decedent in December of 2013, and other dates not presently known to Plaintiff.

159.    That Defendant JELYN WILLIAMS is an adult individual who resides at 230 E. Greenwich Avenue, Roosevelt, County of Nassau, and State of New York.

160.    That at all times pertinent hereto, Defendant JELYN WILLIAMS was and remains a Licensed Practical Nurse holding New York State license number 299097.

161.    That at all times pertinent hereto Defendant JELYN WILLIAMS was employed by Defendant ARMOR.

162.    That at all times pertinent hereto Defendant JELYN WILLIAMS was employed by Defendant COUNTY.

163.    That at all times pertinent hereto Defendant JELYN WILLIAMS was employed as a Licensed Practical Nurse with the responsibility to supervise, implement, deliver, effectuate, and

provide all matters in which health care was provided to or withheld from the inmates at Defendant NCCC, including but not limited to Plaintiff's Decedent.

164.    That Defendant JELYN WILLIAMS personally provided and/or supervised medical care to Plaintiff's Decedent on multiple occasions throughout 2013.

165.    That Defendant JELYN WILLIAMS personally responded to multiple "Sick Call Requests" made by Plaintiff's Decedent throughout 2013.

166.    That Defendant DENISE BRADY is an adult individual who upon information and belief resides in Westbury, within the County of Nassau, State of New York.

167.    That at all times pertinent hereto, Defendant DENISE BRADY was and remains a Licensed Practical Nurse within the State of New York.

168.    That at all time pertinent hereto Defendant DENISE BRADY was and remains employed by Defendant ARMOR.

169.    That at all time pertinent hereto Defendant DENISE BRADY was and remains employed by Defendant COUNTY.

170.    That at all times pertinent hereto Defendant DENISE BRADY was employed as a nurse with the responsibility to supervise, implement, deliver, effectuate, and provide all matters in which health care was provided to or withheld from the inmates at Defendant NCCC, including but not limited to Plaintiff's Decedent.

171.    That Defendant DENISE BRADY personally provided and/or supervised medical care to Plaintiff's Decedent on multiple occasions throughout 2013.

172.    That Defendant DENISE BRADY personally responded to multiple "Sick Call Requests" made by Plaintiff's Decedent throughout 2013.

173.    That Defendant SUSAN JACOB is an adult individual who upon information and belief resides within the State of New York.

174.    That at all times pertinent hereto, Defendant SUSAN JACOB was and remains a Licensed Practical Nurse within the State of New York.

175.    That at all time pertinent hereto Defendant SUSAN JACOB was and remains employed by Defendant ARMOR.

176.    That at all time pertinent hereto Defendant SUSAN JACOB was and remains employed by Defendant COUNTY.

177.    That at all times pertinent hereto Defendant SUSAN JACOB was employed as a nurse with the responsibility to supervise, implement, deliver, effectuate, and provide all matters in which health care was provided to or withheld from the inmates at Defendant NCCC, including but not limited to Plaintiff's Decedent.

178.    That Defendant SUSAN JACOB personally provided and/or supervised medical care to Plaintiff's Decedent on or about August 22 and 27, 2013.

179.    That Defendant SUSAN JACOB personally responded to a "Sick Call Requests" made by Plaintiff's Decedent on or about August 22 and 27, 2013.

180.    That Defendant LISA FITZGERALD is an adult individual who upon information and belief, resides within the County of Suffolk, State of New York.

181.    That at all time pertinent hereto, Defendant LISA FITZGERALD was and remains a Licensed Practical Nurse within the State of New York.

182.    That at all time pertinent hereto Defendant LISA FITZGERALD was and remains employed by Defendant ARMOR.

26

183.   That at all time pertinent hereto Defendant LISA FITZGERALD was and remains employed by Defendant COUNTY.

184.   That at all times pertinent hereto Defendant LISA FITZGERALD was employed as a Licensed Practical Nurse with the responsibility to supervise, implement, deliver, effectuate, and provide all matters in which health care was provided to or withheld from the inmates at Defendant NCCC, including but not limited to Plaintiff's Decedent.

185.   That Defendant LISA FITZGERALD personally provided and/or supervised medical care to Plaintiff's Decedent on multiple occasions throughout 2013.

186.   That Defendant LISA FITZGERALD personally responded to multiple "Sick Call Requests" made by Plaintiff's Decedent throughout 2013.

187.   That Defendant SHAKIM RIVERA is an adult individual who resides upon information and belief, within Holbrook, in the County of Suffolk, State of New York.

188.    That at all time pertinent hereto, Defendant SHAKIM RIVERA was and remains a Licensed Practical Nurse within the State of New York.

189.   That at all time pertinent hereto Defendant SHAKIM RIVERA was and remains employed by Defendant ARMOR.

190.   That at all time pertinent hereto Defendant SHAKIM RIVERA was and remains employed by Defendant COUNTY.

191.   That at all times pertinent hereto Defendant SHAKIM RIVERA was employed as a nurse with the responsibility to supervise, implement, deliver, effectuate, and provide all matters in which health care was provided to or withheld from the inmates at Defendant NCCC, including but not limited to Plaintiff's Decedent.

192.   That Defendant SHAKIM RIVERA personally provided and/or supervised medical care to Plaintiff's Decedent on multiple occasions throughout 2013.

193.   That Defendant SHAKIM RIVERA personally responded to multiple "Sick Call Requests" made by Plaintiff's Decedent throughout 2013.

194.   That "Jane Does" number 1 through 5 are presently unidentified but intended to represent health care and other employees at the NCCC that responded to or should have responded to Decedent's complaints of pain and stiffness in his hands and arms, and the hardening of his skin as the scleroderma presented and progressed, and his worsening complaints as the untreated disease progressed and he deteriorated.

## C. NASSAU UNIVERSITY MEDICAL CENTER DEFENDANTS

195.   That at all time pertinent hereto Defendant NASSAU UNIVERSITY MEDICAL CENTER was a public benefit corporation, duly organized and existing by and through the Laws of the State of New York, with its principle facility for providing medical care located at 2201 Hempstead Turnpike, East Meadow, State of New York.

196.   That at all time pertinent hereto Defendant NASSAU UNIVERSITY MEDICAL CENTER owned, operated, and maintained the hospital facility and all units and portions thereof where Decedent was treated on or about November 27, 2013, located at 2201 Hempstead Turnpike, East Meadow, State of New York.

197.   That Defendant PRACHI ANAND is an adult individual who resides at 288-B Half Hollow Road, Dix Hills, County of Suffolk, and State of New York.

198.   That at all time hereinafter mentioned Defendant PRACHI ANAND was and remains a physician duly licensed to practice medicine within the State of New York under New York State license number 203414.

199.    That at all time hereinafter mentioned Defendant PRACHI ANAND maintains a professional office for the practice of medicine located within the NASSAU UNIVERSITY MEDICAL CENTER, 2201 Hempstead Turnpike, Building D, East Meadow, County of Nassau, and State of New York.

200.    That at all time hereinafter mentioned Defendant PRACHI ANAND was an employee of Defendant NASSAU UNIVERSITY MEDICAL CENTER.

201.    That at all time hereinafter mentioned Defendant PRACHI ANAND was an attending physician specializing in rheumatology at Defendant NASSAU UNIVERSITY MEDICAL CENTER.

202.    That at all time hereinafter mentioned Defendant PRACHI ANAND was on the staff and/or on call at Defendant NASSAU UNIVERSITY MEDICAL CENTER.

203.    That at all time hereinafter mentioned Defendant PRACHI ANAND maintained admitting privileges at Defendant NASSAU UNIVERSITY MEDICAL CENTER.

204.    That on November 27, 2013, Defendant PRACHI ANAND examined and treated Decedent at Defendant NASSAU UNIVERSITY MEDICAL CENTER, and then referred him back to NCCC and the Armor Defendants.

205.    That Defendant SABATINO IENOPOLI is an adult individual who resides at 867 Maloon Avenue, Franklin Square, County of Nassau, and State of New York.

206.    That at all time hereinafter mentioned Defendant SABATINO IENOPOLI was and remains a physician duly licensed to practice medicine within the State of New York under New York State license number 273870.

207.    That at all time hereinafter mentioned Defendant SABATINO IENOPOLI was an employee of Defendant NASSAU UNIVERSITY MEDICAL CENTER.

29

208.    That at all time hereinafter mentioned Defendant SABATINO IENOPOLI was a resident in rheumatology completing his training at Defendant NASSAU UNIVERSITY MEDICAL CENTER.

209.    That at all time hereinafter mentioned Defendant SABATINO IENOPOLI was on the staff and/or on call at Defendant NASSAU UNIVERSITY MEDICAL CENTER.

210.    That at all time hereinafter mentioned Defendant SABATINO IENOPOLI maintained admitting privileges at Defendant NASSAU UNIVERSITY MEDICAL CENTER.

211.    That on November 27, 2013, Defendant SABATINO IENOPOLI examined and treated Decedent at Defendant NASSAU UNIVERSITY MEDICAL CENTER, and then referred him back to NCCC and the Armor Defendants.

### D. ULSTER CORRECTIONAL FACILITY DEFENDANTS

212.    That each of the defendants named in this section are natural persons, sued only in their individual capacities for violations of Decedent's constitutionally protected rights and statutorily protected rights, including the right to be free from cruel and unusual punishment.

213.    That the Ulster Correctional Facility is located at 750 Berme Road, Napanoch, within the State of New York.  It is owned and operated by the State of New York Department of Corrections.

214.    Defendant MICHAEL GRAZIANO is the Superintendent or Warden of the Ulster Correctional Facility.

215.    That at all times pertinent hereto, said Defendant MICHAEL GRAZIANO, among other duties, develops, implements, and executes the policies of the Ulster Correctional Facility, and manages and overseas all its operations which includes the daily operation of all medical units thereat.

216. That Defendant MICHAEL GRAZIANO is responsible for supervising all corrections officers, medical officers, and other staff, as he participates in formulating and establishes the practice, customs, and policies, at said facility, as well as overseeing those practices, customs, and policies.

217. That at all time hereinafter mentioned Defendant JORDAN LAGUIO was a physician duly licensed to practice medicine in New York under license number 236332.

218. That Defendant JORDAN LAGUIO resides at 15 Kile Farm Road, Hurleyville, New York 12747.

219. That at all time pertinent hereto Defendant JORDAN LAGUIO was employed by the State of New York as a physician.

220. That at all time pertinent hereto defendant JORDAN LAGUIO maintains a professional office for the practice of medicine located at the Ulster Correctional Facility.

221. That at all time pertinent hereto Defendant JORDAN LAGUIO was charged with the responsibility to create, direct, approve, implement, supervise, effectuate and provide all manners in which health care was provided to, or withheld from the inmates at the Ulster Correctional Facility, including but not limited to Decedent.

222. That on or about December 27, 2013, and other occasions during Decedent's incarceration, Defendant JORDAN LAGUIO personally provided and supervised medical care to Decedent.

223. That at all time hereinafter mentioned Defendant CHEREF MAKRAM was a physician duly licensed to practice medicine in New York under license number 159208.

224. That Defendant CHEREF MAKRAM maintains his mailing address as PO Box 757, Rock Hill, New York 12775.

225.    That at all time pertinent hereto Defendant CHEREF MAKRAM was employed by the State of New York as a physician.

226.    That at all time pertinent hereto defendant CHEREF MAKRAM maintains a professional office for the practice of medicine located at the Ulster Correctional Facility.

227.    That at all time pertinent hereto Defendant CHEREF MAKRAM was charged with the responsibility to create, direct, approve, implement, supervise, effectuate, deliver, and provide all manners in which health care was provided to, or withheld from the inmates at the Ulster Correctional Facility, including but not limited to Decedent.

228.    That on or about December 27, 2013, and other occasions during Decedent's incarceration, Defendant CHEREF MAKRAM personally provided and supervised medical care to Decedent.

E. GREENE CORRECTIONAL FACILITY DEFENDANTS

229.    That each of the defendants named in this section are natural persons, sued only in their individual capacities for violations of Decedent's constitutionally protected rights and statutorily protected rights, including the right to be free from cruel and unusual punishment.

230.    That the Greene Correctional Facility is located at 165 Plank Road, Coxsackie, within the State of New York.  It is owned and operated by the State of New York Department of Corrections.

231.    Defendant BRANDON SMITH is the Superintendent or Warden of the Greene Correctional Facility.

232.    That at all times pertinent hereto, said Defendant BRANDON SMITH, among other duties, develops, implements, and executes the policies of the Greene Correctional Facility, and

manages and overseas all its operations which includes the daily operation of all medical units threat.

233.    That Defendant BRANDON SMITH is responsible for supervising all corrections officers, medical officers, and other staff located threat, and he participates in formulating and establishes the practice, customs, and policies, at said facility, as well as overseeing those practices, customs, and policies.

234.    That at all time hereinafter mentioned Defendant DOREEN MARY SMITH was a physician duly licensed to practice medicine in New York under license number 199452.

235.    That at all time pertinent hereto Defendant DOREEN MARY SMITH was employed by the State of New York as a physician.

236.    That at all time pertinent hereto defendant DOREEN MARY SMITH maintains a professional office for the practice of medicine located at the Greene Correctional Facility.

237.    That at all time pertinent hereto Defendant DOREEN MARY SMITH was charged with the responsibility to create, direct, approve, implement, supervise, effectuate, deliver, and provide all manners in which health care was provided to, or withheld from the inmates at the Greene Correctional Facility, including but not limited to Decedent.

238.    That on or about January 10 and 16, and February 21, 2014, and other occasions during Decedent's incarceration, Defendant DOREEN MARY SMITH personally provided and supervised medical care to Decedent.

239.    That at all time hereinafter mentioned Defendant JON MILLER was a physician duly licensed to practice medicine in New York under license number 177812.

240.    That at all time pertinent hereto Defendant JON MILLER was employed by the State of New York as a physician.

33

241.     That at all time pertinent hereto defendant JON MILLER maintains a professional office for the practice of medicine located at the Greene Correctional Facility.

242.     That at all time pertinent hereto Defendant JON MILLER was charged with the responsibility to create, direct, approve, implement, supervise, effectuate, deliver, and provide all manners in which health care was provided to, or withheld from the inmates at the Greene Correctional Facility, including but not limited to Decedent.

243.     That on or about March 17, 2014, and other occasions during Decedent's incarceration, Defendant JON MILLER personally provided and supervised medical care to Decedent.

### FACTS COMMON TO ALL CAUSES OF ACTIONS

244.     Plaintiff herein repeats, reiterates, and realleges each and every allegation set forth in each and every paragraph above as though fully set forth at length herein.

### A.     POLICIES, PRACTICES, CUSTOMS, AND SYSTEMIC DEFICIENCIES AT THE NCCC

245.     The COUNTY, NCSD, NCCC and ARMOR share a long and disturbing history of neglect of their duties, obligations, responsibilities with regard to the health and medical needs, and the general well-being of those who become inmates of the NCCC.  The failures to provide appropriate health and medical treatment at the NCCC have been legion, and, all too often, inmates' detentions become death sentences.

246.     The COUNTY, NCSD, NCCC, and ARMOR knew of, then ignored and turned a blind eye towards the pattern of the manifestly deficient, unprofessional, incompetent, reckless, negligent, careless, and inhumane treatment of NCCC inmates with regard to the health and medical services rendered therein.  Despite being warned, advised, castigated, reprimanded, censured, and ordered by various Courts, and State and Federal entities over the years, it appears

34

the COUNTY, NCSD, NCCC, and more recently, ARMOR, consider saving dollars more important than saving lives if those lives are those of pre-trial detainees and inmates. These Defendants have failed to provide the inmates of NCCC, including Plaintiff's Decedent, with medical care that meets the standards of even the most basic accepted medical practice, and failed to meet the obligations, constraints, limitations, and requirements of the United States Constitution and the New York State Constitution.

247. That the events, occurrences, and omissions which occurred while Plaintiff's Decedent was incarcerated and in the custody of the COUNTY, the NCCC, the NCSD, ARMOR, and all other Defendants, which culminated in his death are the result of and are but another component in a long history of the COUNTY, the NCSD, the NCCC, and ARMOR failing to protect human rights, human dignity, and human life, by failing to provide detainees and inmates with medical care which meets the most minimal and basic standards of accepted medical practice, and by failing to fulfill the obligations, constraints, limitations, and requirements imposed upon Defendants by the United States Constitution and the New York State Constitution.

## 1. PRIOR TO ARMOR AT THE NCCC

248. In or about 1981, the Nassau County Sheriff and the COUNTY entered into a consent judgment with inmate plaintiffs who filed suit complaining of the unconstitutional conditions at NCCC, including insufficient medical services at the NCCC.

249. Thereafter the COUNTY, NCSD, and other defendants refused to comply with the terms of the consent judgment. Throughout the 1980s, with no other choice, NCCC inmates brought and won a series of lawsuits against the NCCC, the COUNTY, and the NCSD. Writing for the Second Circuit Court of Appeals which found the County Sheriff in contempt of court,

Judge Jon O. Newman likened the conditions at the NCCC to a "Dickensian saga of prison overcrowding and bureaucratic excuse." *Badgley v. Santacroce*, 800 F.2d 33, 35 (2d Cir. 1986).

250.    In 1999, the United States Department of Justice ("DOJ") conducted an investigation into the conditions of the NCCC following the well-publicized death of inmate Michael Pizzuto, which concluded the conditions at the NCCC rose to the level of constitutional violations due to NCCC's deliberate indifference to inmates' serious medical needs.

251.    More specifically, the DOJ found the NCCC: (1) failed to train and adequately supervise correctional staff; (2) it provided medical care by unlicensed and untrained staff; (3) it failed to ensure inmates in need of routine or acute medical care were seen by medical staff in a timely manner; (4) it failed to ensure that inmates with chronic diseases receive timely and appropriate follow-up treatment or medication; (5) it failed to identify, monitor and treat communicable diseases; and, (6) it failed to adequately manage medication and medical records.

252.    In or about 2002, the United States Attorney for the Eastern District of New York and the United States Attorney General's Office filed a lawsuit against the NCCC, the COUNTY, and the NCSD over similar acts and omissions as mentioned herein.  Following this lawsuit, the United States DOJ and NASSAU COUNTY entered into a consent decree ("Settlement," annexed hereto and made a part hereof as Exhibit "2") that directed the COUNTY and the NCCC to make significant changes to its policies and practices pertaining to, among other things, medical and mental health care provided to inmates.  As a result of the Settlement, the DOJ monitored the NCCC until 2008.

253.    Pursuant to the Settlement, the NCCC was required to develop and/or implement appropriate medical policies, procedures, and protocols, which must conform to the Standards of

the New York State Commission on Correction Health Care ("NYSCCHC") and the American Psychiatric Association Standards for Psychiatric Services in jails and prisons.

254.    In or about 2009, the New York State Commission of Correction ("NYSCOC") issued a report stating the NCCC was not in compliance with the minimum standards for a correctional facility.  Addressing certain health and medical care needs of inmates was part of twenty-five steps the NYSCOC recommended the NCCC would need to take to come into compliance with minimum standards.

255.    The NYSCOC is an executive branch agency established to "visit and inspect . . . all institutions used for the detention of sane adults charged with or convicted of crime."  The organization, powers, and duties of the NYSCOC are prescribed in Article 3 of the New York State Correction Law.    Among other things, the Commission is charged with "making recommendations to administrators of correctional facilities for improving the administration of such correctional facilities and the delivery of services therein" and "promulgating rules and regulations establishing minimum standards for the review of the construction or improvement of correctional facilities in the care, custody, correction, treatment, supervision, discipline, and other correctional programs for all persons confined in correctional facilities."  NYS Correction Law § 45 (2) and (6).  While the NYSCOC is authorized to prescribe rules and regulations governing correctional facilities, the NYSCOC's authority to enforce such rules and regulations is limited.

256.    New York Correction Law §43 establishes a Medical Review Board within the NYSCOC.  Pursuant to Correction Law §47(1)(a), the Medical Review Board is charged, among other things, with investigating and reviewing "the cause and circumstances surrounding the death of any inmate of a correctional facility."  Further, "[u]pon review of the cause of death and

circumstances surrounding the death of any inmate, the Board shall submit its report thereon to the Commission and, where appropriate, make recommendations to prevent the recurrence of such deaths to the Commission and the administrator of the appropriate correctional facility." (§47(1)(d)).   Additionally, the Medical Review Board shall "[i]nvestigate and report to the Commission on the condition of systems for delivery of medical care to inmates of correctional facilities and, where appropriate, recommend such changes as it shall deem necessary and proper to improve the quality and availability of such medical care."  (§47(1)(d)).

257.    In or about 1990, the COUNTY attempted to address some of the human rights and human life problems at the NCCC by amending the County Charter and establishing a Nassau County Correctional Center Board of Visitors (§ 2004).  This Board of Visitors was to have wide-ranging powers to oversee operations at the NCCC, including authority to investigate inmate grievances, inspect the facility, examine records, create reports, and advise the Sheriff's Department about changes that could improve the facility and prevent unnecessary and needless deaths.

258.    The COUNTY Charter's provision mandating a Board of Visitors is a nondiscretionary duty of the COUNTY.  Yet, numerous COUNTY administrations failed to appoint the seven required Board members.

259.    In or about 2012, the New York Civil Liberties Union brought an action on behalf of NCCC inmates who suffered health and medical mistreatment and malpractice while incarcerated in order to compel appointment of the seven Board of Visitors members.  The complaints ranged from inaccurate and/or improper administration of medication, untreated broken bones, and utter neglect in failing to provide a physician's examination despite extended periods of complaints of hearing loss and pain.  A New York State Supreme Court Justice

ordered the appointment of Board members in March 2013.  After much delay, upon information and belief, board members only recently were nominated and eventually, their appointments were confirmed by the Nassau County Legislature.

260.    Upon information and belief, the aforesaid Board of Visitors has not convened to address the health and medical needs of inmates at the NCCC.

261.    Since 2010, at least nine (9) inmates who deaths could have been prevented have perished while incarcerated at the NCCC.

262.    On January 3, 2010 while incarcerated at the jail, Eamin McGinn, age 32, committed suicide.  The NYSCOC reported his death was "a preventable death with inadequate provision of mental and the medical health care."

263.    On October 5, 2010, Gasparino Godino, age 31, hanged himself while in detention at the NCCC.  The NYSCOC found this death was preventable had Mr. Godino had proper health and medical care.  Mr. Godino was a known suicide risk because of his long history of depression and drug use.

264.    On October 27, 2010, Herve Jeanot, age 29, committed suicide while incarcerated at the NCCC.  He had been convicted of first-degree murder at his third retrial.  In its report on Mr. Jeanot's death, NYSCOC noted the NCCC "does not have any procedure in place for screening inmates who have been convicted at trial or have received significant sentences of incarceration" for suicide risk.

265.    On January 3, 2011, Darrell Woody, age 44, committed suicide.  The NYSCOC found Mr. Woody's death may have been prevented but for the grossly inadequate psychiatric care provided him in the jail and NUMC, and the lack of supervision.  The NYSCOC further reported Mr. Woody had a long history of mental instability and previously had attempted

suicide on multiple occasions while at NCCC. The NYSCOC's report recommended investigations into the NCCC's booking, supervision, and staffing procedure and into the "gross negligence and incompetence" of the two doctors who treated Mr. Woody.

## 2. ARMOR AT THE NCCC

266.    On June 11, 2011, Roy C. Nordstrom, age 47, died of cardiac arrest. He complained of chest pains, eventually went to the infirmary, but was sent back to his cell. He continued to complain of chest pain and difficulty breathing. Fellow inmates became aware of the serious distress Mr. Nordstrom was in and shouted for guards to help Mr. Nordstrom, but to no avail.

267.    Mr. Nordstrom had been incarcerated for violation of an order of protection and was due to be released eight days later. On June 11, 2011, at approximate 6 AM, Mr. Nordstrom was helped by two fellow inmates, clutching his chest, as he approached the guard's station. He was in obvious pain, distress, and had difficulty breathing. Despite the guard's call for medical care, no physician was contacted by anyone.

268.    An unsupervised licensed practical nurse (LPN) diagnosed and treated Mr. Nordstrom, and he was sent back to his cell. While being escorted back to his cell, Mr. Nordstrom fell against the wall, could not walk any further, and again notified the guard of his unmitigated chest pain. He was taken back to the infirmary. Again, he was sent back to his cell. Thereafter, he was again observed to have serious chest pain. Eventually, an ambulance was called but Mr. Nordstrom died shortly thereafter.

269.    The NYSCOC report on Mr. Nordstrom indicated he died of myocardial infarction while in the custody of the NCCC and NCSD. The NYSCOC found his death may have been prevented had Mr. Nordstrom receive appropriate emergency medical care.

270.    The NYSCOC also found that ARMOR was grossly incompetent and in violation of New York State Education Law, Article 139 (Nursing) in that the treatment of Mr. Nordstrom constituted unprofessional conduct and the unsupervised LPN acted outside of his scope of practice.

271.    The NYSCOC further found by returning Mr. Nordstrom to his cell, the LPN abandoned the patient.  It was determined Mr. Nordstrom should have been transferred to a hospital and treated by a physician.  This failure constituted grossly inadequate and negligent medical care.

272.    The NYSCOC report recommended the Nassau County Executive "shall conduct" an inquiry into the fitness of ARMOR, its flagrant disregard of the New York State Education Law and the Rules of the Board of Regents, ARMOR's nursing practices, and its "unlawful medical practice."

273.    The NYSCOC further determined the failure to contact a physician constituted grossly inadequate medical care.

274.    On February 24, 2012, Bartholomew Ryan hanged himself in his cell at the NCCC within 24 hours of his arrest.  This 32-year-old Iraq war veteran had been arrested for driving under the influence of drugs and speeding.  There is presently a lawsuit pending in the Eastern District of New York, Docket No.: 12-cv-05343, against the same municipal defendants, the COUNTY OF NASSAU, the NCCC, the NCSD, ARMOR, and various correction offices alleging civil rights violations and wrongful death.  The NYSCOC investigation into the death of Mr. Ryan found ARMOR's psychiatric screening care was inadequate.

275.    According to the NYSCOC's report, ARMOR was to conduct a review of its procedures for medical staff.  It was also to have clinicians available during off hours.  Further,

ARMOR was to inquire into and evaluate professional conduct of the physician who screened Mr. Ryan.

276.    The NYSCOC also recommended that the NCSD review its procedures and improve upon them.  John Jaronczyk, the president of the Nassau County Sheriff Correction Offices Benevolent Association, said, in a public statement that "Medical was supposed to come and take over the scene… and there was a disconnect then, but it wasn't on the offices, it was on the medical company [Armor]."

277.    On February 10, 2014, Kevin C. Brown, age 47, was found dead in his cell.  Mr. Brown was arrested on January 13, 2014, allegedly on an outstanding warrant for a minor crime and was incarcerated at the NCCC.  Mr. Brown reportedly had a history of seizures since suffering head trauma in an automobile accident approximately twenty years before.  He required medication to control the seizures.

278.    The NYSCOC investigated Mr. Brown's death and found he died of heart failure due to hypertensive cardiovascular disease and his body was in full *rigor mortis* when found, indicating Mr. Brown had been neglected and not checked by jail personnel for an extended, unreasonable period of time.

279.    The NYSCOC also found ARMOR's care was deficient and resulted in a mismanaged mental health diagnosis, inadequate psychiatric care, undiagnosed heart problems, and inadequate management of his seizure disorder.  These findings were based in part on the same municipal Defendants' failure to have a physician assess Mr. Brown, and Defendants' not considering Mr. Brown for transfer to a hospital despite his experiencing an earlier seizure at the NCCC.  Further, Mr. Brown never received a full mental health assessment despite his suffering active hallucinations and agitated behavior upon admission to the NCCC.  According to the

NYSCOC, the aforesaid deficiencies were compounded by a health record which was unorganized, incomplete, and illegible.

280.    The NYSCOC concluded "had [Mr.] Brown received proper medical care and supervision, his death may have been prevented," and directed the Nassau County's Legislature inquire into ARMOR's fitness to provide inmate medical services.  This directive was based on the findings in the Brown case and on what the NYSCOC termed as *ARMOR's pattern of failing to provide hospitalization for patients who needed it, failing to properly manage patient's chronic medical needs, and failing to keep proper and organized patient records*.

281.    There is a lawsuit pending in the United States District Court Eastern District of New York, Docket No.: 16-cv-00054, charging these same municipal Defendants with constitutional violations and medical malpractice and wrongful death pertaining to Mr. Brown.

282.    On July 14, 2014, John P. Gleeson, a 40-year-old father of two young children died while he was an inmate in the care and custody of the Defendants COUNTY, NCSD, the NCCC, and in the health and medical care of the staff of Defendant ARMOR.  Mr. Gleeson had been arrested and charged with burglary in the third degree for allegedly taking scrap metal wire from a garage.

283.    Mr. Gleeson's death is the subject of a lawsuit currently pending in the United States District Court, Eastern District of New York, under Docket Number: 15-CV-6487.

284.    Mr. Gleeson had a 12 year history of angioedema, a rheumatologically dangerous condition made known to the officials at the NCCC at the outset of his incarceration.  Mr. Gleeson knew, because he had been so informed by his own doctors in the past and because of his experience during attacks that his condition could be life-threatening if not properly attended and treated during an attack.  Prior to his incarceration, Mr. Gleeson always had an "EpiPen"

available on his person to help deal with an onset of an attack and provide an opportunity for him to reach a hospital.

285.    Despite making this medical condition known to these same Defendants, Mr. Gleeson was allowed to perish after the onset of an attack due to his angioedema condition. When an attack presented, first Mr. Gleeson's hands became swollen, and then the swelling would progress to his arms, and eventually his chest and throat progressively became badly swollen.  Over the course of many hours at that fatal time, with the swelling slowly progressing and a complete failure to treat, he was caused to experience cardiopulmonary arrest.

286.    The NYSCOC investigated Mr. Gleeson's death, and after its Medical Review Board completed its inquiry, issued a final report dated September 15, 2015, and signed by "Phyllis Harrison-Ross, M.D., Commissioner."   Said report, issued to the same Defendants herein, listed numerous findings, including but not limited to: (1) Gleeson had a history of hereditary angioedema that when unrecognized, misdiagnosed, and improperly treated by the medical providers from ARMOR; (2) ARMOR's delivery of healthcare was incompetent and deficient due to a lack of adequate protocol, lack of coordination, lack of effective communication, and deficient medical knowledge by physicians and mid-level clinicians; (3) this was all compounded by a healthcare record that was unorganized, incomplete, and in selected sections, illegible; (4) ARMOR, in its contracted locations in New York State has engaged in a patent of inadequate and neglectful medical care and questions their ability to meet and provide for the health care needs of jail inmates; and, (5) had John Gleeson been provided with competent medical care by ARMOR, in a timely manner, been properly referred to a specialist, received a correct diagnosis and receive proper medical treatment, his death may have been prevented.

287.    That Medical Review Board also found "that the medical providers of ARMOR at the NCCC lack the clinical knowledge to recognize that Gleeson was symptomatic of Hereditary Angioedema and continued him on an ineffective course of treatment… Hereditary Angioedema will not respond to therapy including steroids and antihistamines and must be managed with bradykinin B2 receptor blocking agents such as icatibant.  Additionally, the medical providers of ARMOR failed to recognize multiple trigger mechanisms for attacks of angioedema including administration of calcium channel blockers, nonsteroidal anti-inflammatory drugs, and aspirin."

288.    That like this present case involving this Plaintiffs' Decedent, Mr. Gleeson suffered from a condition needing a specialist in rheumatology, whose condition was ignored, and/or misdiagnosed, who was provided improper and contraindicated medications by inexperience, incompetent, and unqualified personnel, which led to extreme pain and suffering, the condition worsening, and eventually killing Mr. Gleeson in a manner like this Plaintiff's Decedent.

289.    In the Gleeson matter, the NYSCOC also set forth "Recommendations" in their final report to: "To the Chief Executive Officer of ARMOR," which included but were not limited to: (1) ARMOR shall establish an organized and uniform health record for inmate health and mental health care; (2) ARMOR shall conduct a review to assure forms are completed thoroughly, signed, dated and legible; (3) all forms must be filed by date with clearly labeled sections and secured to the record; (4) ARMOR shall assure consistent format for all inmate records which is adhered to in order for adequate review by providers in order to deliver accurate care; (5) ARMOR will review the healthcare delivery system with consideration of a system that identifies a single case manager for each inmates' care; and, (6) that provider will manage chronic conditions and follow up on acute conditions seen by other providers to provide more consistent care compared

to several providers seeing an inmate and to minimize potential errors and gaps in health care such as those that occurred in the Gleeson case and this case.

290.    In the Gleeson matter, the NYSCOC further set forth in their final report to ARMOR that it shall conduct a quality assurance review of the medical care provided to Mr. Gleeson during his incarceration, focusing on: (1) Why a referral to a specialist in rheumatology was not expedited for Mr. Gleeson whose condition was undiagnosed and refractory to the medications provided?   (2) Why medical providers failed to diagnose Mr. Gleeson with Hereditary Angioedema, failed to recognize that prescribed medications would be ineffective, failed to obtain an accurate C1 Esterase reading, failed to initiate treatment with icatibant and failed to recognize current medications may actually be trigger mechanisms?  (3) Why Gleeson was not examined by a physician at his second emergency call on the date of the terminal event or sent immediately to a hospital emergency room?,  and (4) Why medical staff did not consider an immediate transfer to a hospital for Mr. Gleeson after repeated complaints of edema that were refractory to the medical treatments provided?

291.    In the Gleeson matter, the NYSCOC further set forth a recommendation to the Presiding Officer of the Nassau County Legislature, stating that the Legislature shall conduct an inquiry into the fitness of ARMOR as a correctional medical care provider in the NCCC, requiring *specific attention shall be directed to ARMOR's pattern of failing to properly manage patients chronicled medical needs, failing to maintain proper and organized patient records in failing to provide hospitalization for patients when clinically indicated*.

292.    Upon information and belief, Defendant ARMOR did not provide medical specialist services for Decedent (and other patients in need of such services) because doing so

would increase the cost of health and medical services and would not comport with budgetary constraints.

293.    Upon information and belief, Defendant ARMOR did not provide hospitalization for Decedent (and other patients in need of hospitalization) because doing so would increase the cost of health and medical services and would not comport with budgetary constraints.

294.    Upon information and belief, Defendant ARMOR'S doctors at the NCCC had to obtain direct and specific permission and authorization from ARMOR'S corporate headquarters in Miami before the NCCC doctors could order hospitalization or testing for inmates, including for Decedent.

295.    Upon information and belief, Defendant ARMOR failed to follow the above set out Recommendations of the NYSCOC.

296.    Upon information and belief, the Nassau County Legislature never followed the above quoted recommendation of the NYSCOC and, in fact, renewed ARMOR'S contract and continues to use ARMOR'S services at the NCCC despite and with utter disregard of said Recommendations of the NYSCOC.

### 3. ARMOR'S POLICY IS NATIONAL

297.    ARMOR'S track record for providing health and medical services beyond NASSAU COUNTY was and is not a good one, and the COUNTY and the NCSD knew, or, upon exercise of due diligence, would have known that.  There were scores of lawsuits pending against ARMOR in a number of states, including in Florida, Virginia, and Oklahoma at the time of the contract signing; this was something that was simple and easy to check.  Beyond that, news media outlets brought some of ARMOR'S track record to public attention prior to the first contract with the COUNTY.

298.    Despite this history, the COUNTY entered into a contract, negotiated by various COUNTY officials (including input from Defendant SPOSATO), with ARMOR on May 14, 2011, and ARMOR took over and began performing the aforesaid services at the NCCC as of June 1, 2011.  Public relations press releases by COUNTY officials touted a projected $7,000,000 annual savings by the COUNTY using ARMOR, rather than continuing to hire its own medical staff and using the NUMC.

299.    Perhaps even more telling, the COUNTY (with input from defendant SPOSATO) recently renewed its contract with ARMOR.  In fact, the contract has been renewed twice, in June, 2013 and June, 2015.  This was in the wake of Decedent's death in April, 2014, Mr. Gleeson's death in July 2014 while he was in custody at the NCCC, Mr. Brown's death in February 2014, and more recently, the death of NCCC inmate Antonio Marinaccio, after he suffered cardiac arrest in April, 2015.

300.    The foregoing deaths are not isolated phenomenon.  They are merely the more publicized and consequently more visible cases.  Hundreds of complaints from NCCC inmates about the failure to provide needed medical and mental health services are made annually.  Approximately eighty (80) *pro se* inmate lawsuits claiming the failure to provide needed medical and mental health services are pending against ARMOR in the Eastern District of New York alone.

301.    Other jurisdictions are replete with examples of ARMOR'S pattern of reckless negligence, incompetence, and shoddy practices, procedures, and protocols; these are found in the vast swath cut by the lawsuits filed against it.  Nonfeasance, misfeasance, and malfeasance appear to be endemic with ARMOR.  For example, ARMOR provides health and medical services for the Niagara County Jail in upstate New York.  Tommy Lee Jones, age 51, died on December

29, 2012, while in custody.  His history of heart disease, emphysema, and gout was made known to ARMOR.  ARMOR'S medical director gave him medication that was not advisable for someone with cardiovascular disease.  At the least, the use of the medication should have been monitored; it was not.  The day before his death, Mr. Jones told an ARMOR nurse that he felt like he was going to have a heart attack.

302.    Mr. Jones died as a result of untreated acute pulmonary edema caused by an excess of fluid build-up in his lungs.  The NYSCOC found ARMOR to be medically negligent and recommended that state health officials investigate ARMOR'S medical director at the correctional facility for "failing to examine and respond to a patient who demonstrated a need for immediate medical care."   The Commission also found the medical director prescribed improper medication.

303.    Daniel Pantera, age 46, was another inmate at the Niagara County Jail who died in custody.  The NYSCOC found Pantera's treatment by ARMOR constituted "grossly inadequate medical and mental health care" and that his death was preventable.  The death, which occurred on December 25, 2012, was from hypothermia, complicated by heart disease, mental illness, and other elements, all of which previously were made known to ARMOR.  Pantera's crime, stealing a cup of coffee from a 7-Eleven, effectively resulted in a death sentence.

304.    Alan Hicks, age 51, died while incarcerated at the Hillsborough County Jail in Florida, in August 2012.  Hicks, a high school basketball coach, had been driving his car erratically and was pulled over by a Highway Patrol trooper.  He was taken to the aforesaid correctional facility.  It became apparent that the left side of his body was not functioning.  Hicks was speaking incoherently and was unable to move his left arm and left leg.  It is noteworthy that Hicks did not receive a medical screening.

305.    Prompt treatment for stroke is essential.  ARMOR'S failure to provide potentially life-saving treatment for Mr. Hicks as he suffered the early stages of a stroke raises serious questions about the guidelines, procedures, practices, and protocols of, which are, according to ARMOR'S own public statements, *their own national standards*.

306.    Armor's nurses stood by as Mr. Hicks was taken to a cell and placed face down on a mattress.  Within 36 hours, he was found comatose, soaked in his own urine, and the victim of a massive brain hemorrhage.  He died one month later.

307.    To its credit, the Hillsborough County Sheriff's Office put out a press statement: "it is clear mistakes were made by Hillsborough County Sheriff's Office employees and contracted medical staff employed by Armor Correctional Health Services" in the handling of Mr. Hicks.  "The Hillsborough County Sheriff's Office took immediate responsibility for its actions and accountability for its mistakes by conducting a thorough review of the entire matter and working with Hicks' family through their legal representation to reach an amicable settlement."

308.    ARMOR settled with Hicks' family for $800,000.00.  The Hillsborough County Sheriff's Office paid an additional $200,000.00 and terminated its relationship with ARMOR in 2014, when the contract expired and after rejecting ARMOR'S bid for a new contract.

309.    Raleigh Priester, age 52, was another victim of the medical negligence, incompetence, and unprofessionalism of Defendant ARMOR.  He was an inmate in Florida at the Broward County Jail and had a history of schizophrenia.  He was placed in solitary confinement despite his history of mental problems including time spent in a mental hospital.  Mr. Priester would show outward signs of mental disturbance, including getting naked, shouting incoherently,

banging his head on the floor to the point of causing his head to bleed, and actively hallucinating. He was never moved to any facility for treatment.

310.    Further, Mr. Priester was not given medication or medical treatment by ARMOR and received inadequate nutrition.  As a result, in the course of approximately 6 months, he lost about 120 pounds of his original body weight of 240 pounds, and was found dead in his cell on July 10, 2012.  ARMOR and the Broward County Sheriff's Office recently settled the lawsuit brought by Priester's family in 2014.  The terms of the settlement are confidential.

311.    It is noteworthy, however, that the Priester settlement came in close proximity to the decision by a judge of the United States District Court for the Southern District of Florida to compel ARMOR to turn over certain documents to the plaintiffs.  It appears that, in discovery, plaintiffs sought certain mortality review findings and recommended corrective actions that were required to be made by ARMOR in accordance with its contract with the Broward County Sheriff's Office.  ARMOR had objected to the plaintiff's discovery request and vigorously opposed the disclosure.  However, after the briefs, a hearing, argument, and re-argument, the court ordered ARMOR to turn over the documents.  Upon information and belief, ARMOR chose to settle rather than disclose.

312.    Inmates of the Tulsa County Jail sued ARMOR and Tulsa County Sheriff Stanley Glanz alleging inadequate medical care at the correctional facility.  In one of these suits, brought by inmate Scott Birdwell, it was alleged that Birdwell's complaints of pain and his request to be hospitalized were ignored by ARMOR staff.  The poor treatment by and negligence of ARMOR, apparently, resulted in serious eye damage to the inmate.  Upon information and belief, the inmates' lawsuits are pending.

313.    Women prisoners at Fluvanna Correctional Center in Virginia, a 1,200 inmate facility, brought a class action lawsuit against ARMOR and the Virginia Department of Corrections ("VDOC") alleging the failure, "… on a systemic, pervasive and ongoing basis" to provide constitutionally adequate healthcare.  The suit was filed in July, 2012, and alleges the health and medical care at the facility violates the Eighth Amendment's ban on cruel and unusual punishment.

314.    More specifically, the suit alleges the female prisoners suffered pain for prolonged periods as a result of the refusal to provide adequate medical care.  Some inmates, it appears, had spent months in wheelchairs because medical staff had failed to act promptly.  In fact at least _ten deaths_ at Fluvanna over the last few years, it was alleged, could have been prevented had prisoners receive sufficient medical treatment.  According to the suit, the problem lies with the VDOC's outsourcing to ARMOR (and its predecessor private healthcare company); the claim is that the suffering stems directly from the policies, customs, and practices of ARMOR that puts profits over people.

315.    The Fluvanna lawsuit cites, as one example, the case of prisoner Darleen White, and acknowledged diabetic.  She went to the prison infirmary on December 21, 2011, complaining of severe headache, nausea, and diarrhea.  A nurse gave Ms. White a shot to relieve her nausea and sent her back to her dorm.  Later that day, Ms. White returned to the infirmary.  A nurse checked her blood sugar and "found that it was radically elevated above normal levels." Ms. White was instructed to lie on a bed, where she remained for the next day, vomiting and defecating on herself without receiving care or medical exam.  She died shortly thereafter.

316.    A second example cited in that lawsuit involved prisoner Gianna Wright. Beginning in 2011, she complained of severe abdominal and rectal bleeding.  "For at least one

year," medical staff at Fluvanna assured her that she was "fine."  After finally being taken to the University of Virginia Medical Center, Ms. Wright was diagnosed with Stage IV abdominal cancer and died a few weeks later.

317.    Among the examples in the Fluvanna lawsuit was one where a prisoner, after complaining about having difficulty breathing and after losing more than 40 pounds, was told by ARMOR'S doctor she had early stages of menopause.  Almost one year later, upon finally being brought to hospital, oncologists there determined the inmate had sarcoidosis, a collection of nodules within the chest that could cause respiratory failure and death.

318.    That same inmate also had experienced swelling in her legs.  At Fluvanna, she was told by ARMOR staff the swelling was from arthritis or use of birth control pills.  The problem was later revealed to be a blood clot.  Astonishingly, even after the above two situations became known, this inmate was not given the prescription medication by ARMOR'S staff.

319.    The Fluvanna lawsuit cites numerous examples intended to demonstrate the inadequate and improper care that inmates received.  They often must wait months to see a doctor, and the denial of access to physicians results in the medical staff failing to examine, diagnose, and treat serious medical conditions.

320.    Each year, inmates at Fluvanna filed hundreds of grievances recounting the failure to provide appropriate medical care; yet VDOC had not required ARMOR to adopt new practices and to improve medical care (much as in the case with the County defendants herein and ARMOR in the instant case).  The Fluvanna suit claims that, by their actions and inactions, the defendants have shown deliberate indifference to the prisoners' serious medical problems and needs.

321.    The lawsuit was settled in November, 2014, less than a week before the trial was to have begun.  The settlement followed the court's denying defendants' motion for summary

judgment and granting partial summary judgment to plaintiffs, finding that the prison had a constitutional duty to provide adequate medical care to inmates, that the inmates' complaints were "serious medical conditions" and that the defendants showed "deliberate indifference."

### 4. AS APPLIED TO NCCC INMATES

322.    Upon information and belief, more than 10,000 people a year spend time in the NCCC awaiting trial, transfer, or serving sentences for minor crimes, a stay that risks becoming a death sentence.

323.    Quality of healthcare is being sacrificed for population that, generally, is powerless while behind bars to seek any independent means to stay healthy.

324.    The NCCC inmates are literally trapped and cannot leave the facility and, so, they are vulnerable to abuse with regard to health and medical services at this facility.  This makes the abuse much more intense.

325.    Since ARMOR took over providing health and medical services at the NCCC, the number of complaints relating to medical and mental health services at the facility has escalated. Inmates have complained that doctors are no longer available seven days a week, that if someone falls ill or is injured on weekends, no treatment occurs, and that ARMOR personnel create insurmountable barriers to inmates' access to qualified doctors by denying sick call requests and by using non-qualified medical personnel to screen people.  Yet, inmates' medical complaints have little chance of being properly vetted and addressed under the present policies and practices of the ARMOR and the COUNTY Defendants.

326.    In May 2011, Jerry Laricchiuta, president of CSEA Local 830, the union that represented NCCC medical personnel before medical services were taken over by ARMOR, presciently stated his concern that turning over in-jail medical care to ARMOR would not improve

medical healthcare at the NCCC.  He added "considering all the history here, and the suicides, and the DOJ citation, we shouldn't be looking to scale back healthcare, but we are."

327.    The long history of the Defendants' misfeasance, malfeasance, and nonfeasance with regard to the health and medical services at the NCCC establishes that such has become and is the policy, practice and/or custom of the COUNTY Defendants and that such policy, practice and/or custom caused the constitutional injury to Plaintiff's Decedent.

328.    The history of ARMOR'S misfeasance, malfeasance, and nonfeasance with regard to health and medical services at the NCCC and elsewhere establishes that such has become and is the policy, practice, and/or custom of ARMOR and that such policy, practice and/or custom caused the constitutional injury to Plaintiff's Decedent.

329.    The United States Constitution requires governmental agencies and prison officials to provide all prisoners and pretrial detainees with adequate medical care.  These individuals, by virtue of the deprivation of liberty, cannot provide such care for themselves.

### B. DECEDENT'S CONFINEMENT

330.    On or about August 23, 2012, Plaintiff's Decedent became a detainee at the NCCC.  He was charged with possession and sale of heroin.  On multiple prior occasions, Decedent attempted to overcome an addiction to heroin without success.

331.    Without resources to secure his release pending trial, Decedent remained a pretrial detainee for eleven months until July 25, 2013, when he pled guilty to one felony count of criminal sale of a controlled substance, a class B felony.  He remained confined at the NCCC.

332.    On December 10, 2013, Decedent was sentenced to a total of six years and remained confined at the NCCC awaiting transfer.

333.   Decedent remained detained at the NCCC until December 26, 2013.   Decedent was then transferred upstate to the Ulster Correctional Facility where he remained until January 9, 2014, when Decedent was then transferred to the Greene Correctional Facility.   Decedent remained incarcerated at the Greene Correctional Facility until his death on April 23, 2014.

334.   Both the Ulster Correctional Facility and the Greene Correctional Facility are owned and operated by the New York State Department of Corrections.

### C. ABANDONMENT OF DECEDENT'S MEDICAL CARE

335.   Subsequent to the 50-h hearing, Plaintiff's counsel obtained a copy of what defense counsel for Defendant ARMOR represented to be Decedent's medical chart maintained by said Defendant ARMOR for Decedent's NCCC confinement.   Although counsel represented it as being complete, it is unorganized, portions are illegible, and records appear to be missing. Separately obtained was a copy of Decedent's medical records from Decedent's subsequent incarceration with the New York State Department of Corrections.   The following is compiled therefrom.

### 1. NCCC

336.   That Decedent pre-existing hypothyroidism which is not part of this litigation.

337.   Decedent began complaining of swelling and pain in his hands at least as early as March 13, 2013.   On March 22, 2013 Decedent made a "Sick Call Request" while detained at the NCCC.   In it, Decedent wrote "I have been taking medication since March 13, 2013 for swelling of my hands and sometimes feet.   It's going on ten days taking this medication.   The swelling has no [sic] stopped.   My hands at times I can't close into a fist [sic].   It's not working or someone there thought best to guess.   The medication has done nothing to alleviate the pain and swelling I'm going through.   Time is of the essence."   In response, it appears Decedent was only screened

56

by a nurse (LPN) and subsequent records indicate the medication he was receiving was Naprosyn, also known as naproxen and commonly called Aleve. It also appears ARMOR'S medical records are missing and/or are incomplete. There is no official request for, or documentation of an examination by a physician.

338.    Naproxen is class of drug known as nonsteroidal anti-inflammatory drugs (the class is usually abbreviated "NSAIDs"). This class groups together medications that provide analgesic (pain-killing) and antipyretic (fever-reducing) effects, and, in higher doses, anti-inflammatory effects. The class also includes aspirin and ibuprofen (Motrin). They are cheap and available over-the-counter. As the name indicates, these are not steroids.

339.    Both NSAIDs and the steroid prednisone are contraindicated for a subset of scleroderma where the inflammation relates to the skin, as was Decedent's case. These medications are dangerous for those patients like Decedent because NSAIDs and prednisone are universally recognized to cause gastrointestinal disease, fluid retention, renal toxicity, and an increased risk of scleroderma renal crisis. These are the conditions from which Decedent eventually succumbed. And, the record is clear. Defendants continued to provide these medications unabated, and indeed, even increased both dosages at various points.

340.    On April 9, 2013, Decedent wrote another "Sick Call Request." At that time, he wrote "I've been taking medication for thyroid and it's finished on the 12th. Do I need a refill? Also my hands are still getting swollen. My diet food [sic] still not in compliance." It appears he was only screened by a nurse (LPN) and no change was made to his medication. There is no official request for, or documentation of an examination by a physician. The nurse continues Decedent on contraindicated Naprosyn.

341.    On April 29, 2013, Decedent wrote another "Sick Call Request" which read: "Sir/Madam. I have been taking thyroid med [sic] since March 13, 2013.  I have been placed on a 2400 diet meal.  But the swelling of my hands continue [sic].  It is very painful everyday [sic], the swelling gets so bad that at time [sic] I feel that my hands will explode.  I don't know what if [sic] it's water retention or what.  Please call me ASAP."  It appears he was seen only by a nurse (LPN) and who continues to provide Decedent with contraindicated Naprosyn.  There is no official request for, or documentation of an examination by a physician.

342.    On June 17, 2013, Decedent wrote another "Sick Call Request" which read: "my hands are swelling and I am in lots of pain.  No more -- I need to go to out side [sic] hospital to find out what is wrong."  Again, it appears he was screened by a nurse (LPN) with no change to his medication.  There is no official request for, or documentation of an examination by a physician.

343.    On July 3, 2013, it appears Decedent was seen by a Physician Assistant, with the last name of "FRANCIS" identified herein as "JOHN" FRANCIS.  He noted Decedent had bilateral hand swelling and a right breast lump, with a possible inflammatory process.  However, Defendant FRANCIS provided Decedent with the contraindicated Naprosyn and adds topical hydrocortisone which is not recognized as a treatment for Decedent's type of scleroderma. There is no official request for, or documentation of an examination by a physician.

344.    On July 28, 2013, Decedent filed another "Sick Call Request" which read: "I am in pain.  I can't close my hands (fist) due to the swelling.  I need to go to an out side [sic] hospital.  I've been like this for months going through damn pain."  It appears he was only screened by a nurse, with no corresponding medical record, and no request for a physician by

any official personnel.  The medications remained just hydrocortisone cream and contraindicated Naprosyn.

345.    On July 31, 2013, Decedent filed another "Sick Call Request" which read: "my hands are swollen and I am in [illegible] pain."  It appears he was only screened by a nurse and there is no change in his medication.  There is no official request for, or documentation of an examination by a physician.

346.    On August 20, 2013, Decedent filed another "Sick Call Request" however the copy provided by ARMOR is illegible with respect to Decedent's complaints.  It appears he was screened only by a nurse and there is no change his medication.

347.    On August 21, 2013, it appears Defendant CARL-HENRI SANCHEZ examined Decedent and requested a rheumatology consult.  This is the first physician examination recorded despite over five months of complaints and obvious medical need.  Defendant SANCHEZ wrote: "51-year-old male patient with progressive swelling and very limited joint functions at hands, ankles, knees.  Patient can't make a fist. …."  Without further tests and without making any apparent diagnosis, Defendant SANCHEZ added another contraindicated medicine, prednisone, to the medications given to Decedent.  Prednisone is a steroid which was dangerous for scleroderma patients when the inflammation relates to the skin.  Like NSAIDs, it is recognized to cause gastrointestinal disease, fluid retention, renal toxicity, and an increased risk of scleroderma renal crisis (which is what killed Decedent).

348.    On August 22, 2013, Defendant JOHN P. MAY approved Defendant SANCHEZ'S request Decedent be seen by a rheumatology specialist.  Defendant MAY is located in Florida, in ARMOR'S corporate office.  It appears he never examined Decedent.  Despite this approval however, the COUNTY Defendants and Defendant ARMOR do not permit Decedent to be

examined by a rheumatologist until November 27, 2013, some three months thereafter. No apparent reason for this delay is listed in Defendant ARMOR's records and Defendant MAY never follows through to make sure his recommendation for a rheumatology consult is completed.

349.    On September 3, 2013, Decedent filed yet another "Sick Call Request." The copy currently provided by Defendant ARMOR is partially illegible but the legible part reads: "… I am in constant pain in my hands. My joints are in pain – I NEED TO SEE A DOCTOR. I can't sleep due to the swelling and pain…" (Emphasis in original.) Decedent was screened only by a nurse and there is no record a doctor visit was requested by any official.

350.    On September 12, 2013, Decedent filed another "Sick Call Request" which read: "I have swelling of hands and forearms, and swelling [illegible]. Lungs and kidneys hurt. [Illegible] swollen and I can't pinch skin – burning sensation on arms [illegible] with swelling." Later that day, Defendant LAURA HUNT, a physician's assistant, saw Decedent. Defendant HUNT recorded Decedent's hands and forearms were swollen for about seven months already. She noted erythematous skin with mild to moderate swelling on both dorsal hands and up his forearms. She noted redness on his bilateral ankles and the Motrin being provided is not helpful. Defendants' chart is not clear when this contraindicated NSAID was first provided. Defendant HUNT wrote a rheumatology consult was already requested, but it is apparent she did nothing to see the rheumatology consult actually occurred.

351.    On September 27, 2013, Defendant MICHAEL PARRINELLO, a Registered Professional Nurse, saw Decedent. Defendant PARRINELLO noted Decedent was complaining of edema to both hands for about six months and he was unable to close his hands fully. Defendant PARRINELLO noted his skin felt tight and there was pain to both hands. There is no indication a physician examined Decedent at that time. Defendant PARRINELLO noted a rheumatology

consult was ordered, but it is apparent he did nothing to see the rheumatology consult actually occurred. No physician exam or review is evident.

352. On October 8, 2013, Decedent filed another "Sick Call Request" which read: "I have been complaining for months now about the swelling of my hands and arms. I am in constant pain, and I get Tylenol for pain reliever which doesn't work. I can't at this point grip things without them falling out of my hands. I can't properly clean myself without difficulty because at this stage I can no longer close my hands. I am so swollen I can't pinch skin. I need an MRI and to see a specialist. I believe I have permanent nerve damage due to your negligence of not see [sic] or taking me to out side [sic] hospital – two blocks away." No physician exam or review is evident.

353. On October 11, 2013, Defendant PARRINELLO, the Registered Professional Nurse saw Decedent again. Once again, Defendant PARRINELLO noted Decedent had edema to both hands for about six months, he was unable to fully close his hands, and wrote his "skin feels tight." There was pain noted to both hands rated on a scale of 8 of 10. Defendant PARRINELLO again noted a rheumatology consult was ordered, but it is apparent he did nothing to see the rheumatology consult actually occurred. No physician exam or review is evident.

354. On October 25, 2013, Decedent filed another "Sick Call Request" which read: "my arms are swollen (forearms) and my skin is bruised. Also my [illegible] like on fire. I have this burning sensation that is horrible. The medication you keep giving me – DOESN'T DO ANYTHING for the hands and arms swelling. The physicians [likely PA's and the Nurse] keep telling me "that's what they give" but a physician has the authority to prescribe you the "NEEDED" medication – not pass the blame. I can't sleep due to the pain and burning sensation." (Emphasis in the original.)

355.    Later that day on October 25, 2013, Defendant PARRINELLO again saw Decedent. Defendant PARRINELLO wrote the patient returned with increased swelling to both hands and forearms.  Defendant PARRINELLO noted skin tightness with a shiny appearance.  Once again, he noted a rheumatology consult was needed.  Defendant PARRINELLO completed a form called a "Specialty Service/Consultation Request" wherein he requested a rheumatology consult.  This was the second written request for consult.  Defendant PARRINELLO wrote "patient complains of edema – worsening to both hands for seven months."  Defendant PARRINELLO recorded "edema to forearms, skin feels tight – shiny appearance…"  Another month passed before this rheumatology consultation was obtained.  No physician exam or review is evident.

356.    On October 29, 2013, Decedent filed another "Sick Call Request" which read: "I'm in constant pain.  I don't [illegible] not receiving any pain medication.  I went to sick call on October 25, 2013, and the doctor told me he was renewing my pain medication which doesn't do much.  I also need [illegible] medication.  I am in constant pain.  My forearms feel like they are on fire constantly.  Swelling doesn't go down."  No physician exam or review is evident.

357.    On October 31, 2013, Defendant PARRINELLO again saw Decedent.  Defendant PARRINELLO wrote Decedent was complaining of swelling to both hands and forearms with discoloration of the forearms.  He wrote there was tightness to the skin with a shiny appearance. Defendant PARRINELLO recorded Decedent also had this presentation on his stomach and chest region.  Defendant PARRINELLO again wrote a rheumatology consult was needed for the symptoms that were first reported back in March, but once more, nothing was done to obtain this consult which was initially approved in August.  No physician exam or review is evident.

358.    On November 8, 2013, Defendant "JOHN" FRANCIS, a physician assistant examines Decedent and recounted the bilateral hand and forearm swelling for approximately

62

twelve months.  He also wrote he discussed the case with Defendant MARYLYN MARTIN-NAAR who upon information and belief was then the Medical Director for Defendant ARMOR at the NCCC.   According to Defendant FRANCIS'S note, she told him to increase the dosage of prednisone "until Decedent is seen by the rheumatologist."   There is no record indicating Defendant MARTIN-NAAR ever examined Decedent before she blindly increased his dose of prednisone, a steroid contraindicated as dangerous for the condition from which Decedent was suffering.   And once again, it is apparent that nothing was done to expediently obtain the outstanding rheumatology consult which did not occur until the end of that month.

359.    On November 20, 2013, Decedent wrote another "Sick Call Request" which read: "pain medication is due.  Running out.  Renew [illegible] cream for rash."  Later that day, Defendant PARRINELLO noted he examined Decedent who was complaining of shiny skin to both arms and complaining of pain.  He again noted the pending rheumatology consult and continued with an increase of prednisone, which, once more, is contraindicated for Decedent's scleroderma and lead to his fatal renal failure.  No physician exam or review is evident.

360.    On November 22, 2013, Decedent filed another "Sick Call Request" which read: "a medical nurse saw me on the above date to take blood.  Told me my hands had no blood circulation – to put in a sick call slip and see someone."  Defendant PARRINELLO saw Decedent at approximately 7 PM.  He noted the complaints of no blood circulation in Decedent's forearms. Defendant PARRINELLO wrote he will continue to monitor Decedent while Decedent awaits the rheumatology consult.  No physician exam or review is evident.

361.    On November 27, 2013, the COUNTY Defendants and Defendant ARMOR took Decedent to Defendant NUMC for a rheumatology consult.  It was at least eight months since the symptoms first were recorded and three months since this consult was first authorized.  Decedent

was examined by Defendants PRACHI ANAND and SABATINO IENOPOLI who diagnosed scleroderma but required Decedent to be tested for tuberculosis before the proper medication could be started. Upon information and belief, this was because the medication needed was a type of chemotherapy to suppress his natural immune system, and, if Decedent had tuberculosis, this treatment would be contraindicated.

362.    However, neither the NUMC Defendants nor Defendant ARMOR conducted the simple tuberculosis test (known as a "PPD") until December 21, 2013, almost one month later. It turned out to be negative for tuberculosis. Despite this, proper medications were not provided by the NUMC Defendants and nothing is recorded to indicate proper medications were either recommended by the NUMC Defendants or ever provided to Decedent by any Defendant. The NUMC defendants wrote they advised their patient (the incarcerated Decedent) to lower his prednisone dosage and wrote he was to "follow-up" in 3 to 4 weeks. Not surprisingly, this "follow-up" never occurs.

363.    There is no indication the NUMC rheumatology consult, its reports, charts, or records of any kind were provided to, or obtained by Defendant ARMOR. And now, despite the confirmed diagnosis of scleroderma, Defendants still continued with the contraindicated NSAID ibuprofen (Motrin). Upon information and belief, Decedent weaned himself off the prednisone.

364.    On December 5, 2013, Decedent filed another "Sick Call Request." The copy provided is illegible. Defendant PARRINELLO, the nurse, again examines Decedent and notes a rheumatology consult occurred. Despite the diagnosis is scleroderma, he increased the dose of contraindicated ibuprofen. No physician exam or review is evident.

365.    On December 17, 2013, Decedent filed another "Sick Call Request" the copy of which is mostly illegible but appears to request an emergent visit to a doctor because of pain in his arms and hands.

366.    On December 18, 2013, Defendant HABIB, a physician assistant, examined Decedent and wrote he was complaining of pain to his forearms and hands with swelling and hardening of the skin.  Defendant HABIB noted the skin was shiny, indurated, and Decedent was not able to fully close his hand and had decreased grip bilaterally.  Defendant HABIB noted Decedent stated he was diagnosed with scleroderma which caused the swelling and pain.  Despite the diagnosis, Defendant HABIB continued providing the contraindicated NSAIDs and anti-itch cream.  No physician exam or review is evident.

367.    On December 21, 2013, Defendant ARMOR conducted its annual health assessment of Decedent.  It was performed by a nurse who noted Decedent was complaining of bilateral upper extremity burning and the diagnoses of scleroderma and "thyroidism" [sic].  This nurse also noted his skin on both forearms and hands was hardening and shiny.  Notwithstanding other sections of this chart confirming Decedent was still being prescribed Motrin, the only medication the nurse noted was Synthroid, a medication for hypothyroidism.  As noted above, the PPD test was performed at this time and was negative for tuberculosis.  It appears the results of this test were not communicated to any other health care provider.  No physician exam or review is evident.

### 2. ULSTER CORRECTIONAL FACILITY

368.    On or about December 26, 2013, Decedent was transferred upstate to the Ulster Correctional Facility, in Napanoch, New York.  Defendant MICHAEL GRAZIANO is the

Superintendent of that facility and, upon information and belief, is responsible for the care and treatment of all prisoners there, including but not limited to the medical care rendered thereat.

369.    Decedent was examined by a presently unnamed nurse who noted the chart as Provider #253.    That nurse noted the diagnosis of scleroderma and Decedent's receipt of hydrocortisone cream for the itching and ibuprofen for pain.    The nurse also noted thyroid disease for which Decedent was on Synthroid but that medication was not with him.

370.    On December 27, 2013, Defendant JORDAN LAGUIO, a physician, examined Decedent and noted: "patient claimed he was diagnosed with scleroderma last November 27, 2013 at Nassau Medical Center.  He said he was worked up (blood test) and seen by specialist [sic].  Patient said he was weaned off from [oral] steroids [sic].  Patient complaining of burning sensation of his skin.  At Nassau County Jail, he was on ibuprofen and hydrocortisone cream..." Defendant LAGUIO noted there was no record of the scleroderma diagnosis in the transfer summary and directed the records from Nassau County Jail be obtained.

371.    On December 27, 2013, in response to that request, Defendant ARMOR faxed merely eight pages from a 120 page chart to the Ulster Correctional Facility.  Defendant ARMOR chose not to send any pertinent medical records.  Instead, it sent only the medication orders confirming the use of contraindicated medications from September through December and a single laboratory result from August.  These eight pages did not indicate the medication was contraindicated, failed to contain even one physician's note and most importantly, had no mention of the scleroderma diagnosis.  Defendant ARMOR'S choice to send only those eight sheets misinformed the subsequent medical and nonmedical personnel; it effectively continued the contraindicated medications and kept them in the dark about the correct diagnosis of scleroderma being made at NUMC.

372. On December 27, 2013, blood was drawn from Decedent while at the Ulster Correctional Facility. These results were sent to Defendant CHERIF MAKRAM, a physician at the Ulster Correctional Facility. The record does not indicate Defendant MAKRAM acted on these results at all. It appears they were filed and ignored.

373. On January 2, 2014, Decedent filed another "Sick Call Request" seeking hydrocortisone ointment as an anti-itch cream. He also reported a cough and requested lotion for his dry skin. He was seen by a presently unidentified nurse using Provider #266. An appointment was made with a physician's assistant to discuss lactose intolerance.

374. On January 7, 2014, a presently unidentified nurse using Provider #804 reported seeing Decedent. He or she wrote Decedent was complaining of pain in his arms secondary to scleroderma and wanted a follow-up for treatment. The chart was presented to Defendant LAGUIO and that nurse requested an expedited evaluation. No record exists this evaluation occurred and Decedent was transferred to Greene Correctional Facility on January 9.

### 3. GREENE CORRECTIONAL FACILITY

375. Defendant BRANDON SMITH is the Superintendent of the Greene Correctional Facility. Upon information and belief, he is responsible for the care and treatment of all prisoners there, including but not limited to the medical care rendered thereat.

376. At Greene, on or about January 9, 2014, an unidentified nurse using Provider #470 saw Decedent. He or she wrote there was hypothyroidism, and an otherwise ineligible notation, and that Decedent had scleroderma for which he was being provided hydrocortisone 1% and the contraindicated Naprosyn. He or she notes Decedent had very tight skin and very swollen hands and legs. He or she also noted a doctor was to be seen "ASAP."

377.    On January 10, 2014, Defendant DOREEN MARY SMITH (Provider #116), a physician, continued the prescription for the contraindicated Naprosyn with no evidence an examination occurred.  There is no corresponding examination note.

378.    On January 14, 2014, and unidentified nurse using Provider #282 provided more contraindicated Naprosyn without evidence an examination occurred.

379.    On January 15, 2014, Nurse Deborah Gottobed (Provider #468) wrote Decedent was coughing for about four hours and he was out of cough medicine.  This nurse wrote his cough was worse lying down and there were increased fluids.  She wrote Decedent described "pressure on his face."

380.    On January 16, 2014, Defendant DOREEN MARY SMITH (Provider #116) wrote Decedent told her that he was originally on prednisone which was stopped by the rheumatology consultant at Nassau County Medical.  This Defendant noted some lab results, decreased range of motion of his jaw, swelling of his face, lower arms, lower legs and skin that had tightness with harden appearance and touch.  On January 17, 2014, it appears this Defendant, for the first time, requested the records from Nassau University Medical Center.

381.    On January 29, 2014, nurse Robin Rizzi (Provider #457) wrote blood was drawn by a lab technician.

382.    On or about February 14, 2014, Martin Morell, an outside rheumatologist, conducted a "Telemed" examination of Decedent, where audio and video information was sent to him off-site while Decedent remained in jail.  Dr. Morell wrote scleroderma was a possibility and requested additional blood testing.  There is no indication any blood tests previously conducted, either while Decedent was incarcerated at the NCCC, or those obtained at the NUMC, or at Ulster or Greene, were reviewed or even available for this consult.

383.    On February 21, 2014, Defendant DOREEN MARY SMITH first reviewed Dr. Morell's consult note and ordered the lab work Dr. Morel asked for a week before.

384.    On March 4, 2014, an unidentified nurse using Provider #285 issued ammonium lactate lotion.

385.    On March 17, 2014, over one month since it was requested by the rheumatology consultant, it appears blood was first drawn for laboratory analysis.  No reason for the delay is evident.  The results thereof were sent to Defendant JON MILLER, a physician.  There is no indication Defendant MILLER reviewed or acted upon these results which indicated a positive ANA screen and titer findings consistent with scleroderma.

386.    On March 28, 2014, an unidentified nurse using Provider #282 issued ammonium lactate lotion and levothyroxine, a replacement for a hormone normally produced by the thyroid gland to regulate the body's energy and metabolism.

387.    The records and charts do not contain any notation Decedent's scleroderma was ever treated, properly or not, or any follow-up, physician or otherwise, occurred after the Telemed rheumatology consult.  Defendants simply ignored his obvious condition, his test results, consultant reports, and the previous diagnosis.

388.    There is no indication the health care providers and treating physicians at either Ulster or Greene Correctional Facilities meaningfully reviewed the medical records of the Defendant Nassau University Medical Center prior to Decedent's death.  It appears these records were sent to Ulster Correctional Facility and received there on or about January 14, 2014, but by that time, Decedent had already been transferred to the Greene Correctional Facility.  There is no indication these critical medical records were forwarded to, or received by Greene Correctional Facility at any time before Decedent died.

### 4. DEATH

389.    At 1:20 AM on April 23, 2014, Decedent was escorted to the infirmary complaining of shortness of breath.  Nurse Robin Rizzi reported his pallor was gray; she placed Decedent in a wheelchair and escorted him to an urgent care room.  His respiration decreased to 10 breaths per minute, she started CPR and placed AED pads.  EMTs arrived and continued with CPR and started other efforts but Decedent was pronounced at 2:17 AM.

390.    Later that morning, an autopsy was performed by Jeffrey D. Hubbard, M.D., at St. Peter's Hospital Mortuary in Albany, New York.  Dr. Hubbard wrote: "Mr. Casiano had a long-standing diagnosis of scleroderma with Raynaud's phenomenon, and had extensive skin involvement.  He died after complaining of shortness of breath.  Autopsy revealed extensive skin fibrosis.  An additional manifestation of scleroderma was bilateral renal obliterative arterial disease, with focal acute hemorrhage.  Scleroderma renal crisis is a complication of scleroderma with a poor prognosis.  Focal myocardial necrosis and scarring was also present in the absence of significant large-vessel coronary artery disease.  Toxicological testing yielded no significant results.  Death is natural, ascribed to scleroderma renal crisis."

391.    From the onset, Decedent's symptoms were a classic presentation of scleroderma affecting the skin and would have easily been confirmed with a proper rheumatologic workup. Given this subtype of scleroderma, Decedent should have been treated with Penicillamine, which is sold under the trade names Cuprimine and Depen.  It is a medication of the chelator class. Also, Decedent should have received immunosuppressive therapy to control the inflammatory phrase of his scleroderma.  Proper treatment should have included methotrexate, which is a type of chemotherapy, or mycophenolate mofetil or cyclophosphamide with or without antithymocyte globulin.  These are known as "disease modifying drugs" sometimes called "disease modifying anti-rheumatic drugs" or DMARD's.  This treatment would have greatly eased his pain,

prevented the disease from worsening, and greatly extended his life. Instead, for over one year, Defendants gave Decedent contraindicated NSAID's and prednisone. These are cheap drugs which did nothing for his pain but instead, exacerbated his condition and caused irreparable renal damage which resulted in a lingering death due to scleroderma renal crisis.

392.    Decedent's medical condition was a serious medical condition. He suffered a sufficiently serious injury – one year of substantial pain with disability, *to wit*, the loss of use of his arms and hands, culminating in death – as a result of the failures, deficiencies, and deliberate indifference of the Defendants.

393.    The denial of appropriate medical care to Decedent created a condition of urgency and resulted, unnecessarily, in his death.

394.    The treatment of, and harm to Decedent was so egregious as to rise to the level of constitutional violation.

395.    The NYSCOC, via a number of reports issued by it relating to other inmate deaths at the NCCC prior to Decedent's death, warned the COUNTY Defendants and Defendant ARMOR that they should and must address the deficiencies, failures, and other problems relating to health care and medical services at the NCCC. The reports relating to the deaths in custody of inmates Roy Nordstrom and Kevin Brown, described, *supra*, are especially to be noted.

396.    The COUNTY Defendants and Defendant ARMOR ignored the warnings and recommendations of the NYSCOC.

397.    Based on the well-known, long and repetitious history (played out in thematic rataplan) of systemic medical and health care deficiencies and failures at the NCCC, as well as an abundance of adverse media coverage and publicity in that regard (i.e. as to the systemically deficient health and medical care provided at the NCCC, as to ARMOR'S track record of scores of

lawsuits and multiple jurisdictions, as to ARMOR'S pattern of medical and health service deficiencies, etc.), a number of adverse NYSCOC reports, especially over the last five years or so, the successful lawsuits brought against the COUNTY Defendants and ARMOR in the Eastern District of New York and in Nassau Supreme Court and the many hundreds of prisoner complaints, the COUNTY Defendants and Defendant ARMOR had actual knowledge of the deficiencies in the health and medical clear at the NCCC but did nothing to try and stop and/or remedy the situation.

398.    The acts and omissions of the COUNTY Defendants and their repeated conduct, was so persistent and widespread, as has been set out hereinabove, as to constitute policies, customs, and practices that proximately caused the constitutional injury to Decedent.

399.    Defendant ARMOR, along with its private doctors and medical personnel, as a consequence of ARMOR'S contract with Defendant COUNTY to provide health and medical services to the inmates of the NCCC, were performing governmental functions and all are subject to §1983 claims relating to the adequacy of the medical and health services provided.

400.    Defendant ARMOR and NCCC officials knew that Decedent faced a substantial risk of serious harm and disregarded that risk by failing to take reasonable measures to abate that risk.

401.    That Defendant SPOSATO and the herein named corporeal ARMOR medical personnel and that medical staff at Defendant NUMC, through their own individual actions, violated Decedent's constitutional rights.

402.    Defendant SPOSATO, as a supervisory official, participated directly in the constitutional violations.  As Sheriff and chief administrator and supervisor of the NCCC, he promulgated, created, or participated in the creation of the policies, practices, and customs under

which the unconstitutional conduct occurred and/or he allow the continuance of such policies, practices and customs.

403.    Defendant SPOSATO knew and/or it was obvious that continuing the above-said policies, practices, and customs posed an excessive risk to the health and safety of inmates like Decedent.

404.    Defendant SPOSATO, through his continued encouragement, approval, and ratification of the aforementioned policies, practices, and customs, despite their known and obvious inadequacies and danger and risk to inmates, was deliberately indifferent to the inmates' serious medical needs, inclusive of Decedent.

405.    The COUNTY Defendants (including SPOSATO) failed to adequately train and supervise the staff of the NCCC.  This constituted deliberate indifference to the rights of those who would come into contact with that staff, including Decedent.

406.    Defendant ARMOR failed to adequately train and supervise its medical staff, which staff performed health and medical care services at the NCCC.  This constituted deliberate indifference to the rights of those inmates who came into contact with that staff, including Decedent.

407.    That the COUNTY Defendants endorsed, accepted, and adopted the policies, practices, and protocols of Defendant ARMOR and its employees, and the conduct, acts, and failures to act in pursuance of these policies caused the violation of Decedent's constitutional rights.

408.    In twice renewing Defendant ARMOR'S contract, the COUNTY Defendants repeatedly ratified the policies, practices, and protocols of Defendant ARMOR, when in fact, they should have taken affirmative action to terminate the existing contract or to refuse renewal.

409.    As recently as May, 2015, prior to the last renewal, NCSD spokesman Captain Michael Golio, in response to an inquiry, publicly averred, "There is no intention of discontinuing the existing relationship [with Armor] at this time."

410.    The COUNTY Defendants created the risk of violating Decedent's constitutional rights by creating conditions, policies, customs, and practices as those set out hereinabove.

411.    Defendant ARMOR created the risk of violating Decedent's constitutional rights by creating conditions, policies, customs, and practices as those set out hereinabove.

412.    Upon information and belief, based on the well-known, long and repetitious history of systemic medical and health care deficiencies and failures at the Ulster Correctional Facility, Defendant MICHAEL GRAZIANO had actual knowledge of the deficiencies in the health and medical care thereat but did nothing to try and stop and/or remedy the situation.

413.    The acts and omissions of the health care employees at the Ulster Correctional Facility demonstrate deliberate indifference to defendant's health and constitutional rights to be free from cruel and unusual punishment by ignoring obvious conditions, failing to provide treatment for diagnosed conditions, failing to investigate enough to make an informed judgment, delaying treatment, interfering with access to medical treatment such as by failing to obtain prior medical records in a timely manner, making decisions based on nonmedical factors, and making so-called "medical" decisions so bad that they were not medical judgments at all, and their repeated conduct in accord herewith, was so persistent and widespread, as has been set out hereinabove, as to constitute policies, customs, and practices that proximately caused the constitutional injury to Decedent.

414.    Defendants MICHAEL GRAZIANO, CHEREF MAKRAM, and JORDAN LAGUIO were officials that knew Decedent faced a substantial risk of serious harm and disregarded that risk by failing to take reasonable measures to abate that risk.

415.    Defendants MICHAEL GRAZIANO, CHEREF MAKRAM, and JORDAN LAGUIO, through their own individual actions, violated Decedent's constitutional rights.

416.    Defendant MICHAEL GRAZIANO, as a supervisory official, participated directly in the constitutional violations.  As Superintendent and chief administrator and supervisor of the Ulster Correctional Facility, he promulgated, created or participated in the creation of the policies, practices, and customs under which the unconstitutional conduct occurred and/or he allow the continuance of such policy, practice, and customs.

417.    Defendant MICHAEL GRAZIANO knew and/or it was obvious that continuing the above-said policies, practices, and customs posed an excessive risk to the health and safety of inmates like Decedent.

418.    Defendant MICHAEL GRAZIANO, through his continued encouragement, approval, and ratification of the aforementioned policies, practices, and customs, despite their known and obvious inadequacies, dangers, and risk to inmates, was deliberately indifferent to the inmates' serious medical needs, inclusive of Decedent.

419.    Defendant MICHAEL GRAZIANO failed to adequately train and supervise the medical staff of the Ulster Correctional Facility.  This constituted deliberate indifference to the rights of those who would come into contact with that staff, including Decedent.

420.    That Defendant MICHAEL GRAZIANO endorsed, accepted, and adopted the policies, practices, and protocols of Defendants CHEREF MAKRAM and JORDAN LAGUIO and other healthcare providers at the Ulster Correctional Facility, and the conduct, acts, and failures to act

in pursuance of these policies caused the violation of Decedent's constitutional rights, and created the risk of violating Decedent's constitutional rights by creating conditions, policies, customs, and practices as those set out hereinabove.

421.    Upon information and belief, based on the well-known, long and repetitious history of systemic medical and health care deficiencies and failures at the Greene Correctional Facility, Defendant BRANDON SMITH had actual knowledge of the deficiencies in the health and medical care threat but did nothing to try and stop and/or remedy the situation.

422.    The acts and omissions of health care employees at the Greene Correctional Facility demonstrate deliberate indifference to defendant's health and constitutional rights to be free from cruel and unusual punishment by ignoring obvious conditions, failing to provide treatment for diagnosed conditions, failing to investigate enough to make an informed judgment, delaying treatment, interfering with access to medical treatment such as by failing to obtain prior medical records in a timely manner, making decisions based on nonmedical factors, and making so-called "medical" decisions so bad that they were not medical judgments at all, and their repeated conduct in accord herewith, was so persistent and widespread, as has been set out hereinabove, as to constitute policies, customs, and practices that proximately caused the constitutional injury to Decedent.

423.    Defendants BRANDON SMITH, DOREEN MARY SMITH, and JON MILLER were officials that knew Decedent faced a substantial risk of serious harm and disregarded that risk by failing to take reasonable measures to abate that risk.

424.    Defendants BRANDON SMITH, DOREEN MARY SMITH, and JON MILLER, through their own individual actions, violated Decedent's constitutional rights.

425.    Defendant BRANDON SMITH, as a supervisory official, participated directly in the constitutional violations.  As Superintendent and chief administrator and supervisor of the Greene Correctional Facility, he promulgated, created or participated in the creation of the policies, practices, and customs under which the unconstitutional conduct occurred and/or he allow the continuance of such policy, practice, and customs.

426.    Defendant BRANDON SMITH knew and/or it was obvious that continuing the above-said policies, practices, and customs posed an excessive risk to the health and safety of inmates like Decedent.

427.    Defendant BRANDON SMITH, through his continued encouragement, approval, and ratification of the aforementioned policies, practices, and customs, despite their known and obvious inadequacies, dangers, and risk to inmates, was deliberately indifferent to the inmates' serious medical needs, inclusive of Decedent.

428.    Defendant BRANDON SMITH failed to adequately train and supervise the medical staff of the Greene Correctional Facility.  This constituted deliberate indifference to the rights of those who would come into contact with that staff, including Decedent.

429.    That Defendant BRANDON SMITH endorsed, accepted, and adopted the policies, practices, and protocols of Defendants DOREEN MARY SMITH, and JON MILLER and other healthcare providers at the Greene Correctional Facility, and the conduct, acts, and failures to act in pursuance of these policies caused the violation of Decedent's constitutional rights, and created the risk of violating Decedent's constitutional rights by creating conditions, policies, customs, and practices as those set out hereinabove.

430.    All Defendants were performing governmental functions and all are subject to §1983 claims relating to the inadequacy of the medical and health services provided.

CLAIMS FOR RELIEF - FEDERAL

A. FIRST CLAIM - NASSAU COUNTY

431.   Plaintiff herein repeats, reiterates, and realleges each and every previously stated allegation of this Complaint, inclusive, with the same force and effect as if each and every preceding allegation was more fully and completely set forth at length herein.

432.   That at all time material hereto, all Defendants herein are "persons" for the purposes of all claims brought under 42 USC §1983.

433.   That Defendant COUNTY, acting on its own and through the Defendant NCCC, Defendant SPOSATO, Defendant NUMC, and Defendant ARMOR, directly caused the constitutional violations suffered by Decedent as a result of the pattern of conduct alleged herein of Defendant SPOSATO, Defendant NUMC, Defendant ARMOR, and the defendant physicians and other defendant medical personnel employed by Defendant ARMOR and Defendant NUMC, respectively, and is liable for damage suffered by Plaintiff herein.

434.   That Defendant COUNTY, acting on its own and through the Defendant NCCC, Defendant SPOSATO, Defendant NUMC, and Defendant ARMOR, had in effect certain policies, practices, and customs that created, cause, condoned, contributed to, allowed and fostered the unconstitutional conduct of the other County Defendants, Defendant ARMOR, and the individual employees and agents of Defendant NUMC and of Defendant ARMOR.

435.   That Defendant COUNTY, acting on its own and through the Defendant NCCC, Defendant SPOSATO, Defendant NUMC, and Defendant ARMOR and the aforesaid individual defendants, had an effect certain policies, practices and customs which overlooked and ignored, encouraged and explicitly and/or tacitly sanctioned, through the conduct alleged herein, the violation of Decedent's and other inmate's constitutional rights to adequate health and medical care at the NCCC.

436. The aforesaid policies, practices, and customs were a direct and proximate cause of the unconstitutional conduct alleged herein as to Decedent and other NCCC inmates.

437. The Defendant COUNTY knew of the deficiencies of health and medical services at the NCCC, and by Defendant ARMOR, and by the aforesaid individual defendants prior to December 26, 2013, the date Decedent was transferred upstate.

438. Despite its knowledge and awareness, as aforesaid, the Defendant COUNTY allowed this wrongful and unconstitutional conduct and failed to take appropriate remedial action.

439. The Defendant COUNTY knew of Defendant ARMOR'S propensity for performing deficient health and medical services on behalf of inmates.

440. By renewing its contract with Defendant ARMOR, the Defendant COUNTY ratified and condoned ARMOR'S policy, practice and/or custom of deficient health and medical care services, including but not limited to its permitting, causing, and allowing its medical staff to repeatedly and consistently:

  a. ignore obvious conditions;

  b. fail to provide treatment for diagnosed conditions;

  c. fail to investigate enough to make an informed medical judgment;

  d. delay treatment such as by denying examinations by qualified personnel and/or doctors following sick call requests;

  e. interfere with access to medical treatment such as by failing to maintain and keep legible, organized medical records and failing to obtain prior and consultant medical records in a timely manner;

  f. make decisions based on nonmedical factors such as cost; and,

g. make "medical" decisions so bad that they were not medical judgments at all.

441.   Despite its knowledge of the aforesaid propensity of Defendant ARMOR, the Defendant COUNTY failed to take appropriate remedial action.

442.   The Defendant COUNTY'S conduct demonstrated reckless and/or callous indifference to the federally protected rights of Decedent.

443.   All of the foregoing caused the violations of Decedent's constitutional rights, deprived Decedent of his right to be free from cruel and unusual punishment and his right to due process of law, caused him to needlessly sustain serious and severe personal injuries including over one full year of horrific pain and suffering, severe swelling and pain of his hands and arms, hardening of the skin on his hands and arms, loss of use of his hands and arms, internal organ failure, culminating in his lingering but unnecessary death from scleroderma renal crisis.

## B.  SECOND CLAIM - NASSAU COUNTY

444.   Plaintiff herein repeats, reiterates, and realleges each and every previously stated allegation of this Complaint, inclusive, with the same force and effect as if each and every preceding allegation was more fully and completely set forth at length herein.

445.   That at all time material hereto, all Defendants herein are "persons" for the purposes of all claims brought under 42 USC §1983.

446.   The Defendant COUNTY, acting on its own and through the other County Defendants, failed to hire qualified personnel at NCCC, and failed to train or adequately train the non-medical and medical staff at the NCCC.

447.   The Defendant COUNTY, acting on its own and through the other County Defendants failed to hire qualified personnel, failed to train or to adequately train the Defendant

ARMOR, and their employees and medical staff, inclusive of both those individuals named herein and those currently unidentified.

448.    The need for hiring qualified personnel, and then training, additional training, or different training to avoid violations of constitutional rights was such as to be obvious that the inadequacy of training would result in a violation of Decedent's and other inmates' constitutional rights relating to their serious medical needs and other aspects of health and medical care.

449.    The inadequacy of hiring and then training as aforesaid at the NCCC was so pervasive and long-standing as to form a pattern constituting deliberate indifference to the serious medical needs of Decedent and other inmates and established deficient and inappropriate hiring and training as policy, practice and/or custom.

450.    The pattern of similar constitutional violations by unqualified, untrained or inadequately trained NCCC staff (including medical staff of Defendant ARMOR) demonstrates the deliberate indifference of the Defendant COUNTY toward its failure to adequately hire and train NCCC staff.

451.    As a result of all that is set out above, the Defendant COUNTY had sufficient notice of the failure to adequately hire and also train.

452.    Despite the said sufficient notice, the Defendant COUNTY failed to take appropriate remedial action.

453.    It is and was reasonable for Plaintiff, Decedent, and other NCCC inmates to expect the hiring of qualified personal and adequate training to have occurred.

454.    The Defendant COUNTY'S conduct demonstrated reckless and/or callous deliberate indifference to the federally protected rights of Decedent.

455.   All of the foregoing caused the violations of Decedent's constitutional rights, deprived Decedent of his right to be free from cruel and unusual punishment and his right to due process of law, caused him to needlessly sustain serious and severe personal injuries including over one full year of horrific pain and suffering, severe swelling and pain of his hands and arms, hardening of the skin on his hands and arms, loss of use of his hands and arms, internal organ failure, culminating in his lingering but unnecessary death from scleroderma renal crisis.

### C. Third Claim - Nassau County

456.   Plaintiff herein repeats, reiterates, and realleges each and every previously stated allegation of this Complaint, inclusive, with the same force and effect as if each and every preceding allegation was more fully and completely set forth at length herein.

457.   That at all time material hereto, all Defendants herein are "persons" for the purposes of all claims brought under 42 USC §1983.

458.   The Defendant County, acting on its own and through the other County Defendants failed to supervise or to adequately supervise Defendant Sposato, and other NCCC staff, both medical and nonmedical, including those employees of Defendant Armor identified and named herein, and those which are currently unidentified.

459.   The Defendant County employee supervisors in the County government's executive branch, participated directly in the unconstitutional actions of the defendants by promulgating, creating, condoning, implementing, directing, adopting as their own and carrying out or continuing certain policies, practices, and customs that violated Decedent's and other inmates' constitutional rights, as alleged hereinabove.

460.   That Defendant Sposato, as a supervisor and administrator, participated directly in the unconstitutional actions of the defendants by promulgating, creating, condoning,

82

implementing, directing, adopting as his own and carrying out or continuing certain policies, practices and customs that violated Decedent's and other inmates' constitutional rights, as alleged hereinabove.

461.    The aforesaid defendant supervisors were deliberately indifferent with regard to their supervision of others, including the other defendants.

462.    The aforesaid defendant supervisors had knowledge of the inadequacies of their supervision and failed to do anything to remedy the situation that existed.

463.    The aforesaid supervisors caused Decedent to be subjected to the deprivation of rights, privileges, or immunities secured by the Constitution and laws of the United States.

464.    The conduct of the Defendant COUNTY and the aforesaid supervisors demonstrated reckless and/or callous deliberate indifference to the federally protected rights of Decedent.

465.    The Defendant COUNTY'S and the aforesaid supervisors' failures to adequately supervise, as set forth, led to the violation of Decedent's constitutional rights and his unnecessary and untimely death.

466.    All of the foregoing caused the violations of Decedent's constitutional rights, deprived Decedent of his right to be free from cruel and unusual punishment and his right to due process of law, caused him to needlessly sustain serious and severe personal injuries including over one full year of horrific pain and suffering, severe swelling and pain of his hands and arms, hardening of the skin on his hands and arms, loss of use of his hands and arms, internal organ failure, culminating in his lingering but unnecessary death from scleroderma renal crisis.

### D. Fourth Claim - Armor

467.   Plaintiff herein repeats, reiterates, and realleges each and every previously stated allegation of this Complaint, inclusive, with the same force and effect as if each and every preceding allegation was more fully and completely set forth at length herein.

468.   That at all time material hereto, all Defendants herein are "persons" for the purposes of all claims brought under 42 USC §1983.

469.   That Defendant Armor, its supervisors and its employees, named and identified herein and those presently unidentified were acting under color of state law and in their official capacities.

470.   The Defendant Armor and its supervisors named and identified herein and those presently unidentified failed to hire qualified personnel, and failed to train or to adequately train the medical staff at the NCCC, including its employees both named herein and those which are presently unidentified.

471.   That the need for hiring qualified personnel, and for training, additional training, or different training to avoid violations of constitutional rights was such as to be obvious that the need to hire qualified personnel, and the inadequacy of training would result in a violation of Decedent's and other inmates' constitutional rights relating to their serious medical needs and other aspects of health and medical care.

472.   The inadequacy of hiring by, and training given by Defendant Armor and its supervisors named and identified herein and those presently unidentified, to its medical and nonmedical staff at the NCCC was so pervasive and long-standing as to form a pattern constituting deliberate indifference to the serious medical needs of Decedent and other inmates and established deficient and inappropriate hiring and training as policy, practice and/or custom of Defendant Armor.

473.    The pattern of similar constitutional violations by unqualified, untrained or inadequately trained NCCC nonmedical and medical staff demonstrates the deliberate indifference of Defendant ARMOR and its supervisors named and identified herein and those presently unidentified, toward its failure to adequately hire and train said NCCC staff.

474.    As a result of all that is set out above, Defendant ARMOR and its supervisors named and identified herein and those presently unidentified, had sufficient notice of its failure to hire qualified personnel and its failure to adequately train.

475.    Despite the said sufficient notice, Defendant ARMOR and its supervisors named and identified herein and those presently unidentified, failed to take appropriate remedial action.

476.    It is and was reasonable for Plaintiff, Decedent, and other NCCC inmates to expect qualified personnel to be hired, and adequate training to have occurred.

477.    That the conduct of Defendant ARMOR and its supervisors named and identified herein and those presently unidentified, demonstrated reckless and/or callous deliberate indifference to the federally protected rights of Decedent.

478.    All of the foregoing caused the violations of Decedent's constitutional rights, deprived Decedent of his right to be free from cruel and unusual punishment and his right to due process of law, caused him to needlessly sustain serious and severe personal injuries including over one full year of horrific pain and suffering, severe swelling and pain of his hands and arms, hardening of the skin on his hands and arms, loss of use of his hands and arms, internal organ failure, culminating in his lingering but unnecessary death from scleroderma renal crisis.

### E. Fifth Claim - Armor

479.    Plaintiff herein repeats, reiterates, and realleges each and every previously stated allegation of this Complaint, inclusive, with the same force and effect as if each and every preceding allegation was more fully and completely set forth at length herein.

480.    That at all time material hereto, all Defendants herein are "persons" for the purposes of all claims brought under 42 USC §1983.

481.    That Defendant ARMOR, its supervisors and its employees, named and identified herein and those presently unidentified were acting under color of state law and in their official capacities.

482.    The Defendant ARMOR and its supervisors named and identified herein and those presently unidentified failed to supervise or adequately supervise the medical staff at the NCCC, including its employees both named herein and those which are presently unidentified.

483.    Supervisors and administrators employed by Defendant ARMOR participated directly in the unconstitutional actions of other defendants by promulgating, creating, condoning, implementing, directing, adopting as their own and carrying out or continuing certain policies, practices, and customs that violated Defendant's and other inmates' constitutional rights, as alleged hereinabove.

484.    The aforesaid defendant supervisors and administrators were deliberately indifferent with regard to their supervision of others, including other defendants.

485.    The aforesaid defendant supervisors and administrators had knowledge of the inadequacies of their supervision and failed to do anything to remedy the situation that existed.

486.    The aforesaid supervisors caused Decedent to be subjected to the deprivation of rights, privileges, or immunities secured by the Constitution and laws of the United States.

487.    The conduct of the Defendant ARMOR, and the aforesaid supervisors and administrators demonstrated reckless and/or callous deliberate indifference to the federally protected rights of Decedent.

488.    All of the foregoing caused the violations of Decedent's constitutional rights, deprived Decedent of his right to be free from cruel and unusual punishment and his right to due process of law, caused him to needlessly sustain serious and severe personal injuries including over one full year of horrific pain and suffering, severe swelling and pain of his hands and arms, hardening of the skin on his hands and arms, loss of use of his hands and arms, internal organ failure, culminating in his lingering but unnecessary death from scleroderma renal crisis.

## F. SIXTH CLAIM – UPSTATE DEFENDANTS

489.    Plaintiff herein repeats, reiterates, and realleges each and every previously stated allegation of this Complaint, inclusive, with the same force and effect as if each and every preceding allegation was more fully and completely set forth at length herein.

490.    That at all time material hereto, all Defendants herein are "persons" for the purposes of all claims brought under 42 USC §1983.

491.    That at all times pertinent hereto, Defendant MICHAEL GRAZIANO and Defendant BRANDON SMITH were the Superintendents and/or Wardens of the Ulster Correctional Facility and the Greene Correctional Facility, respectively.

492.    That Defendants CHEREF MAKRAM, JORDAN LAGUIO, DOREEN MARY SMITH, and JON MILLER were physicians hired by the State of New York to provide constitutionally adequate health and medical care services for the inmates at their respective correctional facilities and hire qualified personnel for their respective medical units and properly train their staffs.

493.    That at all times pertinent hereto, Defendants MICHAEL GRAZIANO, BRANDON SMITH, CHEREF MAKRAM, JORDAN LAGUIO, DOREEN MARY SMITH, and JON MILLER were acting under color of state law and in their official capacities.

494.    That Defendants MICHAEL GRAZIANO, BRANDON SMITH, CHEREF MAKRAM, JORDAN LAGUIO, DOREEN MARY SMITH, and JON MILLER are named and sued in their individual capacities.

495.    The Defendants MICHAEL GRAZIANO, BRANDON SMITH, CHEREF MAKRAM, JORDAN LAGUIO, DOREEN MARY SMITH, and JON MILLER had a duty to hire qualify medical personnel and properly train their respective staffs.

496.    That Defendants MICHAEL GRAZIANO, BRANDON SMITH, CHEREF MAKRAM, JORDAN LAGUIO, DOREEN MARY SMITH, and JON MILLER failed to hire qualified personnel, and failed to train or to adequately train the medical staff at their respective prisons, including the employees both named herein and those which are presently unidentified.

497.    That the need for hiring qualified personnel, and for training, additional training, or different training to avoid violations of constitutional rights was such as to be obvious that the need to hire qualified personnel, and the inadequacy of training would result in a violation of Decedent's and other inmates' constitutional rights relating to their serious medical needs and other aspects of health and medical care.

498.    The inadequacy of hiring by, and training given by Defendants MICHAEL GRAZIANO, BRANDON SMITH, CHEREF MAKRAM, JORDAN LAGUIO, DOREEN MARY SMITH, and JON MILLER to their medical and nonmedical staff was so pervasive and long-standing as to form a pattern constituting deliberate indifference to the serious medical needs of Decedent and other

inmates and established deficient and inappropriate hiring and training as policy, practice and/or custom.

499.    The pattern of similar constitutional violations by unqualified, untrained or inadequately trained nonmedical and medical staff demonstrates the deliberate indifference of Defendants MICHAEL GRAZIANO, BRANDON SMITH, CHEREF MAKRAM, JORDAN LAGUIO, DOREEN MARY SMITH, and JON MILLER toward their failure to adequately hire and train their respective staffs.

500.    The pattern of similar constitutional violations by unqualified, untrained or inadequately trained nonmedical and medical staff ratified and condoned a policy, practice and/or custom of deficient health and medical care services, including but not limited to permitting, causing, and allowing their respective medical staffs to repeatedly and consistently:

a.  ignore obvious conditions;

b.  fail to provide treatment for diagnosed conditions;

c.  fail to investigate enough to make an informed medical judgment;

d.  delay treatment such as by denying examinations by qualified personnel and/or doctors following sick call requests;

e.  interfere with access to medical treatment such as by failing to maintain and keep legible, organized medical records and failing to obtain prior and consultant medical records in a timely manner;

f.  make decisions based on nonmedical factors such as cost; and,

g.  make "medical" decisions so bad that they were not medical judgments at all.

501.    As a result of all that is set out above, Defendants MICHAEL GRAZIANO, BRANDON SMITH, CHEREF MAKRAM, JORDAN LAGUIO, DOREEN MARY SMITH, and JON MILLER had sufficient notice of its failure to hire qualified personnel and its failure to adequately train.

502.    Despite the said sufficient notice, Defendants MICHAEL GRAZIANO, BRANDON SMITH, CHEREF MAKRAM, JORDAN LAGUIO, DOREEN MARY SMITH, and JON MILLER failed to take appropriate remedial action.

503.    It is and was reasonable for Plaintiff, Decedent, and other inmates situated similarly to expect qualified personnel to be hired, and adequate training to have occurred.

504.    That the conduct of Defendants MICHAEL GRAZIANO, BRANDON SMITH, CHEREF MAKRAM, JORDAN LAGUIO, DOREEN MARY SMITH, and JON MILLER demonstrated reckless and/or callous deliberate indifference to the federally protected rights of Decedent.

505.    All of the foregoing caused the violations of Decedent's constitutional rights, deprived Decedent of his right to be free from cruel and unusual punishment and his right to due process of law, caused him to needlessly sustain serious and severe personal injuries including the continuation of horrific pain and suffering, severe swelling and pain of his hands and arms, hardening of the skin on his hands and arms, loss of use of his hands and arms, internal organ failure, culminating in his lingering but unnecessary death from scleroderma renal crisis.

### G. SEVENTH CLAIM – UPSTATE DEFENDANTS

506.    Plaintiff herein repeats, reiterates, and realleges each and every previously stated allegation of this Complaint, inclusive, with the same force and effect as if each and every preceding allegation was more fully and completely set forth at length herein.

507.    That at all time material hereto, all Defendants herein are "persons" for the purposes of all claims brought under 42 USC §1983.

508. That at all times pertinent hereto, Defendant MICHAEL GRAZIANO and Defendant BRANDON SMITH were the Superintendents and/or Wardens of the Ulster Correctional Facility and the Greene Correctional Facility, respectively.

509. That Defendants CHEREF MAKRAM, JORDAN LAGUIO, DOREEN MARY SMITH, and JON MILLER were physicians hired by the State of New York to provide constitutionally adequate health and medical care services for the inmates at their respective correctional facilities and supervisors the medical staff in their units.

510. That at all times pertinent hereto, Defendants MICHAEL GRAZIANO, BRANDON SMITH, CHEREF MAKRAM, JORDAN LAGUIO, DOREEN MARY SMITH, and JON MILLER were acting under color of state law and in their official capacities.

511. That Defendants MICHAEL GRAZIANO, BRANDON SMITH, CHEREF MAKRAM, JORDAN LAGUIO, DOREEN MARY SMITH, and JON MILLER are named and sued in their individual capacities.

512. That Defendants MICHAEL GRAZIANO, BRANDON SMITH, CHEREF MAKRAM, JORDAN LAGUIO, DOREEN MARY SMITH, and JON MILLER failed to supervise or adequately supervise their respective medical staffs, including its employees both named herein and those which are presently unidentified.

513. Defendants MICHAEL GRAZIANO, BRANDON SMITH, CHEREF MAKRAM, JORDAN LAGUIO, DOREEN MARY SMITH, and JON MILLER participated directly in the unconstitutional actions of other defendants by promulgating, creating, condoning, implementing, directing, adopting as their own and carrying out or continuing certain policies, practices, and customs that violated Defendant's and other inmates' constitutional rights, as alleged herein.

514.     That the failure to supervise or the failure to adequately supervise by Defendants MICHAEL GRAZIANO, BRANDON SMITH, CHEREF MAKRAM, JORDAN LAGUIO, DOREEN MARY SMITH, and JON MILLER caused a policy, practice and/or custom of deficient health and medical care services, including but not limited to permitting, causing, and allowing its medical staff to repeatedly and consistently:

a.  ignore obvious conditions;

b.  fail to provide treatment for diagnosed conditions;

c.  fail to investigate enough to make an informed medical judgment;

d.  delay treatment such as by denying examinations by qualified personnel and/or doctors following sick call requests;

e.  interfere with access to medical treatment such as by failing to maintain and keep legible, organized medical records and failing to obtain prior and consultant medical records in a timely manner;

f.  make decisions based on nonmedical factors such as cost; and,

g.  make "medical" decisions so bad that they were not medical judgments at all.

515.     That Defendants MICHAEL GRAZIANO, BRANDON SMITH, CHEREF MAKRAM, JORDAN LAGUIO, DOREEN MARY SMITH, and JON MILLER were deliberately indifferent with regard to their supervision of others, including other defendants.

516.     That Defendants MICHAEL GRAZIANO, BRANDON SMITH, CHEREF MAKRAM, JORDAN LAGUIO, DOREEN MARY SMITH, and JON MILLER had knowledge of the inadequacies of their supervision and failed to do anything to remedy the situation that existed.

517.     That Defendants MICHAEL GRAZIANO, BRANDON SMITH, CHEREF MAKRAM, JORDAN LAGUIO, DOREEN MARY SMITH, and JON MILLER caused Decedent to be subjected to the

deprivation of rights, privileges, or immunities secured by the Constitution and laws of the United States.

518.   The conduct of Defendants MICHAEL GRAZIANO, BRANDON SMITH, CHEREF MAKRAM, JORDAN LAGUIO, DOREEN MARY SMITH, and JON MILLER demonstrated reckless and/or callous deliberate indifference to the federally protected rights of Decedent.

519.   All of the foregoing caused the violations of Decedent's constitutional rights, deprived Decedent of his right to be free from cruel and unusual punishment and his right to due process of law, caused him to needlessly sustain serious and severe personal injuries including the continuation of horrific pain and suffering, severe swelling and pain of his hands and arms, hardening of the skin on his hands and arms, loss of use of his hands and arms, internal organ failure, culminating in his lingering but unnecessary death from scleroderma renal crisis.

## H. EIGHTH CLAIM

520.   Plaintiff herein repeats, reiterates, and realleges each and every previously stated allegation of this Complaint, inclusive, with the same force and effect as if each and every preceding allegation was more fully and completely set forth at length herein.

521.   That all Defendants had an affirmative duty to provide it administer health and medical services to Decedent and other inmates at their respective facilities.

522.   That all Defendants, as previously alleged, had a duty and obligation to Decedent and other inmates similarly situated, to provide reasonable and adequate health and medical services.

523.   The Defendants had knowledge that the health care they provided and/or were responsible for providing to Decedent and other similarly situated inmates was deficient, inadequate, and incompetent.

524.    The health and medical care provided by Defendants, or which they were responsible for providing to Decedent failed to meet an acceptable standard of treatment and care in terms of modern medicine, technology, and current beliefs about human decency.

525.    The health and medical care provided by the Defendants, or which they were responsible for providing created an excessive risk to Decedent, and the harm to which Decedent was exposed was sufficiently serious as to implicate his constitutional rights.

526.    The Defendants knew that Decedent's medical condition constituted a serious need for competent and adequate medical care and treatment.

527.    The Defendants knew of and ignored the aforesaid excessive risk to Decedent's health.

528.    The denial of adequate medical care as aforesaid created a condition of urgency, where pain, emotional distress, disability, permanent injury and even death were likely.

529.    The Defendants' policies, practices, customs, actions and failures to act constituted deliberate indifference to the serious medical needs of Decedent.

530.    As a direct and proximate result of the foregoing, Decedent was subjected to great physical and emotional pain and suffering.

531.    The Defendants' conduct demonstrated reckless and/or callous deliberate indifference to the federally protected rights of Decedent.

532.    All of the foregoing caused the violations of Decedent's constitutional rights, deprived Decedent of his right to be free from cruel and unusual punishment and his right to due process of law, caused him to sustain serious and severe personal injuries including over one full year of horrific pain and suffering, severe swelling and pain of his hands and arms, hardening of

the skin on his hands and arms, loss of use of his hands and arms, internal organ failure, culminating in his lingering but unnecessary death from scleroderma renal crisis.

## I. NINTH CLAIM

533.    Plaintiff herein repeats, reiterates, and realleges each and every previously stated allegation of this Complaint, inclusive, with the same force and effect as if each and every preceding allegation was more fully and completely set forth at length herein.

534.    That Defendant ARMOR was under contract with the Defendant County to provide constitutionally adequate health and medical care services for the inmates at the NCCC.

535.    That Defendant ARMOR, including its doctors and nurses, both identified and named herein and those which are presently unidentified, made numerous egregious mistakes in the care and treatment of Decedent, including but not limited to:

      a.  ignoring obvious conditions;

      b.  failing to provide treatment for diagnosed conditions;

      c.  failing to investigate enough to make an informed medical judgment;

      d.  delaying treatment such as by denying examinations by qualified personnel and/or doctors following sick call requests;

      e.  interfering with access to medical treatment such as by failing to maintain and keep legible, organized medical records and failing to obtain prior and consultant medical records in a timely manner;

      f.  making decisions based on nonmedical factors such as cost; and,

      g.  making "medical" decisions so bad that they were not medical judgments at all.

536.    That Defendant ARMOR, including its doctors and nurses, both identified and named herein and those which are presently unidentified were reckless and negligent in the care and treatment of Decedent.

537.    That Defendant ARMOR, including its doctors and nurses, both identified and named herein and those which are presently unidentified, failed to provide constitutionally adequate health and medical care to Decedent.

538.    As a direct and proximate result of the foregoing, Decedent was subjected to great physical and emotional pain and suffering.

539.    The conduct of Defendant ARMOR, including its doctors and nurses, both identified and named herein and those which are presently unidentified, demonstrated reckless and/or callous deliberate indifference to the federally protected rights of Decedent.

540.    All of the foregoing caused the violations of Decedent's constitutional rights, deprived Decedent of his right to be free from cruel and unusual punishment and his right to due process of law, caused him to needlessly sustain serious and severe personal injuries including over one full year of horrific pain and suffering, severe swelling and pain of his hands and arms, hardening of the skin on his hands and arms, loss of use of his hands and arms, internal organ failure, culminating in his lingering but unnecessary death from scleroderma renal crisis.

### J. TENTH CLAIM

541.    Plaintiff herein repeats, reiterates, and realleges each and every previously stated allegation of this Complaint, inclusive, with the same force and effect as if each and every preceding allegation was more fully and completely set forth at length herein.

542.    That at all time material hereto, all Defendants herein are "persons" for the purposes of all claims brought under 42 USC §1983.

543.    That Defendants CHEREF MAKRAM, JORDAN LAGUIO, DOREEN MARY SMITH, and JON MILLER were physicians hired by the State of New York to provide constitutionally adequate health and medical care services for the inmates at their respective correctional facilities.

544.    That at all times pertinent hereto, Defendants CHEREF MAKRAM, JORDAN LAGUIO, DOREEN MARY SMITH, and JON MILLER were acting under color of state law and in their official capacities.

545.    That Defendants CHEREF MAKRAM, JORDAN LAGUIO, DOREEN MARY SMITH, and JON MILLER are named and sued in their individual capacities.

546.    That Defendants CHEREF MAKRAM, JORDAN LAGUIO, DOREEN MARY SMITH, and JON MILLER made numerous egregious mistakes in the care and treatment of Decedent, including but not limited to:

    a.  ignoring obvious conditions;

    b.  failing to provide treatment for diagnosed conditions;

    c.  failing to investigate enough to make an informed medical judgment;

    d.  delaying treatment such as by denying examinations by qualified personnel and/or doctors following sick call requests;

    e.  interfering with access to medical treatment such as by failing to maintain and keep legible, organized medical records and failing to obtain prior and consultant medical records in a timely manner;

    f.  making decisions based on nonmedical factors such as cost; and,

    g.  making "medical" decisions so bad that they were not medical judgments at all.

547.     That Defendants CHEREF MAKRAM, JORDAN LAGUIO, DOREEN MARY SMITH, and JON MILLER were reckless and negligent in the care and treatment of Decedent.

548.     That Defendants CHEREF MAKRAM, JORDAN LAGUIO, DOREEN MARY SMITH, and JON MILLER failed to provide constitutionally adequate health and medical care to Decedent.

549.     As a direct and proximate result of the foregoing, Decedent was subjected to great physical and emotional pain and suffering.

550.     The conduct of Defendants CHEREF MAKRAM, JORDAN LAGUIO, DOREEN MARY SMITH, and JON MILLER demonstrated reckless and/or callous deliberate indifference to the federally protected rights of Decedent.

551.     All of the foregoing caused the violations of Decedent's constitutional rights, deprived Decedent of his right to be free from cruel and unusual punishment and his right to due process of law, caused him to needlessly sustain serious and severe personal injuries including the continuation of horrific pain and suffering, severe swelling and pain of his hands and arms, hardening of the skin on his hands and arms, loss of use of his hands and arms, internal organ failure, culminating in his lingering but unnecessary death from scleroderma renal crisis.

### K. ELEVENTH CLAIM - FEDERAL STATUTORY VIOLATIONS

552.     Plaintiff herein repeats, reiterates, and realleges each and every previously stated allegation of this Complaint, inclusive, with the same force and effect as if each and every preceding allegation was more fully and completely set forth at length herein.

553.     Decedent was in the care, custody, control, supervision and medical care of Defendants as a prisoner aforesaid.

554.     Decedent suffered from a disability as that term is defined by the Americans with Disabilities Act, and as such was a qualified individual with a disability.

555.    Decedent was discriminated against in violation of § 504 of the Rehabilitation Act of 1973, 29 USC §794(a), and by Title II of the Americans with Disabilities Act, 42 USC §12131, et seq., and suffered injury as a direct cause a result thereof.

556.    As a direct result thereof, Plaintiff's Decedent sustained serious and severe violations of his constitutional right to be free from cruel and unusual punishment and his right to due process of law, and needlessly sustained serious and severe personal injuries including over one full year of horrific pain and suffering, severe swelling and pain of his hands and arms, hardening of the skin on his hands and arms, loss of use of his hands and arms, internal organ failure and culminating in a lingering death from scleroderma renal crisis.

### L. Twelfth Claim - Compensation & Punishment

557.    Plaintiff herein repeats, reiterates, and realleges each and every previously stated allegation of this Complaint, inclusive, with the same force and effect as if each and every preceding allegation was more fully and completely set forth at length herein.

558.    The purpose and policies underlying 42 USC § 1983 are compensation for those whose constitutional rights are violated as a result of actions taken under color of state law and deterrence by punishing those who have caused the constitutional violations.

559.    New York law regarding wrongful death and survival actions and recoverable damages is inconsistent with the purpose and policies of § 1983, and that such state statute would bar or limit available remedies under § 1983.

560.    As set forth hereinabove, Defendants' wrongful conduct, policies, customs and practices with regard to health and medical services at the NCCC, NUMC, and the Ulster and Green Correctional Facilities were the direct and proximate cause of Decedent's death.

561.    As a direct and proximate result of the aforesaid wrongful conduct, policies, customs, and practices, Decedent was deprived of his enjoyment of life.

562.    As a direct and proximate result of the aforesaid wrongful conduct, policies, customs, and practices, Decedent suffered great physical pain, severe emotional distress, terror, and mental anguish and the loss of health prior to his death.

563.    As a direct and proximate result of the aforesaid wrongful conduct, policies, customs, and practices, Decedent suffered the illegal deprivation of his constitutional entitlements.

564.    That Defendants' conduct demonstrated reckless and/or callous deliberate indifference to the federally protected rights of Decedent.

565.    As a direct result thereof, Plaintiff's Decedent sustained serious and severe violations of his constitutional right to be free from cruel and unusual punishment and his right to due process of law, and needlessly sustained serious and severe personal injuries including over one full year of horrific pain and suffering, severe swelling and pain of his hands and arms, hardening of the skin on his hands and arms, loss of use of his hands and arms, internal organ failure and culminating in a lingering death from scleroderma renal crisis.

### STATE CAUSES OF ACTION

### M. MEDICAL MALPRACTICE

566.    Plaintiff herein repeats, reiterates, and realleges each and every previously stated allegation of this Complaint, inclusive, with the same force and effect as if each and every preceding allegation was more fully and completely set forth at length herein.

567.    This cause of action is stated only against the COUNTY Defendants, Defendant ARMOR, Defendant NUMC, and the defendant healthcare providers that treated Decedent at the

NCCC and NUMC, both named identified herein and those presently unidentified.   It is specifically not brought against the Defendants affiliated with the Ulster and Greene Correctional Facilities.

568.    That the COUNTY Defendants, Defendant ARMOR, Defendant NUMC, are responsible for and vicariously liable for all acts and/or omissions of their employees and staff under the doctrine of *respondeat superior*.

569.    That the COUNTY Defendants and Defendant ARMOR owned, operated, staffed and controlled the medical facilities located at the NCCC, and all units thereof where Decedent was treated for which treatment and care is a subject of this complaint.

570.    That the COUNTY Defendants and Defendant ARMOR fully equipped and staffed the medical facilities located at the NCCC for the full care and treatment of all pretrial detainees and inmates at the NCCC.

571.    That Defendant NUMC owned, operated, staffed and controlled the hospital and all units thereof where Decedent was treated on or about November 27, 2013, for which treatment and care is a subject of this complaint.

572.    That Defendant NUMC fully equipped and staffed this medical facility for the full care and treatment of all pretrial detainees and inmates of the NCCC, brought to it by the NCCC.

573.    That all defendant medical providers, named herein or unknown presently, whether they be physicians, nurses, physicians' assistants, or otherwise designated, held themselves out to be specialists in their respective designated profession.

574.    That all defendant medical providers, named herein or unknown presently, whether they be physicians, nurses, physicians assistants or otherwise designated, had a duty to

act with reasonable care, including but not limited to acting in accord with good and accepted practice for their profession.

575.   That each of these defendant medical providers, named herein or presently unknown, by and through their agents, employees, and/or servants were negligent, careless, reckless, and breached their duty to act with reasonable care, and/or deviated and departed from good and accepted practice for their respective profession as follows:  in repeatedly ignoring obvious conditions pertaining to the scleroderma such as Decedent's constant pain, hardening of the skin, and the inability to close his hands; in misdiagnosing his scleroderma; in failing to properly consider the signs, symptoms, and conditions which were wholly consistent with scleroderma; in failing to obtain timely bloodwork to rule in or rule out scleroderma; in failing to timely obtain a PPD test to rule in or rule out tuberculosis prior to medication; in failing to perform a proper differential diagnosis, repeatedly; in negligently, carelessly, and recklessly endangering Decedent by failing to do proper differential diagnoses; in failing to have qualified personnel examine Decedent; in permitting, allowing, and causing untrained and unqualified personnel to diagnose Decedent and then to provide improper and contraindicated medications; in failing to obtain a timely rheumatology consult; in ignoring that rheumatology consult once obtained; in failing to obtain the records from the rheumatology consult at NUMC in a timely fashion; in failing to act upon that rheumatology consult; in failing to provide all medical records in an organized, coherent, legible fashion to subsequent healthcare providers; in failing to establish an organized and uniform health record for inmate health care; in failing to assure consistent formats for all inmate records which were adhered to in order for adequate review by providers to promote and deliver accurate care; in failing to manage chronic conditions and follow up on acute conditions seen by other providers to provide more consistent care compared

to several providers seeing an inmate and to minimize potential errors and gaps in health care; in failing to provide a single health care provider or informed team to monitor Decedent's chronic condition; in failing to keep adequate and thorough medical records; in failing to keep medical records that were organized in a fashion so that the information was legible and accessible; in failing to maintain all medical records; in failing to assure that all personnel had access to medical records prior to treating or undertaking to treat Decedent; in losing and/or misplacing significant medical documentation; in failing to provide treatment for the scleroderma even after he was diagnosed; in failing to investigate enough to make an informed judgment by failing to have qualified physicians examine Decedent, repeatedly ignoring the recommendation and authorization for a rheumatology consult, and even after that occurred, failing to order appropriate recommendations, tests, and medicines; in repeatedly and consistently providing contraindicated medications such as NSAIDs and prednisone which are universally recognized to cause gastrointestinal disease, fluid retention, renal toxicity, and an increased risk of scleroderma renal crisis in patients such as Decedent; in increasing the dosage of prednisone without any test or examination; in failing to provide Decedent with Penicillamine (a/k/a Cuprimine or Depen), or other like chelator class medication; in failing to provide Decedent with immunosuppressive therapy to control the inflammatory phrase of his scleroderma, including methotrexate, which is a type of chemotherapy, or mycophenolate mofetil or cyclophosphamide with or without antithymocyte globulin; in failing to provide Decedent with "disease modifying drugs" sometimes called "disease modifying anti-rheumatic drugs" or DMARD's; in failing to provide Decedent with treatment that would have greatly eased his pain, prevented the disease from worsening, and greatly extended his life; in delaying treatment throughout Decedent's incarceration repeatedly, such as failing to have a physician examine Decedent and leaving his

care to unqualified, under train nurses and physician assistants, by ignoring the repeated requests for a rheumatology consult, ignoring the authorization for said rheumatology consult when granted, ignoring the recommendations of the rheumatology consultant, ignoring and preventing the rheumatology follow-ups that were requested; in interfering with access to treatment such as by failing to obtain a rheumatology consult, ignoring the request for a follow-up by the rheumatology consultant, failing to gather, collect, forward, and transfer the necessary medical records, and failing to keep adequate, legible, and organized medical records; in making medical decisions based on non-medical factors such as the cost of the medicines involved and instead providing Decedent contraindicated medications because these were cheap and available; and in making a "medical" judgments so bad that these could not be considered medical judgment at all, such as ignoring all signs and symptoms clearly indicating the dangerous condition known as scleroderma; in failing to timely and thoroughly communicate the results of the rheumatology consult at NUMC to Decedent's jailers and healthcare providers at said facilities; in failing to follow Decedent after the rheumatology consult at NUMC; in failing to provide all medical records from NUMC to the subsequent jailers; in failing to conduct a PPD test at NUMC and provide Decedent and the healthcare providers at the NCCC and upstate with the results thereof; in failing to provide Decedent with the proper medications following the rheumatology consult at NUMC; in abandoning the patient; and in otherwise being negligent, careless, and a reckless in the circumstances.

576. As a direct result thereof, Plaintiff's Decedent missed a substantial opportunity for a cure, or extension of his life, sustained serious and severe personal injuries including over one full year of needless horrific pain and suffering, severe swelling and pain of his hands and arms,

hardening of the skin on his hands and arms, loss of use of his hands and arms, internal organ failure and culminating in a lingering death from scleroderma renal crisis.

### N. NEGLIGENT HIRING, RETENTION, SUPERVISION, AND TRAINING

577.    Plaintiff herein repeats, reiterates, and realleges each and every previously stated allegation of this Complaint, inclusive, with the same force and effect as if each and every preceding allegation was more fully and completely set forth at length herein.

578.    This cause of action is stated only against the COUNTY Defendants, Defendant ARMOR, Defendant SPOSATO and the individually named physicians and supervisors at NCCC and of ARMOR.  It is specifically not brought against the Defendants affiliated with the Ulster and Greene Correctional Facilities.

579.    That the COUNTY Defendants, Defendant ARMOR, Defendant SPOSATO, and the individually named physicians and supervisors at NCCC and of ARMOR are responsible for and vicariously liable for all acts and/or omissions of their employees and staff under the doctrine of *respondeat superior*.

580.    That these Defendants had a duty to act with reasonable care when hiring, retaining, supervising and training individuals at their respective facilities, including but not limited to physicians, nurses, physician assistants, and all other healthcare providers.

581.    That these Defendants, by and through their agents, employees, and/or servants were negligent, careless, reckless, and breached their duty to act with reasonable care, in hiring, supervising, retaining, and training individuals at their respective facilities, including but not limited to physicians, nurses, physician assistants, and all other healthcare providers, as follows: in failing to hire and retain qualified personnel; in failing to supervise, train, direct, and instruct all healthcare providers cared for Decedent; in failing to supervise, train, direct, and instruct all

healthcare providers to keep legible, organize, and adequate medical records; in failing to supervise, train, direct, and instruct all healthcare providers to provide medical records to other healthcare providers that request these records in a timely, and thorough fashion; in failing to make significant, necessary, important medical documentation available for subsequent healthcare providers upon request; in hiring and retaining unqualified personnel, and providing unqualified, untrained, under-trained, unsupervised, and under-supervised healthcare providers that: (1) repeatedly ignored obvious conditions pertaining to the scleroderma such as Decedent's constant pain, hardening of the skin, and the inability to close his hands; (2) failed to provide treatment for the scleroderma even after Decedent was diagnosed; (3) repeatedly failed to investigate enough to make an informed judgment by failing to have qualified physicians examine Decedent, repeatedly ignoring the recommendation and authorization for a rheumatology consult, and even after that occurred, failing to order appropriate recommendations, tests, and medicines; (4) delayed treatment throughout Decedent's incarceration repeatedly, such as failing to have a physician examine Decedent and leaving his care to unqualified, under-trained nurses and physician assistants, by ignoring the repeated requests for a rheumatology consult, ignoring sick-call requests, ignoring the authorization for said rheumatology consult when granted, ignoring the recommendations of the rheumatology consultant, ignoring and preventing the rheumatology follow-ups that were requested; (5) interfered with access to treatment such as by failing to obtain a rheumatology consult, ignoring the request for a follow-up by the rheumatology consultant, failing to gather, collect, forward, and transfer the necessary medical records, and failing to keep adequate, legible, and organize medical records; (6) made medical decisions based on non-medical factors such as the cost of the medicines involved and instead providing Decedent contraindicated medications because these

were cheap and available; and (7) made a "medical" judgments so bad that these could not be considered medical judgment at all, such as ignoring all signs and symptoms clearly indicating the dangerous condition known as scleroderma, and in otherwise being negligent, careless, and a reckless in the circumstances.

582.   As a direct result thereof, Plaintiff's Decedent missed a substantial opportunity for a cure, or extension of his life, sustained serious and severe personal injuries including over one full year of needless horrific pain and suffering, severe swelling and pain of his hands and arms, hardening of the skin on his hands and arms, loss of use of his hands and arms, internal organ failure and culminating in a lingering death from scleroderma renal crisis.

<u>O. WRONGFUL DEATH AND LOSS OF GUIDANCE</u>

583.   Plaintiff herein repeats, reiterates, and realleges each and every previously stated allegation of this Complaint, inclusive, with the same force and effect as if each and every preceding allegation was more fully and completely set forth at length herein.

584.   This cause of action is stated only against the COUNTY Defendants, Defendant ARMOR and its employees both named here and those presently unidentified, Defendant SPOSATO, and Defendant NUMC and its named and identified employees.  It is specifically not brought against the Defendants affiliated with the Ulster and Greene Correctional Facilities.

585.   That as a direct result of the constitutional violations, statutory violations, negligence, carelessness, and/or recklessness of Defendants, Plaintiff both in her individual capacity and as mother and natural guardian of her infant son, suffered the loss of her father and her infant child suffered the loss of his grandfather.

586.   Plaintiff, both in her individual capacity and as mother and natural guardian of her infant son, brings this cause of action claiming all items for his wrongful death, including but not

limited to the loss of parental guidance for herself and for her infant son, loss of support, and loss of inheritance.

PUNITIVE DAMAGE CLAIM

587.    Plaintiff herein repeats, reiterates, and realleges each and every previously stated allegation of this Complaint, inclusive, with the same force and effect as if each and every preceding allegation was more fully and completely set forth at length herein.

588.    The foregoing conduct, acts, omissions, policies, customs, and practices, as set forth in detail hereinabove, undertaken with such callousness, recklessness, deliberate indifference, wanton willfulness, and utter disregard for human sensitivities and rights, constitutes extreme and outrageous conduct that is so egregious as to exceed the bounds of civilized behavior and shocks the conscience.

589.    The foregoing, as set forth above, was substantially certain to cause, and did in fact cause, Plaintiff and her Decedent, to suffer extreme and enduring mental anguish, shock, degradation, and enduring physical pain, which was and is the direct result of the aforesaid.

JURY DEMAND

590.    Plaintiff demands trial by jury on all causes of action.

*WHEREFORE*, Plaintiff demands judgment and the following relief against all of Defendants, jointly and severally, as follows:

591.    Awarding compensatory damages as to all claims for relief, in an amount not less than $10,000,000 to be proved at trial;

592.    Awarding punitive damages as to all claims for relief, in an amount not less than $10,000,000 to be proved the trial;

593.    Awarding costs, including reasonable and statutory attorney's fees; and,

108

594.    Awarding such other relief as this Court may deem just and proper.

Dated:  Mineola, New York                          Yours, etc.
        March 7, 2016

                                                   GIANFORTUNE & MIONIS, P.C.
                                                   *Attorneys for Plaintiff*
                                                   231 Mineola Boulevard
                                                   Mineola, N.Y. 11501
                                                   (516) 281-8550
                                                   File No.: 3681

                                                   By: _____

                                                   John P. Gianfortune, Esq. (JPG4762)

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

CHRISTINE J. CASIANO, as Administrator of the Estate of RAYMOND
CASIANO, Deceased, and CHRISTINE J. CASIANO, Individually,

Plaintiff,

-against-

COUNTY OF NASSAU, NASSAU COUNTY CORRECTIONAL CENTER,
MICHAEL J. SPOSATO, Individually and as Sheriff of Nassau County,
ARMOR CORRECTIONAL HEALTH SERVICES, INC., ARMOR
CORRECTIONAL HEALTH SERVICES OF NEW YORK, INC., JOHN P. MAY,
MARYLYN MARTIN-NAAR, CARL-HENRI SANCHEZ, MICHAEL
PARRINELLO, BIJU JOSE, LAURA HUNT, AHSAN HABIB, "JOHN" FRANCIS
(whose first name is fictitious but intended to designate the Armor
Correctional Physician's Assistant that examined Decedent on multiple
occasions in 2012 and 2013), DOROTHY MAZYCK, ANDREA JANUSZ,
"JANE" MUNOZ (whose first name is fictitious but intended to designate
the Armor Correctional LPN that treated Decedent on multiple
occasions throughout 2013), JOSEPHINE "DOE" (whose last name is
fictitious but intended to designate the Armor Correctional LPN that
treated Decedent through November, 2013), JELYN WILLIAMS, DENISE
BRADY, SUSAN JACOB, LISA FITZGERALD, SHAKIM RIVERA, "JANE DOES
#1-5" (whose names are fictitious but representing presently
unidentified NCCC and Armor Correctional employees processing
Decedent's multiple sick call requests and internal clinic referrals
throughout 2013), NASSAU UNIVERSITY MEDICAL CENTER, PRACHI
ANAND, SABATINO IENOPOLI, MICHAEL GRAZIANO, CHERIF MAKRAM,
JORDAN LAGUIO, BRANDON SMITH, DOREEN MARY SMITH, and JON
MILLER,

Defendants.

Docket No.: 16-cv-1194

**Certificate of
Merit**

STATE OF NEW YORK    )
COUNTY OF NASSAU    ) ss:

JOHN P. GIANFORTUNE, being duly sworn, deposes and says;

1.    That I am an attorney for Plaintiff herein and as such am fully familiar with all of

the facts and circumstances surrounding this matter.

2.    That I submit this certification pursuant to the requirements of New York CPLR §

3012-a.

3.     That I have reviewed the available facts of this case.

4.     That I have consulted with at least one physician who is licensed to practice in this state or any other state and who I reasonably believe is knowledgeable in the relevant issues involved in the particular action and that I have concluded on the basis of such review and consultation that there is a reasonable basis for the commencement of the within cause of action for medical malpractice.

JOHN P. GIANFORTUNE

Sworn to before me this 9th day of March, 2016

Notary Public

GARY M. MIONIS
Notary Public, State of New York
No.: 02MI5040657
Qualified in Suffolk County
Commission Expires: July 1, 20 19

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

CHRISTINE J. CASIANO, as Administrator of the Estate of RAYMOND
CASIANO, Deceased, and CHRISTINE J. CASIANO, Individually,

                                Plaintiff,

-against-

COUNTY OF NASSAU, et al,

                                Defendants.

Docket No.:  16-cv-1194

**Verification**

STATE OF NEW YORK    )
COUNTY OF NASSAU    ) ss:

        CHRISTINE J. CASIANO, being duly sworn, deposes and says;

        1.      That I am Plaintiff in the above action, and as such am fully familiar with the facts and circumstances set forth herein.

        2.      That I have read the foregoing Complaint and know the contents thereof.

        3.      That the same is true to my own knowledge, except as to the matters therein stated to be alleged on information and belief, and as to those matters, I believe it to be true.

                                            CHRISTINE J. CASIANO, as Administrator of
                                          the Estate of RAYMOND CASIANO, Deceased,
                                          and Individually

Sworn to before me this ___ day of
March, 2016

_____
Notary Public

GARY M. MIONIS
Notary Public, State of New York
No.: 02MI5040657
Qualified in Suffolk County
Commission Expires: July 1, 20 19