UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
CHRISTINE J. CASIANO, as Administrator of the
Estate of Raymond Casiano, Deceased, and
CHRISTINE J. CASIANO, Individually,

        Plaintiff,      **REPORT AND**
                    **RECOMMENDATION**
    -against –       CV 16-1194 (SJF)(ARL)

COUNTY OF NASSAU, et al.,

        Defendants.
----------------------------------------------------------X

**LINDSAY, Magistrate Judge:**

   Before the Court, on referral from District Judge Feuerstein, is the motion by the State

defendants, Jerome Nicolato, Cherif Makram, Jordan Laguio, Brandon J. Smith, Doreen Mary

Smith and Jon Miller, to dismiss the amended complaint pursuant to Rules 12(b)(6) of the

Federal Rules of Civil Procedure.  For the reasons that follow, the undersigned respectfully

recommends that the motion be granted, in part.

BACKGROUND

   The facts underlying this action were set forth in the undersigned's December 22, 2016

Report and Recommendation.  *Casiano v. Cty. of Nassau, No*. 16 CV 1194 (SJF) (ARL), 2016

WL 7667287 (E.D.N.Y. Dec. 22, 2016), report and recommendation adopted, No. CV 16 1194

(SJF)(ARL), 2017 WL 78892 (E.D.N.Y. Jan. 9, 2017).  Although the parties' familiarity with the

facts is assumed, for ease of reference, the Court will repeat the facts in this report.[1]

---

[1] The following facts are drawn from the amended complaint, together with "documents incorporated in it by reference" and "document[s] upon which the complaint heavily relies." *In re Thelen LLP*, 736 F.3d 213, 219 (2d Cir. 2013).  Deposition transcripts are not the type of document that may be reviewed on a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).  *Allstate Ins. Co. v. Rozenberg*, 771 F. Supp. 2d 254, 268 (EDNY 2011).  Accordingly, the Court has not considered Dr. Laguio's transcript, which counsel for the plaintiff annexed to

## A.    Factual Assertions

### 1. The Parties

The plaintiff, Christine J. Casiano ("Casiano"), is the daughter of the decedent, Raymond

Casiano.  Am. Compl. ¶ 48.  Mr. Casiano was a detainee at the Nassau County Correctional

Center ("NCCC") between August 23, 2012 and December 26, 2013.[2]  *Id.* ¶¶ 5, 336, 339.

Following his detention at NCCC, Mr. Casiano was transferred to the Ulster County Correctional

Facility ("Ulster") for two weeks and then to Greene County Correctional Facility ("Greene"),

where he remained until his death on April 23, 2014.  State Defs.' Mem. at 4.   Ulster and

Greene are both state correctional facilities.

### 2.    Mr. Casiano's Medical Condition

According to the plaintiff, approximately seven months after his arrival to NCCC, Mr.

Casiano began exhibiting signs of scleroderma including painful hardening and discoloration of

the skin on his hands and arms.  Am. Compl. ¶ 7.  On March 22, 2013, Mr. Casiano submitted a

Sick Call Request complaining that his hands and feet were swelling.  *Id.* ¶ 343.  In that request,

he wrote:

> I have been taking medication since March 13, 2013 for swelling of my hands
> and sometimes feet.  It's going on ten days taking this medication.  The
> swelling has no [sic] stopped.  My hands at times I can't close into a fist [sic].
> It's not working or someone there thought best to guess.  The medication has
> done nothing to alleviate the pain and swelling I'm going through.  Time is of
> the essence.

his declaration.  Nonetheless, the facts set forth in the amended complaint are taken as true for purposes of deciding the instant motion.

[2] Mr. Casiano was charged with criminal sale and possession of heroin and pled guilty to one felony count of criminal sale of a controlled substance.  Am. Compl. ¶¶ 336-37.

*Id.* In response to the Sick Call Request, Mr. Casiano was seen by a nurse and prescribed Naprosyn. *Id*. The plaintiff asserts that NSAIDs like Naprosyn were contraindicated for the decedent's condition. *Id.* ¶ 345.

On April 9, 2013, the decedent submitted a second Sick Call Request, in which he indicated that he was taking medication for his thyroid and inquired if he needed a refill. *Id.* ¶ 346. He also stated that his hands were still getting swollen and his "diet food [sic] [was] not in compliance." *Id.* Once again, Mr. Casiano was seen by a nurse, but no change was made to his medication. *Id*. On April 29, 2013, Mr. Casiano submitted a third Sick Call Request, in which he again complained of pain and swelling in his hands. *Id*. ¶ 347. In that request he stated:

> Sir/Madam. I have been taking thyroid med [sic] since March 13, 2013. I have been placed on a 2400 diet meal. But the swelling of my hands continue [sic]. It is very painful everyday [sic], the swelling gets so bad that at time [sic] I feel that my hands will explode. I don't know what if [sic] it's water retention or what. Please call me ASAP.

*Id.* Following the third request, the decedent was seen by a nurse who once again gave him Naprosyn. *Id*.

On June 17, 2013, Mr. Casiano submitted a fourth Sick Call Request, which read: "my hands are swelling and I am in lots of pain. No more -- I need to go to out side [sic] hospital to find out what is wrong." *Id.* ¶ 348. Following the submission of his fourth request, the decedent was again seen by a nurse with no change to his medication; however, on July 3, 2013, he was also examined by the defendant Michael Francis ("Francis"), who is a physician's assistant. *Id.* ¶¶ 348-49. Francis noted that the decedent had bilateral hand swelling and a right breast lump, with a possible inflammatory process. *Id*. ¶ 349. Francis prescribed Naprosyn and a topical hydrocortisone cream. *Id.* The plaintiff contends that hydrocortisone is not a recognized treatment for scleroderma. *Id.*

3

On July 28 and 31, Mr. Casiano filed two additional Sick Call Requests complaining of pain and swelling. *Id.* ¶¶ 350-51. Once again, he asked to be taken to the hospital. *Id.* After he filed the seventh request, on August 20, 2013, Mr. Casiano was examined by a Dr. Carl-Henri Sanchez ("Sanchez"). *Id.* ¶¶ 352-53. Following the examination, Dr. Sanchez prescribed prednisone, which the plaintiff asserts is also dangerous for scleroderma patients when the inflammation relates to the skin. *Id.* ¶ 353. In addition, Sanchez requested that Casiano be seen by a rheumatology specialist. *Id.* That request was approved the next day, but Mr. Casiano was not examined by a rheumatologist until November 27, 2013. *Id.* ¶ 354.

In the meantime, the decedent continued to file Sick Call Requests, complaining of severe pain and swelling in his hands and arms and imploring NCCC to let him see a doctor. *Id.* ¶¶ 355-56. Despite his requests, Mr. Casiano was not immediately examined by a physician. *Id.* ¶ 355. He was, however, seen by the defendants, Laura Hunt, a physician's assistant, and Michael Parrinello ("Parrinello"), a registered professional nurse. *Id.* ¶¶ 356-57. Hunt recorded that Mr. Casiano's hands and forearms had been swollen for about seven months. *Id.* ¶ 356. She also noted that he had mild to moderate swelling on both dorsal hands and up his forearms as well redness on his bilateral ankles. *Id.* Parrinello noted that Mr. Casiano's skin was tight and that a rheumatology consult had been ordered. *Id.* ¶ 357. At a later visit, Parrinello noted that Mr. Casiano was reporting pain to both hands rated on a scale of 8 out of 10. *Id.* ¶ 359. Following that visit, Parrinello submitted a second request for the rheumatology consult. *Id.* ¶ 361.

Between September 12 and November 22, Mr. Casiano filed several additional Sick Call Requests but, as stated above, he was not seen by a rheumatologist until November 27, 2013, eight months after his first symptoms were recorded and three months after Sanchez requested

4

the consult.  *Id*. ¶ 367.  The rheumatologists at Nassau University Medical Center, the defendants

Prachi Anand and Sabatino Ienopoli, diagnosed Mr. Casiano with scleroderma and advised that

before the proper medication could be started, he had to be tested for tuberculosis.  *Id*.

According to the plaintiff, this is because the medication needed to treat scleroderma is a type of

chemotherapy to suppress his immune system and the treatment would have been

contraindicated if the decedent had tuberculosis.  *Id*.  However, the tuberculosis test was not

conducted until December 21, 2013.  *Id*. ¶ 368.  When the tuberculosis test turned out to be

negative, the decedent was told to lower his prednisone dosage and follow-up in 3 to 4 weeks,

but he did not receive any new medications for his condition.  *Id*.

Between the end of November and December, Mr. Casiano filed several additional Sick

Call Requests and was seen by medical staff but, according to the plaintiff, continued to receive

contraindicated medications.  *Id*. ¶¶ 370-72.  During December, Armor of New York then

conducted its annual health assessment of the decedent.  *Id*. ¶ 373.  The examination was

performed by a nurse who noted that Mr. Casiano was complaining of bilateral upper extremity

burning and had been diagnosed with scleroderma and thyroidism.  *Id*.  The nurse who examined

Mr. Casiano also noted that the decedent's skin on both forearms and hands was hardened and

shiny.  *Id*.  The only medication noted by the nurse was Synthroid, a medication for

hypothyroidism, even though Casiano was still being prescribed Motrin.[3]  *Id*.

On December 26, 2013, Mr. Casiano was transferred to Ulster County Correctional

Facility and was immediately examined by an unnamed nurse.  *Id*. ¶ 374.  During the intake

examination, Mr. Casiano reported that he had been diagnosed with scleroderma at NCCC and

---

[3] According to the amended complaint, Mr. Casiano was primarily being prescribed Naprosyn.  It is not clear to the Court if he was also prescribed Motrin.

5

was being treated with the corticosteroid hydrocortisone cream and ibuprofen for pain. *Id.* ¶ 375. The nurse also noted that Mr. Casiano was suffering from thyroid disease and was taking Synthroid, although the medication was not with him. *Id*. ¶ 375. The following day, Mr. Casiano was examined by the defendant Dr. Jordan Laguio, who also noted that Mr. Casiano reported having been diagnosed with scleroderma in November and treated with ibuprofen, hydrocortisone cream and steroids at the Nassau County jail. *Id*. ¶ 376. Dr. Laguio indicated, however, that there was no record of the scleroderma diagnosis in the decedent's transfer summary. *Id.* Accordingly, he requested Mr. Casiano's records from NCCC. *Id.*

On December 27, 2013, in response to Dr. Laguio's request, the defendant Armor Correctional Health Services of New York, Inc. ("Armor") faxed eight pages of the decedent's 120-page chart to the Ulster. *Id.* ¶ 384. The eight pages included the recent medication orders and the results of a single laboratory test from August but did not contain a physician's notes or mention the scleroderma diagnosis. *Id.* The complete medical records containing the scleroderma diagnosis were not received by Ulster until January 14, 2014, after Casiano was no longer an inmate at the facility. *Id*. ¶ 424.

Nevertheless, during his two week stay at Ulster, the medical staff drew Mr. Casiano's blood and sent the results to Dr. Cherif Makram. *Id.* ¶ 385. At some point, Dr. Makram also examined Mr. Casiano. *Id.* ¶ 385. On January 2, 2014, the decedent was then seen by a nurse after he complained of a cough and requested a lotion for his dry skin. *Id.* ¶ 392. In addition, he was seen by an unidentified nurse on January 7, 2014, at which point he complained of pain in his arms secondary to scleroderma and requested follow-up treatment. *Id*. ¶ 393.

Two days later, on January 9, 2014, Mr. Casiano was transferred to Greene and, upon arrival, was examined by a nurse. *Id.* ¶ 394. The unidentified nurse noted that the decedent said

6

he had scleroderma and was being treated with hydrocortisone cream and Naprosyn. *Id.* ¶ 396.

He or she recommended that the decedent be seen by a doctor "ASAP." *Id.*  There is no

indication in the record who was responsible for responding to the nurse's request that Mr.

Casiano be seen by a doctor ASAP.  However, the following day, the defendant, Dr. Smith did

write an order to have Mr. Casiano's prescription for Naprosyn continued. *Id.* ¶ 396.  Then, on

January 14, 2014, a nurse at Green provided Mr. Casiano with more Naprosyn. *Id*. ¶ 405.

On January 15, 2014, a second unidentified nurse at Greene noted that the decedent was

coughing for about four hours and was out of cough medicine. *Id.* ¶ 406.  She also noted that the

decedent's cough was worse lying down and he described "pressure on his face." *Id.*

Accordingly, the next day, Greene was examined by Dr. Smith who noted that Mr. Casiano had

"decreased range of motion of his jaw, swelling of his face, lower arms, lower legs and skin that

had tightness with harden appearance and touch." *Id.* ¶ 407.  Following the exam, Dr. Smith

requested Mr. Casiano's NUMC records where the initial scleroderma diagnosis had allegedly

been made. *Id.*  Despite her request, there is no indication the critical medical records were

forwarded to or received by Greene before the decedent died. *Id.* ¶ 424.

Nonetheless, between January 17 and 29, someone at Greene did order additional blood

tests and a rheumatology consult.  As a result, on February 14, 2014, an outside rheumatologist,

Dr. Marin Morell, conducted a "Telemed" examination of Mr. Casiano, where audio and video

information was sent to him off-site while Mr. Casiano remained in jail. *Id.* ¶ 410.  Dr. Morell

noted that scleroderma was "a possibility" and requested additional blood tests. *Id.*  One week

later, Dr. Smith reviewed Dr. Morell's consult notes and ordered the lab work the consultant

requested. *Id.* ¶ 411.  Although Mr. Casiano continued to be seen by medical providers and was

issued a lotion on March 4, 2014, for some unexplained reason, his blood was not drawn until

March 17, 2014. *Id.* ¶¶ 414-15. The results were sent to the defendant Dr. Jon Miller, but there is no indication that they were reviewed or acted upon by him even though the results indicated a positive ANA screen and titer consistent with scleroderma. *Id.* ¶ 415.

On April 23, 2014, Mr. Casiano was escorted to the infirmary at 1:00 a.m. complaining of shortness of breath. *Id.* ¶ 429. He was pronounced dead within the hour. Id. The autopsy report concluded that death was due to "scleroderma renal crisis." *Id.* ¶ 430. Specifically, the report noted:

> Mr. Casiano had a long-standing diagnosis of scleroderma with Raynaud's phenomenon, and had extensive skin involvement. He died after complaining of shortness of breath. Autopsy revealed extensive skin fibrosis. An additional manifestation of scleroderma was bilateral renal obliterative arterial disease, with focal acute hemorrhage. Scleroderma renal crisis is a complication of scleroderma with a poor prognosis. Focal myocardial necrosis and scarring was also present in the absence of significant large-vessel coronary artery disease. Toxicological testing yielded no significant results.

*Id.*

### B. Procedural History

The plaintiff commenced this action on March 9, 2016, alleging violations of 42 U.S.C § 1983, Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a), and Title II of the Americans with Disabilities Act, 42 U.S.C. § 12121. The complaint also included several state law claims including: medical malpractice; negligent hiring, retention, supervision, and training; and wrongful death. The plaintiff did not assert a medical malpractice, wrongful death or loss of guidance claim against any of the State defendants. Compl. ¶¶ 567, 584. Casiano did, however, assert several §1983 claims against the State defendants, alleging that they failed to hire and adequately train qualified personnel in violation of the decedent's constitutional rights relating to his health and medical care. *Id.* ¶¶ 490-505. Casiano also alleged that the State defendants, Drs. Smith, Makram, Laguio, Smith, and Miller, failed to adequately supervise their respective

8

medical staffs, which caused a policy, practice and/or custom of deficient health and medical care services. *Id.* ¶¶ 497-519, 542-551. Finally, Casiano alleged that the failure to provide her father with adequate health care violated his due process rights and amounted to cruel and unusual punishment. *Id.* ¶¶ 521-32.

On November 28, 2016, the State defendants filed a motion to dismiss the claims asserted against them by the plaintiff and by the Nassau County defendants in their cross claims. ECF No. 40. On August 8, 2017, after being referred the motion, the undersigned recommended that the motion to dismiss the complaint be granted with leave to replead, and the motion to dismiss the cross claims be denied with leave to renew. By order dated September 30, 2017, District Judge Feuerstein adopted the report and recommendation in its entirety and, soon thereafter, the plaintiff filed an amended complaint. On April 12, 2018, the State defendants filed the instant motion to dismiss the amended complaint. As discussed below, the State defendants contend that the amended complaint remains deficient for the same reasons set forth in the Court's order dismissing the original complaint.

## DISCUSSION

### A.  Standards of Law

The Supreme Court clarified the appropriate pleading standard in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), in which the court set forth a two-pronged approach to be utilized in analyzing a motion to dismiss. District courts are to first "identify [ ] pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 679. Though "legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* Second, if a complaint contains "well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an

entitlement to relief." *Id.* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a [d]efendant has acted unlawfully." *Id.* at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556-57 (2007) (internal citations omitted)). Governed by these standards, the court will address each of the State defendants' arguments in turn.

**B. The Claims Asserted Against the Superintendents**

The plaintiff has asserted several §1983 claims against Jerome Nicolato, the Superintendent at Ulster, and Brandon J. Smith, the Superintendent at Greene. Specifically, she alleges that the Superintendents failed to provide adequate health and medical care services for the inmates, to hire qualified personnel for their respective medical units and to properly train their staffs. Am. Compl. ¶¶ 214-19*,* 234-239, 374, 395, 425-428, 456-473, 535, 537-576, 585-595, 601-609. To prevail on a Section 1983 claim, a plaintiff must show: (1) the deprivation of any rights, privileges, or immunities secured by the Constitution and its laws; (2) by a person acting under the color of state law. 42 U.S.C. §1983. In this case, there is no dispute that the State defendants were all acting under the color of state law. Nonetheless, each of the State defendants contends that the plaintiff has failed to state sufficient facts to establish that the decedent's rights secured by the Eighth Amendment were violated. *Randle v. Alexander,* 170 F. Supp. 3d 580, 596 (S.D.N.Y. 2016)("a prisoner's right to be free from deliberate indifference to his serious medical needs has been clearly established for decades"); *Estelle v. Gamble*, 429 U.S. 97, 103, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976) ("[T]he [Eighth] Amendment proscribes more than physically barbarous punishments. ... [Supreme Court precedents] establish the government's obligation to provide medical care for those whom it is punishing by

10

incarceration").  The Superintendents further argue that, even if Mr. Casiano's Eight Amendment

rights were violated, neither of them was personally involved with the decedent's treatment or

had actual knowledge of his condition.

In the next section, the Court will address the States defendants' argument that the

alleged facts are insufficient to establish that the decedent's constitutional rights were violated.

But, the Court begins its analysis with a discussion surrounding the Superintendents' alleged

involvement with Mr. Casiano.  "[It] is well settled in this Circuit that 'personal involvement of

defendants in alleged constitutional deprivations is a prerequisite to an award of damages under §

1983.'" *Bristol v. Queens Cty.*, No. 09 CV 5544 (JFB)(AKT), 2013 WL 1121264, at *21

(E.D.N.Y. Feb. 27, 2013), report and recommendation adopted, No. 09 CV 5544 (JFB)(AKT),

2013 WL 1120895 (E.D.N.Y. Mar. 18, 2013) (citing *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir.

1994)).  In other words, government officials may not be held liable for the unconstitutional

conduct of their subordinates under a theory of *respondeat superior.  See Iqbal*, 556 U.S. at 676

(citing *Monell v. New York City Dept. of Social Servs*., 436 U.S. 658, 691, 98 S. Ct. 2018, 56

L.Ed.2d 611 (1978) (finding no vicarious liability for a municipal "person" under 42 U.S.C. §

1983)).  Indeed, a supervisor may only be personally liable where "the supervisor '(1) directly

participated in the violation; (2) failed to remedy the violation after learning of it through a report

or appeal; (3) created a custom or policy fostering the violation or allowed the custom or policy

to continue after learning of it; or (4) was grossly negligent in supervising subordinates who

caused the violation.'" *Bristol*, 2013 WL 1121264, at *21(citing *Sealey v. Giltner*, 116 F.3d 47,

51 (2d Cir. 1997)).

In this case, the State defendants argue that the boilerplate factual allegations asserted

against Nicolato and Smith in the amended complaint remain deficient.  The undersigned agrees.

11

To begin with, the plaintiff has done little to bolster the allegations against the Superintendents. For example, with respect to both Nicolato and Smith, the plaintiff continues to assert, in a conclusory fashion, that:

> That at all times pertinent hereto, said [Superintendent], among other duties, develops, implements, and executes the medical treatment policies for inmates of the [correctional facility], and manages and oversees all its medical operations which includes the daily operation of all medical units thereat.
>
> That [said Superintendent], directly supervises all medical doctors, officers, nurses, and other medical staff at that facility.
>
> That [said Superintendent] establishes the practices, customs, and policies of all medical personnel at that facility, as well as overseeing its practices, customs, and policies which pertain to the medical treatment of its inmates.
>
> *          *          *
>
> [That said Superintendent] is, . . . upon information and belief, is responsible for the care and treatment of all prisoners there, including but not limited to the medical care rendered thereat.
>
> *          *          *
>
> Upon information and belief, . . . [that said Superintendent] had actual knowledge of the deficiencies in the health and medical care [at the correctional facility] but did nothing to try and stop and/or remedy the situation.
>
> *          *          *
>
> [That said Superintendent] knew and/or it was obvious that continuing the above-said policies, practices, and customs posed an excessive risk to the health and safety of inmates like Decedent.
>
> *          *          *
>
> [That said Superintendent] failed to adequately train and supervise the medical staff of the [the correctional facility].
>
> [That said Superintendent] endorsed, accepted, and adopted the policies, practices, and protocols of [the physician defendants] and other healthcare providers at the [the correctional facilities], and the conduct, acts, and failures to act in pursuance of these policies caused the violation of Decedent's

12

constitutional rights, and created the risk of violating Decedent's constitutional rights by creating conditions, policies, customs, and practices as those set out hereinabove.

Am. Compl. ¶¶ 215-17, 235-37, 374, 395, 425-28, 456, 461, 461-64, 470-73.  In fact, the original complaint named Michael Graziano as a defendant although he was no longer the Superintendent at Ulster when Mr. Casiano was an inmate.  After the State defendants' initial motion to dismiss was filed, the plaintiff voluntarily dismissed the action against Graziano.  In the amended complaint, the plaintiff has simply swapped Nicolato for Graziano without altering the assertions in any way.

Absent further factual enhancement, simply stating that the defendant supervisors created unidentified policies or practices or had actual knowledge of the deficiencies at the correctional facilities is not enough to defeat a Rule 12(b)(6) motion where, as here, the defendants did not actually participate in the underlying violation. *See, e.g. Lindsey v. Butler*, 43 F. Supp. 3d 317, 330 (S.D.N.Y. 2014), *reconsideration granted on other grounds*, 2014 WL 5757448 (S.D.N.Y. Nov. 5, 2014) ("In order to hold supervisors liable for creating a custom or policy fostering a constitutional violation, courts in this Circuit have required that plaintiffs plead more than conclusory allegations of the existence of the custom or policy." (citing cases)); *C.f. Wright,* 21 F.3d 502 (Superintendent could not escape liability where he personally received plaintiff's petition outlining the depravation of rights and failed to address legality of the inmate's detention); *Paul v. Bailey*, No. 09 CIV. 5784 RO, 2013 WL 2896990, at *4 (S.D.N.Y. June 13, 2013) (Prison warden could not escape personal liability where plaintiff had a personal conversation with warden about his medical condition and the warden had the authority to obtain provide him with care but failed to do so).

13

Moreover, while the plaintiff asserts that Ulster and Greene had "long and repetitious histor[ies] of systemic medical and health care failures" and that Nicolato and Smith failed to coordinate medical care at their respective facilities, the Superintendents "linkage in the prison chain of command" is not enough on its own to satisfy the pleading requirement.  Finally, the plaintiff's broad assertion that Nicolato and Smith must have known that the decedent faced a substantial risk of serious harm because his scleroderma was so obvious does not support an inference that they had actual knowledge of the decedent's condition.   Indeed, nothing in the amended complaint suggests that either of the Superintendents actually met Mr. Casiano, knew that he was ill or was aware that he faced a substantial risk of harm.  Accordingly, the undersigned recommends that the individual claims against Nicolato and Smith be dismissed.[4]

### C.  The Physician Defendants

Drs. Laguio, Makram, Smith and Miller similarly argue that the amended complaint must be dismissed because the allegations do not contain sufficient factual matter to establish an Eighth Amendment claim against them.  In the amended complaint, the plaintiff continues to assert six causes of action against these four physician defendants.  Specifically, she alleges that each of the State physician defendants failed to hire qualified personnel or to properly train staff (the sixth cause of action); to adequately supervise their medical staff (the seventh cause of action); and to meet an acceptable standard of treatment and care (the eighth cause of action). She also asserts that the State physician defendants made "egregious mistakes in care and

---

[4] The Court need not address the State defendants' statute of limitation argument or the plaintiff's relation-back argument given its determination that the factual allegations asserted against Nicolato are insufficient.

14

treatment" which deprived the decedent of his right to be free from cruel and unusual punishment (the tenth cause of action).[5]

>    *1.    Failure to Provide Constitutionally Adequate Health and Medical Care*

The crux of the plaintiff's amended allegations is that the decedent's condition was so obvious that any reasonable medical professional would have discontinued the contraindicated medication, ordered urgent testing and provided the decedent with proper treatment.  Pl.'s Mem. at 27.  "In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove 'deliberate indifference to [his or her] serious medical needs.'" *Chance v. Armstrong,* 143 F.3d 698, 702-03 (2d Cir. 1998) (citing *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S. Ct. 285, 291, 50 L. Ed.2d 251 (1976)).  This can only be done by meeting certain objective and subjective criteria.  *See Mastroianni v. Reilly*, 602 F. Supp. 2d 425, 433 (E.D.N.Y. 2009) (citing *Bellotto v. County of Orange*, 248 Fed. Appx. 232, 236 (2d Cir. 2007)).  First, a plaintiff must establish that the severity of the alleged deprivation is sufficiently seriously in objective terms.  *Chance,* 143 F.3d at 703.  This objective prong is satisfied when "(a) the prisoner was actually deprived of adequate medical care, meaning prison officials acted unreasonably in response to an inmate health risk under the circumstances, and (b) the inadequacy in medical care is sufficiently serious."  *Id.*  "While there is no 'precise metric' by which to measure the severity of the prisoner's condition, the standard 'contemplates a condition of urgency that may result in degeneration or extreme pain' and 'actual medical consequences are highly relevant.'" *Mastroianni*, 602 F. Supp. 2d at 433 (citing *Bellotto*, 248 Fed. Appx. at 236).

---

[5] It is not clear if the plaintiff still intends to assert a claim under the Americans with Disabilities Act and the Rehabilitation Act again the State physician defendants (the eleventh cause of action).  The Court previously dismissed this claim and her memorandum in opposition to the motion to dismiss is silent as to this cause of action. In addition, the plaintiff has asserted a general claim for compensation related to each of her section 1983 claims (the twelfth cause of action).

Second, the plaintiff must establish that the defendant acted with a sufficiently culpable state of mind. *Id.* (citing *Smith v. Carpenter*, 316 F.3d 178, 183-84 (2d Cir. 2003)). The subjective prong "is met where an 'official knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it.'" *Id.* (*citing Farmer v. Brennan*, 511 U.S. 825, 847, 114 S. Ct. 1970, 128 L.Ed.2d 811 (1994)). In sum, a plaintiff must show more than "'an inadvertent failure to provide adequate medical care by prison officials to successfully establish Eighth Amendment liability.'" *Mastroianni*, 602 F. Supp. 2d at 433 (citing *Smith*, 316 F.3d at 183-84). Although the State defendants have not conceded that the medical care was inadequate, given the undisputed severity of Mr. Casiano's condition, they have not addressed the objective prong of the test. Instead, their memorandum focuses on the subjective component of an Eight Amendment claim. Specifically, they argue that none of the physician defendants acted with a sufficiently culpable state of mind. *See Grafton v. Cty. of Nassau,* No. 15 CV 4564 SJF GRB, 2016 WL 8711072, at *10 (E.D.N.Y. July 15, 2016) ("'Subjectively, the official must have acted with the requisite state of mind, the 'equivalent of criminal recklessness'").

To address the pleading deficiencies previously outlined by the Court, the plaintiff has added a series of allegations to the amended complaint with respect to the four State physician defendants. Although the allegations are separately stated for each physician defendant, the allegations are virtually identical and can be addressed simultaneously. Specifically, the plaintiff asserts:

> Decedent's scleroderma manifested on his hands, arms, feet and legs, and was so advanced, obvious and apparent, a diagnosis of scleroderma was inherently and necessarily apparent to [the physician defendants] as it would be to any reasonable doctor. Decedent's skin was hard and discolored as evidence by all prior, contemporaneous, and then subsequent medical records.

16

[The physician defendants] further knew, as would any reasonable doctor, that Decedent's condition was deadly serious, and that the failure to immediately and properly treat Decedent's scleroderma would produce continued degeneration, continued extreme and chronic pain, and imminent death.

Both the presentation and need for immediate treatment of scleroderma is such basic, unequivocal, and undeniable medical knowledge, the failure to understand either by a doctor is reckless, grossly negligent, and even criminally negligent.

[The physician defendants] knew: (1) Decedent was in chronic and substantial pain from the scleroderma; (2) that Decedent's skin on his hands, arms, feet, and legs was so obviously and substantially swollen and discolored and hardened, that [these defendants] knew or any reasonable physician would know Decedent's internal organs necessarily would be hardening and causing extreme pain and from the readily apparent advancing scleroderma; (3) that the hardening of Decedent's skin alone, known through its obvious, apparent, and outright appearance and through simple reasonable clinical observation, posed a serious medical need that required urgent testing and immediate, proper treatment to relieve Decedent's substantial pain and save Decedent's life.

[The physician defendants] further knew, as would any reasonable doctor, that the continued administration of the contraindicated NSAIDs and the corticosteroid hydrocortisone were dangerous for Decedent because NSAIDs and hydrocortisone are universally and unequivocally recognized to cause gastrointestinal disease, fluid retention, renal toxicity, and an increased risk of scleroderma renal crisis in scleroderma patients. These are the exact conditions with which Decedent presented and from which Decedent eventually succumbed. That these medications are contraindicated for those suffering from scleroderma is so basic, so fundamental in medicine it amounts to criminal recklessness to continue these medications in Decedent - even the most basic, simple internet search reveals the deadly danger these medications posed to Decedent. And, the record is clear. [The Defendants] continued to provide these medications unabated, and this continued administration of patently and obviously contraindicated, dangerous medications continued and exacerbated the degeneration within Decedent's body, continued and exacerbated his extreme and chronic pain, and caused his eventual death from scleroderma renal crisis, commonly known as kidney failure.

[The physician defendants were] deliberately indifferent to Decedent's serious medical needs. [These defendants]: (1) continued to provide patently dangerous, obviously contraindicated medications to a man visibly suffering from deadly scleroderma; and (2) did so knowing that Decedent faced a substantial risk of serious harm and disregarded that risk by failing to take reasonable measures to abate it by simply stopping the dangerous medications, order urgent testing, and provide proper medication.

17

Am. Compl. ¶¶ 378-83 (Dr. Laguio), 389-91 (Dr. Markim), 399, 401-04, 408 (Dr. Smith), 417-20 (Dr. Miller).  The plaintiff contends that these new allegations exceed the minimum necessary to state a claim for deliberate indifference.  Pl.'s Mem. at 15. The undersigned agrees.

As previously stated, to state a claim of deliberate indifference, a plaintiff must establish that an official "knew of and disregarded an excessive risk to [the inmate's] health or safety and . . . was both aware of facts from which the inference could be drawn that a substantial risk of serious harm existed and drew the inference."  *Grafton*, 2016 WL 8711072, at *10 (citing *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006)).  "'[D]eliberate indifference describes a state of mind more blameworthy than negligence.'" *Id.* (citing *Farmer*, 511 U.S. at 835, 114 S. Ct. 1970); *see also Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996); *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976) ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim . . . under the Eighth Amendment.  Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.").

Liberally construing the complaint in the light most favorable to the plaintiff, the Court finds that the plaintiff has alleged sufficient facts to establish that the State physician defendants acted with the requisite state of mind.  Although the State defendants urge the Court to consider that there was no record of the decedent's scleroderma diagnosis in the transfer summary sent to Ulster or Greene, the plaintiff has asserted that "any reasonable physician with eyes and ears" would have, nonetheless, stopped the dangerous medications and ordered further testing and treatment rather than

18

waiting to obtain Mr. Casiano's medical records from NCCC. *Id.* ¶ 384. While it is true that Dr. Laguio only examined the decedent on one occasion, during the exam, Mr. Casiano reported that he had been diagnosed with scleroderma at the Nassau County Jail and indicated that his condition was being treated with ibuprofen and hydrocortisone cream. *Id.* Moreover, although the plaintiff is the first to say that the "eight-page chart" sent to Ulster "aided in the continued use of contraindicated medication and may have misled subsequent medical persons about the correct diagnosis of scleroderma," *see id.,* according to the amended complaint, Dr. Laguio, nonetheless, ignored a nurse's request for an expedited evaluation on or about January 7, 2014. *Id.* ¶¶ 393-94. Given these details, a jury could infer that Dr. Laguio's failure to take immediate action nevertheless amounted to deliberate indifference.

Similarly, the plaintiff has now added an assertion that Dr. Makram, a second physician at Ulster, received the results of a blood test indicating that Mr. Casiano had a significantly elevated BUN as well as elevated monocytes consistent with his reported scleroderma diagnosis. The plaintiff further asserts that there is no indication in the decedent's medical record that any action was taken by Dr. Makram when he received those results. *Id.* ¶ 385. Although the Court recognizes that the decedent's complete records from the Nassau University Medical Center were not received by Ulster until January 14, 2014, five days after the decedent had already been transferred to the Greene, a jury might conclude that the decedent's reported diagnosis, coupled with his appearance and elevated BUN and monocytes, should have been a red flag to any reasonable physician that he needed immediate treatment. *Id.* ¶¶ 385, 424.

19

Accordingly, the plaintiff has pled sufficient facts to support a claim for constitutionally inadequate healthcare as against the Ulster physicians.

For the same reasons, the amended allegations support an Eight Amendment claim for failure to provide adequate healthcare against Drs. Smith and Miller, the Greene physicians. The material allegations referencing Dr. Smith suggest that soon after the decedent arrived at Greene, Dr. Smith was advised by an unnamed nurse that Mr. Casiano reported that he had been diagnosed with scleroderma and was being treated with hydrocortisone and Naprosyn. *Id.* ¶¶ 396, 398. The following day, Dr. Smith wrote orders to have the decedent's medications continued, but she did not examine Mr. Casiano until January 16, 2016. *Id*. ¶ 407. The plaintiff takes issue with the fact that Dr. Smith continued to prescribe her father a controlled substance without an examination. *Id.* ¶ 397. In addition, the pleading suggests that Dr. Smith may have also ignored a request from a nurse for an urgent evaluation. *Id.* When Dr. Smith finally examined the decedent, Dr. Smith noted that Mr. Casiano had "decreased range of motion of his jaw, swelling of his face, lower arms, lower legs and skin that had tightness with harden appearance and touch." *Id.* Mr. Casiano told her that he had been prescribed prednisone for his condition, but it had been discontinued by a rheumatologist while he was still incarcerated at the NCCC. *Id.* ¶ 407. Immediately following his examination, Dr. Smith also ordered his medical records from Nassau University Medical Center in an apparent attempt to confirm the diagnosis but did not otherwise act. *Id.* ¶ 407.

Like the Ulster physicians, the record suggests that Dr. Smith only examined Mr. Casiano on one occasion and without the benefit of his prior medical records. However, the plaintiff, nevertheless, contends that by the time the decedent arrived at Greene, the decedent's scleroderma was so advanced any reasonable doctor would have recognized that the reported

diagnosis was correct, would have assumed that the decedent's internal organs were swelling and hardening and would have discontinued the NSAIDs and corticosteroid hydrocortisone. *Id.* ¶¶ 399-403. Moreover, although Dr. Smith also requested Mr. Casiano's medical records after she examined him, little was done by way of treatment from the date of his arrival to the date of his death. In fact, between January 9 and January 29, Mr. Casiano had one blood test taken. Then, on February 14, 2014, over a month after he arrived, Dr. Morell, an outside rheumatologist, conducted a "Telemed" examination of the decedent. *Id.* ¶ 409. However, Mr. Casiano's blood tests that would have confirmed progressing kidney failure were not forwarded to Dr. Morell. Accordingly, the consultation notes made available to Dr. Smith indicated that "scleroderma was a possibility," not a certainty, and recommended that additional blood tests be taken. *Id.* ¶ 410. Finally, despite the seriousness of his condition, it allegedly took Dr. Smith an additional week to review Dr. Morell's note. *Id.* ¶ 412.

With respect to Dr. Miller, the plaintiff alleges that on March 17, 2014, Mr. Casiano finally had his blood drawn in response to the request by the rheumatology consultant. *Id.* ¶ 415. The results of the lab test, which indicated a positive ANA screen and titer consistent with scleroderma, were sent to Dr. Miller for his review. However, according to the complaint, no action was taken by Dr. Miller despite Mr. Casiano's worsening condition. Accordingly, a reasonable jury might find the facts surrounding Mr. Casiano's care at Greene to be on par with the type of medical malfeasance typically found in Eight Amendment deliberate indifference cases. *See Hathaway v. Coughlin*, 37 F.3d 63, 71 (2d Cir. 1994) (citing *Williams v. Vincent*, 508 F.2d 541 (2d Cir. 1974) (prison surgeon discarded the prisoner's ear and stitched the stump, explaining to the prisoner that he "did not need his ear" and throwing "the severed portion away in front of him"); *Thomas v. Pate*, 493 F.2d 151, 158 (7th Cir. 1974) (prison doctor injected the

prisoner with penicillin, knowing that the prisoner was allergic, and then refused to treat the allergic reaction); *Martinez v. Mancusi*, 443 F.2d 921 (2d Cir. 1970) (prison doctor refused to administer the prescribed pain killer and frustrated the prisoner's leg surgery by requiring the prisoner to stand despite contrary instructions of the surgeon)).

In sum, a reasonable jury could conclude that each of the four State physicians acted with subjectively culpable intent. Therefore, the undersigned recommends that the plaintiff's claim against the State defendants for failure to provide adequate healthcare set forth in the eight and tenth causes of action be upheld.

2.    *Failure to Adequately Hire, Train and Supervise Medical and Non-Medical Personnel*

The Court turns to the plaintiff's claims that the State physician defendants failed to hire qualified medical personnel or train and supervise the medical and non-medical staff at Ulster and Greene. The plaintiff has done little to enhance the factual assertions concerning the doctors' role at the institutions vis-a vis the nurses and physician's assistant. Nor has she addressed the substance of these claims in her memorandum. Indeed, the plaintiff has only asserted in a conclusory fashion that:

> That [the State physician defendants] were physicians hired by the State of New York to . . . hire qualified personnel for their respective medical units and properly train their staffs.
>
> The [the State physician defendants] had a duty to hire qualify medical personnel and properly train their respective staffs.
>
> That [the State physician defendants] failed to hire qualified personnel and failed to train or to adequately train the medical staff at their respective prisons, including the employees both named herein and those which are presently unidentified.
>
> That the need for hiring qualified personnel, and for training, additional training, or different training to avoid violations of constitutional rights was such as to be obvious that the need to hire qualified personnel, and the

22

inadequacy of training would result in a violation of Decedent's and other inmates' constitutional rights relating to their serious medical needs and other aspects of health and medical care.

The inadequacy of hiring by, and training given by [the State physician defendants] to their medical and nonmedical staff was so pervasive and long-standing as to form a pattern constituting deliberate indifference to the serious medical needs of Decedent and other inmates and established deficient and inappropriate hiring and training as policy, practice and/or custom.

The pattern of similar constitutional violations by unqualified, untrained or inadequately trained nonmedical and medical staff demonstrates the deliberate indifference of [the State physician defendants] toward their failure to adequately hire and train their respective staffs.

The pattern of similar constitutional violations by unqualified, untrained or inadequately trained nonmedical and medical staff ratified and condoned a policy, practice and/or custom of deficient health and medical care services, including but not limited to permitting, causing, and allowing their respective medical staffs to repeatedly and consistently:

> a. ignore obvious conditions;
> b. fail to provide treatment for diagnosed conditions;
> c. fail to investigate enough to make an informed medical judgment;
> d. delay treatment such as by denying examinations by qualified personnel and/or doctors following sick call requests;
> e. interfere with access to medical treatment such as by failing to maintain and keep legible, organized medical records and failing to obtain prior and consultant medical records in a timely manner;
> f. make decisions based on nonmedical factors such as cost;
> g. administering deadly medications when any reasonable doctor would know the medications were deadly to this Decedent;
> h. provide so-called care to Decedent and others that was so grossly negligent and deplorable it shocks the conscience; and,
> i. make "medical" decisions and judgments so highly contrary to accepted medical practice that they were not medical judgments at all.

Because of all that is set out above, [the State physician defendants] had sufficient notice of its failure to hire qualified personnel and its failure to adequately train.

Despite the said sufficient notice, [the State physician defendants] failed to take appropriate remedial action.

23

> It is and was reasonable for Plaintiff, Decedent, and other inmates situated similarly to expect qualified personnel to be hired, and adequate training to have occurred.
>
> That the conduct of [the State physician defendants] demonstrated reckless and/or callous deliberate indifference to the federally protected rights of Decedent.

Am. Compl. ¶¶ 533- 48.

Standing alone, these claims are insufficient to state an Eighth Amendment cause of action for failure to hire, supervise or train medical staff. First, it is not clear from the amended complaint if the named physicians had the power or authority to hire staff at their respective correctional facilities or any role in the medical training or supervision of nurses and physician's assistants who attended to Mr. Casiano. Moreover, even if the Court were to accept these vague allegations as true, the statements do nothing more than establish that the State physicians had a role in supervising the nurses and physician's assistants at Ulster and Greene. They do not, however, establish the requisite personal involvement of the doctors in the decisions that were being made by that staff or the particular treatment that was rendered by each of them to Mr. Casiano. *Bridgewater v. Taylor*, 832 F. Supp. 2d 337, 348 (S.D.N.Y. 2011) (citing *Ayers v. Coughlin*, 780 F.2d 205, 210 (2d Cir. 1985) ("to hold a prison official liable under § 1983 "requires a showing of more than the linkage in the prison chain of command."). Accordingly, the undersigned recommends that the sixth and seventh causes of action be dismissed as against the State defendants.

> 3.    *Disability Claims Under the Americans with Disabilities Act and the Rehabilitation*

Finally, to the extent the plaintiff continues to assert a discrimination claim against the State physician defendants, those claims must also be dismissed as there is no individual liability

24

under Title II of the ADA or the Rehabilitation Act. *See Garcia v. S.U.N.Y. Health Sciences Ctr. of Brooklyn*, 280 F.3d 98, 107 (2d Cir. 2001); *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (Neither the ADA nor the Rehabilitation Act may not be brought against individuals in their individual capacity). The State defendants have been named and sued in their individual capacities. Accordingly, the undersigned further recommends that the State physician defendants' motion to dismiss the plaintiff's eleventh cause of action be granted.

### D. Plaintiff's Request for Leave to Amend the Complaint

In the first paragraph of her memorandum in opposition to the motion, the plaintiff requests leave to file an amended complaint should the Court determine that the amended complaint does not meet the pleading requirements. "'[N]umerous courts have held that a bare request to amend a pleading contained in a brief, which does not also attach the proposed amended pleading, is improper under Fed. R. Civ. P. 15,'" *Garnett-Bishop v. N.Y. Cmty. Bancorp, Inc.*, No. 12 CV 2285, 2014 WL 5822628, at *5 (E.D.N.Y. Nov. 6, 2014). Moreover, "[a] plaintiff need not be given leave to amend if it fails to specify either to the district court or to the court of appeals how amendment would cure the pleading deficiencies in its complaint." *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014); *see also City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 188 (2d Cir. 2014) (denying leave to amend where "plaintiffs have identified no additional facts or legal theories" they might assert if given leave to amend"). In this case, the plaintiff has already been given one opportunity to cure the deficiencies outlined in this report. According to the defendants, she has also received the medical records from the state correctional facilities but has been unable to enhance the material facts with respect to the State defendants. Accordingly, the undersigned recommends that the sixth, seventh and eleventh causes of action be dismissed without leave to replead.

25

**OBJECTIONS**

A copy of this Report and Recommendation is being electronically served by the Court on all parties.  Any objections to this Report and Recommendation must be electronically filed with the Clerk of the Court with a courtesy copy to the undersigned within 14 days.  Failure to file objections within this period waives the right to appeal the District Court's Order. *See* 28 U.S.C. § 636(b)(1); Fed R. Civ. P 72; *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.,* 596 F.3d 84, 92 (2d Cir. 2010); *Beverly v. Walker*, 118 F.3d 900, 902 (2d Cir. 1997); *Savoie v. Merchant's Bank*, 84 F.3d 52, 60 (2d Cir. 1996).

Dated: Central Islip, New York
       January 7, 2019

_____/s/_____
ARLENE R. LINDSAY
United States Magistrate Judge

26